UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| In re VERTRUE INC. MARKETING AND SALES PRACTICES LITIGATION | ) ) ) ) | No. 09-vm-75000 |
| | | (MDL No. 2044) |
| This Document Relates To: | ) ) ) ) ) | Judge Patricia A. Gaughan |
| ALL ACTIONS. | | |

CONSOLIDATED AMENDED COMPLAINT FOR: (1) VIOLATIONS OF THE ELECTRONIC FUNDS TRANSFER ACT, 15 U.S.C. §1693 *et seq.*; (2) VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§1962(c) AND 1964(c)-CREDIT CARD FRAUD ENTERPRISE (PARTICIPATION IN AN ENTERPRISE); (3) VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§1962(d) AND 1964(c)-CREDIT CARD FRAUD ENTERPRISE (CONSPIRACY TO VIOLATE 18 U.S.C. §1962(c)); (4) VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§1962(c) AND 1964(c)-PARTICIPATION IN REGULATORY ENTERPRISE (OBSTRUCTION OF JUSTICE); (5) VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§1962(d) AND 1964(c)-REGULATORY ENTERPRISE (CONSPIRACY TO VIOLATE 18 U.S.C. §1962(c)); (6) VIOLATION OF STATE CONSUMER PROTECTION STATUTES; (7) CONVERSION; (8) UNJUST ENRICHMENT; (9) FRAUD; (10) NEGLIGENT MISREPRESENTATION; AND (11) MONEY HAD & RECEIVED

DEMAND FOR TRIAL BY JURY

# TABLE OF CONTENTS

**Page**

SUMMARY OF COMPLAINT ........................................................................1

JURISDICTION AND VENUE .....................................................................5

PARTIES ..................................................................................................8

DEFENDANTS' WRONGFUL CONDUCT ..................................................64

TOLLING OF THE STATUTE OF LIMITATIONS......................................80

CLASS ACTION ALLEGATIONS ..............................................................87

COUNT I ................................................................................................90

    For Violations of the Electronic Fund Transfer Act, 15 U.S.C. §1693 *et seq.* (On Behalf of Plaintiffs Waslin and Geldmacher and the Members of the Class Whose Debit Cards Were Billed) ........................................90

COUNT II ..............................................................................................91

    For Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1962(c) and 1964(c) – Credit Card Fraud Enterprise (Participation in an Enterprise) (On Behalf of All Plaintiffs and All Members of the Class) ........................................91

COUNT III...........................................................................................117

    For Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1962(d) and 1964(c) – Credit Card Fraud Enterprise (Conspiracy to Violate 18 U.S.C. §1962(c)) (On Behalf of All Plaintiffs and All Members of the Class) ........................................117

COUNT IV...........................................................................................119

    For Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1962(c) and 1964(c) – Participation in Regulatory Enterprise (Obstruction of Justice) (On Behalf of All Plaintiffs and All Members of the Class)........................................119

COUNT V.............................................................................................123

    For Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1962(d) and 1964(c) – Regulatory Enterprise (Conspiracy to Violate 18 U.S.C. §1962(c)) (On Behalf of All Plaintiffs and All Members of the Class) ........................................123

COUNT VI...........................................................................................125

**Page**

For Conversion (On Behalf of All Plaintiffs and All Members of the Class) .................125

COUNT VII .................................................................................................................126

For Unjust Enrichment (On Behalf of All Plaintiffs and All Members of the Class)........................................................................................................126

COUNT VIII ...............................................................................................................127

For Fraud (On Behalf of All Plaintiffs and All Members of the Class) ..........................127

COUNT IX...................................................................................................................129

Negligent Misrepresentation (On Behalf of All Plaintiffs and All Members of the Class)..................................................................................................129

COUNT X.....................................................................................................................130

Money Had & Received (On Behalf of All Plaintiffs and All Members of the Class)..................................................................................................130

COUNT XI...................................................................................................................130

For Violation of State Consumer Protection Laws  (On Behalf of All Plaintiffs and All Members of the Class) ..........................................................130

PRAYER FOR RELIEF .............................................................................................136

JURY DEMAND.........................................................................................................138

NOW COME plaintiffs in on behalf of themselves and all others similarly situated, by and through counsel, and for their complaint charge the following.  This Complaint supersedes all complaints on file in the cases that have been filed in or transferred to this Court as part of this multidistrict litigation.

## SUMMARY OF COMPLAINT

1.    Defendant MemberWorks, Incorporated,[1] also known as MWI Essentials, MWI Leisure Advantage, MWI Home & Garden, MWI Connections, MWI Value Max and other MWI entities, which subsequently changed its name to Vertrue Inc. (collectively, "MWI")[2], in conjunction with its co-conspirators, the telemarketing entities (collectively, the "Telemarketers" or "Telemarketing Entities")[3] and the bait product suppliers ("Bait Product Suppliers") have been

---

[1]    MemberWorks, Incorporated with Adaptive Marketing LLC is referred to herein as "Defendants."

[2]    As used in this Complaint, the term "Defendants" does not refer to West Corporation, and/or West Telemarketing Corporation, and/or West Telemarketing, L.P. and their predecessors, successors, present and former owners, subsidiaries, affiliates, employees, officers, directors, agents, attorneys and assigns, including West Direct, Inc. and West TeleServices Corporation (collectively, "West").  Therefore, any reference to acts or omissions by "Defendants" does not include or refer to the West entities.  Further, the claims for relief in this Complaint do not arise from  actions or omissions under the following agreements: the March 16, 1998 "Joint Marketing Agreement between West Telemarketing Corporation and MemberWorks Incorporated," and/or the January 1, 1999 "Agreement" between West Telemarketing Corporation and MemberWorks Incorporated, and/or the July 1, 1999 "Joint and Wholesale Marketing Agreement" between West Telemarketing Corporation, West Teleservices Corporation and MemberWorks Incorporated and/or the December 1, 2001 "Wholesale and Retail Marketing Agreement" between MemberWorks Incorporated and West Direct, Inc., and any amendments or addendums to these agreements.  Thus, by way of example (but without limitation), any acts or omissions that include, relate to or were part of an upsell to a Tae-Bo product that occurred under or as part of one of the agreements listed in this footnote 2, are not included in the claims and allegations of this Complaint.

[3]    As used in this Complaint, the terms "Telemarketers" and "Telemarketing Entities" and the allegations of this Complaint referring to acts or omissions of "Telemarketing Entities" and "Telemarketers" do not include or refer to the actions or omissions of West under the March 16, 1998 "Joint Marketing Agreement between West Telemarketing Corporation and MemberWorks Incorporated," and/or the January 1, 1999 "Agreement" between West Telemarketing Corporation and MemberWorks Incorporated, and/or the July 1, 1999 "Joint and Wholesale Marketing

engaged in the practice of making unlawful charges to consumers' credit and/or debit cards through a scheme involving the mailing of an unordered membership program marketed through the use of a deceptive script. Defendants obtain the necessary information to mail their unwanted membership (and charge for it) through the use of a telemarketing scam. By this method, Defendants are able to accomplish the old and pernicious practice of mailing unsolicited merchandise and then tricking consumers into paying for it.

2.    MWI, in concert with the Telemarketers and the Bait Product Suppliers, through agreements with MWI, capture consumers' credit and/or debit card information when those consumers call to order products – products which are *not* marketed or produced by MWI. This is referred to as an "inbound" telemarketing call, as the consumer initiates the call. The consumer has initiated the call to inquire about or purchase a product usually advertised with a 1-800 number. The consumer ***does not call*** to order an MWI product. In fact, the consumer has most likely never heard of MWI and has no expectation of receiving an MWI membership program when the call is made by the consumer. Moreover, the consumer gives his/her credit card or debit card information, which Defendants capture long before the consumer ever hears of any MWI product. This private financial information is then used by Defendants to charge the consumer for a membership the consumer never wanted or agreed to purchase.

3.    MWI has reached agreements with a number of Telemarketing Entities, whereby the consumer is subjected to a deceptive sales pitch to purchase an MWI membership program before the call made by the consumer to purchase an unrelated product is completed. This is referred to as

---

Agreement" between West Telemarketing Corporation, West Teleservices Corporation and MemberWorks Incorporated and/or the December 1, 2001 Wholesale and Retail Marketing Agreement between MemberWorks Incorporated and West Direct, Inc., and any amendments or addendums to these agreements. The terms "Telemarketers" and "Telemarketing Entities" do refer to West under its fee-for-service arrangements with MWI.

an "unrelated upsell." MWI's products are not related to the product sought by the consumer and the consumer has no idea that an MWI product will be made a part of the call – or even what an MWI product is.

4.     MWI prepares a script for the Telemarketers to use for the unrelated upsell. As more specifically alleged below, MWI pays the Telemarketers and the Bait Product Suppliers a fee for each consumer who they enroll in MWI's membership programs.  Some number of MWI membership programs are sold through a joint venture and wholesale arrangement between MWI and the Telemarketers, where MWI and the Telemarketers jointly pay a separate fee to the Bait Product Suppliers for each of their customers enrolled in an MWI program. The Telemarketers, who handle the inbound calls, approve the scripts, read the scripts to the consumers, capture the consumers' credit and/or debit card information and transmit that information to MWI to mail the "kits" and bill the consumers' cards.

5.     After the consumers have given the information necessary to purchase the product the consumers called to buy, a deceptive script is read to the consumers informing them that they will be sent *free* materials in the mail.  Consent to receive the materials in the mail is not requested. Consent to bill the credit and debit cards is not requested.  In actuality, Defendants enroll consumers in a membership and mail them a membership "kit."  Consumers are deceived and do not know that they have been enrolled in a "membership" and will be billed $60-$170 annually unless they call MWI to inform them that they want to cancel the FREE 30-day trial membership.  Upon receipt of the class members' confidential billing information – typically 24 to 48 hours after the class member called to purchase the bait product – MWI mails a packet with a membership card to the consumers which allows the consumers to access the so-called benefits of an MWI membership.  By enrolling consumers who called to order an unrelated product and mailing those consumers a membership kit

without the prior express consent of the consumers, consumers are unwittingly billed by Defendants for a membership they neither requested nor intended to purchase.

6.      Consumers are never asked for their permission for the Telemarketers to provide their credit and/or debit card information to MWI.  MWI has the Telemarketing Entities transfer the class members' confidential credit and/or debit card information to MWI, who uses the information to charge consumers membership fees and membership renewal fees which range from $60-$170 annually.  Although MWI processes the charges, neither it nor the Telemarketing Entities send the consumers any bill or invoice notifying them that their credit and/or debit cards have been assessed such a charge.

7.      In order to conceal their scheme, MWI will reverse the charges for those consumers who notice that they have been assessed a charge on their credit and/or debit card statements who call to question the charge and get through Defendants' multifarious system of avoiding cancellations.  However, as Defendants know, a significant percentage of the population does not closely review their credit and/or debit card statements, and will not notice the offending charge (as was the case with plaintiff Elizabeth Loeper who did not realize she had been assessed such a charge until the second time it appeared on her credit card statement; plaintiff Phyllis Callahan who did not realize she had been assessed such a charge until the second time it appeared on her credit card statement; plaintiff Tari Faulk who did not realize she had been assessed such a charge until the fifth time it appeared on her credit card statement; plaintiff Abby Malloy who did not realize she had been assessed such a charge until the sixth time it appeared on her credit card statement; plaintiff Christine Felichio who did not realize she had been assessed such a charge until the fifth time it appeared on her credit card statement; plaintiff Kathleen Tarantino who did not realize she had been assessed such a charge until the fifth time it appeared on her credit card statement; plaintiff Wayman Ashburne who did not realize he had been assessed such a charge until the fifth time it appeared on

his credit card statement and with plaintiff Patricia Sanford ("Sanford") in the federal action *Sanford, et al. v. MemberWorks, Inc., et al.*, No. 02-CV-0601 (S.D. Cal.) ("Original *Sanford* Federal Action")[4], who did not realize she had been assessed such a charge until the ***second*** time it appeared on her credit card statement). These individuals are billed between $60-$170, each year, until they notice the charge and complain. ***Defendants never send any bill or invoice to the class members notifying them that they have been, or will be, billed***. The named plaintiffs and the class members in this action were all victimized by Defendants by this same exact method.

8.      Defendants share in the revenues and profits generated from their deceptive scheme of mailing unordered merchandise and then charging consumers for it.

## JURISDICTION AND VENUE

9.      This action arises under 39 U.S.C. §3009, 15 U.S.C. §1693 *et seq.* and 18 U.S.C. §1962 *et seq.*

10.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1331 (federal question), 28 U.S.C. §1337 (federal regulation of commerce) and 28 U.S.C. §1367 (supplemental jurisdiction).

---

[4]      The Original *Sanford* Federal Action was filed in 2002, as a class action against West and MWI in the United States District Court for the Southern District of California. The claims against MWI were asserted on behalf of all consumers in the United States enrolled in an MWI membership in connection with their purchase of an unrelated bait product. The claims against West were asserted on behalf of a subclass of all consumers in the United States enrolled in an MWI membership program who were customers of a joint venture between MWI and West or were wholesale customers of West. The district court dismissed the federal count against West and declined to exercise supplemental jurisdiction over the state law claims of the West Subclass. Plaintiffs re-filed the state law claims of the West Subclass in *Sanford v. West Corporation, et al.*, Case No. GIC805541 (the "*West Action*"). The claims of the West Subclass included similar claims, based on the same fraudulent telemarketing scheme asserted in this action. The *West* court certified a class (February 16, 2007 Order Granting Plaintiffs' Motion for Class Certification), the case settled and Final Approval of the settlement was entered on December 24, 2008.

11.     This Court has jurisdiction over all claims under 28 U.S.C. §1332(d).  Jurisdiction is proper because: (1) the aggregated claims of the individual members of the proposed class exceed the sum or value of $5,000,000; and (2) this is a class action in which plaintiffs and Defendants are citizens of different states.  28 U.S.C. §1332(d)(2).

12.     This Court has jurisdiction over each defendant named below because each defendant is either a corporation or association organized under the laws of the State of Ohio, a foreign corporation or association authorized to do business in Ohio and registered with the Ohio Secretary of State, or does sufficient business, has sufficient minimum contacts with Ohio or otherwise intentionally avails itself of the Ohio market, through the manufacturing, production, promotion, sale, marketing and distribution of its products in Ohio, to render the exercise of jurisdiction by the Ohio courts permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court because, at all relevant times, Defendants either maintained offices in Ohio, a substantial portion of the practices complained of herein occurred in Ohio under 28 U.S.C. §1391 *et seq.* or because Defendants have received substantial compensation as a result thereof in Ohio.

14.     Venue is proper in this Court because on September 30, 2008 the district court presiding over the Original *Sanford* Federal Action: (1) dismissed the Electronic Funds Transfer Act ("EFTA") claims of plaintiffs and the unnamed class members without prejudice; and (2) declined to exercise supplemental jurisdiction over the state-law claims and dismissed them without prejudice.  In seeking to have the EFTA and state-law claims stricken from the proposed third amended complaint, on December 16, 2008 defendants stated that "the Court previously dismissed numerous state law claims without prejudice, and thus the state law claims can be pursued in the appropriate state court(s)."  MemberWorks Inc.'s Memorandum of Points and Authorities in Support of *Ex Parte* Application for Dismissal or, in the Alternative, to Strike Claims and Additional Parties

- 6 -

("Defendants' Motion") at 8.  On December 23, 2008, the federal court struck the state-law claims from the proposed amended complaint, holding: "Furthermore, dismissing the action would not preclude Plaintiffs from pursuing relief in other venues.  The Court has not precluded the Plaintiffs from pursuing its state law claims in state court."  December 23, 2008 Order at 4.  On January 22, 2009, plaintiff Michael Waslin re-filed the dismissed EFTA claims, as well as the dismissed state-law claims, in the district court of Connecticut, on behalf of the identical nationwide class.  On January 15, 2009, plaintiffs Preston and Rita Smith re-filed the dismissed state-law claims, in the Court of Common Pleas, Cuyahoga County, Ohio, on behalf of those class members residing in Ohio.  Other unnamed class members similarly re-filed the dismissed state-law claims, in their state courts, on behalf the class members residing in their home states.[5]  Contrary to their prior assertion to the district court presiding over the Original *Sanford* Federal Action, Defendants removed these state-law claims, at which time, the MDL Panel transferred the actions to this Court.

---

[5]      Plaintiff Phyllis Callahan in *Callahan v. Vertrue Inc., et al.*, No. 37-2009-00080962-CU-BT-CTL (Superior Court, County of San Diego, California), filed Jan. 8, 2009; plaintiffs Jammie McKay and Claire Teasley in *McKay, et al. v. Vertrue Inc., et al.*, No. 0001108-09 (Superior Court for the District of Columbia), filed Feb. 23, 2009;  plaintiff Patricia Gucker in *Gucker v. Vertrue Inc., et al.*, No. CV-09-2264-C (District Court for the Third Judicial District, County of Canyon, Idaho), filed Feb. 27, 2009; plaintiffs Michael Limon, Debby Limon and Elizabeth Loeper in *Limon, et al. v. Vertrue Inc., et al.*, No. C20091533 (Superior Court, County of Pima, Arizona), filed Mar. 3, 2009; plaintiffs Mary Beth Zorn and Cynthia Burrell in *Zorn, et al. v. Vertrue Inc., et al.*, No. 0:09-cv-00755 (D. Minn.), filed Apr. 2, 2009; plaintiff Rise Sheehan in *Sheehan v. MemberWorks, Inc., et al.*, No. 09-581-A (Essex County Superior Court, Massachusetts), filed Mar. 30, 2009; plaintiffs Arline Rosenzweig, Frederick French and Tari Faulk in *Rosenzweig, et al. v. MemberWorks, Inc., et al.*, No. 2009-CA-009706 (Circuit Court of the Fifteenth Judicial Circuit, Palm Beach County, Florida), filed Mar. 19, 2009; plaintiffs Bonnie Douthitt and Amber Tulbert in *Douthitt, et al. v. MemberWorks, Inc., et al.*, No. 09-CVS-7064 (Superior Court, Mecklenburg County, North Carolina), filed Mar. 24, 2009; plaintiffs James Brammer and Jason Geldmacher in *Brammer, et al. v. MemberWorks, Inc., et al.*, No. 1:09-cv-00516 (E.D. Va.), filed May 8, 2009; plaintiffs Abby Malloy and Christine Felichio in *Malloy, et al. v. MemberWorks, Inc., et al.*, No. 09 CH 15874 (Chancery Division of the Circuit Court of Cook County, Illinois), filed Apr. 14, 2009; and plaintiffs Joan Thornton, Agarette Kirch, Debra Muoio, Matthew Maistoru and Rosalba Maistoru in *Thornton, et al. v. MemberWorks, Inc., et al.*, No. 09-007400 (Supreme Court, County of Nassau, New York), filed Apr. 16, 2009.

## PARTIES

**Plaintiffs Preston and Rita Smith**

15.     Plaintiffs Preston and Rita Smith (the "Smiths") have been, at all times relevant to this action, residents of the City of Cuyahoga County, State of Ohio.  The Smiths have purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes, NADS hair removal products and Tai Vital Basics by way of example).  In connection with these purchases, MWI billed the Smiths unsolicited, unauthorized and unexpected charges (totaling approximately $407.16) for several of MWI's membership programs.  The Smiths were never asked for their consent to be billed for any of these MWI membership programs.  Moreover, the Smiths never utilized or received any benefit from any of the MWI membership programs.

(a)     On or about February 10, 1999, at the end of the call to purchase Tae-Bo exercise videotapes, the telemarketer who answered the call read MWI's deceptive telemarketing pitch to the Smiths, informing them they were receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that they "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred the Smiths' confidential credit card information to MWI using the wires.  On or around February 12, 1999, Defendants mailed the bogus membership kit to these plaintiffs.  Thereafter, on March 5, 1999, MWI billed the Smiths' credit card an unsolicited and unexpected $72.00 (billed as "MWI Essentials").  The Smiths do not seek a recovery here for this $72 as they have submitted a claim pursuant to the settlement reached in *Ritt v. Billy Blanks, et al.*, Case No. CV8424237, Court of Common Pleas, Cuyahoga County, Ohio (the "*Ritt Action*") for reimbursement of this charge.[6]

---

[6]     The *Ritt Action* included similar claims, based on the same telemarketing fraud asserted in this action, but was limited to claims relating only to the Tae-Bo bait product.  The court in the *Ritt*

(b)      On or about November 20, 1999, at the end of the call to purchase a different bait product – plaintiffs cannot remember which one (possibly NADS), however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to the Smiths, informing them they were receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that they "WON'T BE BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred the Smiths' confidential credit card information to MWI using the wires.  On or around November 22, 1999, Defendants mailed the bogus membership kit to these plaintiffs. Thereafter, on December 27, 1999, MWI billed the Smiths' credit card an unsolicited and unexpected $95.88 (billed as "MWI Essentials").

(c)      On or about October 30, 2000, at the end of the call to purchase Tai Vital Basics, the telemarketer who answered the call read MWI's deceptive telemarketing pitch to the Smiths, informing them they were receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that they "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred the Smiths' confidential credit card information to MWI using the wires.  On or around November 1, 2000, Defendants mailed the bogus membership kit to these plaintiffs.  Thereafter, on December 6, 2000, MWI billed the Smiths' credit card an unsolicited and unexpected $84 (billed as "MWI Tai Value Max").  On December 29, 2000, the Smiths were issued a credit for this charge.

(d)      On or about November 20, 2000, at the end of the call to purchase a different bait product – plaintiffs cannot remember which one (possibly NADS), however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive

_Action_ certified a class on March 28, 2006 and (as modified on September 8, 2008), the case settled and Final Approval of the settlement was entered on December 11, 2008.

telemarketing pitch to the Smiths, informing them they were receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that they "WON'T BE BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred the Smiths' confidential credit card information to MWI using the wires.  On or around November 22, 2000, Defendants mailed the bogus membership kit to these plaintiffs. Thereafter, on December 27, 2000, MWI billed the Smiths' credit card an unsolicited and unexpected $59.40 (billed as "24-Hour Protect").  On December 29, 2000, the Smiths were issued a credit for this charge.

(e)        On or about November 20, 2000, at the end of the call to purchase a different bait product – plaintiffs cannot remember which one (possibly NADS), however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to the Smiths, informing them they were receiving a risk-free 30-day trial membership, emphasizing the thank you gift was FREE and that the they "WON'T BE BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred the Smiths' confidential credit card information to MWI using the wires.  On or around November 22, 2000, Defendants mailed the bogus membership kit to these plaintiffs. Thereafter, on December 27, 2000, MWI billed the Smiths' credit card an unsolicited and unexpected $95.88 (billed as "MWI Essentials"). [7]

**Plaintiff Michael L. Waslin**

16.        Plaintiff Michael L. Waslin ("Waslin") has been, at all times relevant to the action, a resident of Cleveland, State of Ohio.  Waslin has purchased various products after watching

---

[7]        While the Smiths cannot recall the bait product they purchased, counsel have verified that the charges for which the Smiths seek a recovery in this action are not included in the list of charges that were settled under the *West* Settlement.

television commercials advertising these products and displaying a 1-800 number to call. While plaintiff knows that he purchased an Ab Slider and Tae-Bo exercise videotapes (which may have been two of the bait products under which he was enrolled), he cannot recall which of the three purchases was the Ab Slider. However, MWI's internal databases will identify the bait products that were purchased that resulted in his enrollment. In connection with these purchases, MWI billed Waslin unsolicited, unauthorized and unexpected charges (totaling approximately $342.91) for several MWI membership programs.[8] Waslin was never asked for his consent to be billed for any of these MWI membership programs. Moreover, Waslin never utilized or received any benefit from any of the MWI membership programs.

(a) On or about August 12, 2002, at the end of the call to purchase a bait product – plaintiff cannot remember which one (possibly Ab Slider), however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Waslin, informing him he was receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that he "WON'T BE BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶58 below. The telemarketer thereafter transferred Waslin's confidential credit card information to MWI using the wires. On or around August 14, 2002, Defendants mailed the bogus membership kit to Waslin. Thereafter, on September 18, 2002, MWI billed Waslin's debit card $96.00 for an "Essentials" membership.

(b) On or about September 10, 2002, at the end of the call to purchase a bait product – plaintiff cannot remember which one (possibly Ab Slider), however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Waslin, informing him that he was receiving a risk-free 30-day trial

---

[8]     While Waslin cannot recall what bait products he purchased, counsel have verified that there is no Michael Waslin listed as a class member whose claims were settled under the *West* Settlement.

membership, emphasizing the thank you gift was "FREE" and that he "WON'T BE BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶58 below. The telemarketer thereafter transferred Waslin's confidential debit card information to MWI using the wires. On or around September 12, 2002, Defendants mailed the bogus membership kit to Waslin. Thereafter, on October 15, 2002, MWI billed Waslin's debit card an unsolicited and unexpected $96.00 for a "24 Protect" membership.

(c)      On or about July 15, 2002, at the end of the call to purchase a bait product – plaintiff cannot remember which one (possibly Ab Slider), however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Waslin, informing him that he was receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that he "WON'T BE BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶58 below. On or around July 17, 2002, Defendants mailed the bogus membership kit to Waslin. On August 22, 2002, MWI billed Waslin's debit card $1.00 (billed as "MWI Homework"). Several weeks later, on September 25, 2002, MWI billed Waslin's debit card an additional unsolicited and unexpected $149.95 for a "Homework" membership.

**Plaintiff Phyllis Callahan**

17.      Plaintiff Phyllis Callahan ("Callahan") has been, at all times relevant to the action, a resident of the City of San Diego, San Diego County, State of California. Callahan has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (NADS by way of example). [9] MWI's internal database will identify the bait products purchased that resulted in her enrollment. In connection with these purchases, MWI billed

---

[9]      While Callahan cannot recall what bait products she purchased in addition to NADS, counsel have verified that Phyllis Callahan is not listed as a class member whose claims were settled under the *West* Settlement.

Callahan unsolicited, unauthorized and unexpected charges (totaling approximately $183.95) for an MWI membership program.  Callahan was never asked for her consent to be billed for the MWI membership program.  Moreover, Callahan never utilized or received any benefit from the MWI membership program.

(a)      On or about November 12, 2000, at the end of the call to purchase a bait product – plaintiff cannot remember which one (possibly NADS) however, this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Callahan, informing her she was receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Callahan's confidential credit card information to MWI using the wires.  On or about November 14, 2000, Defendants mailed the bogus membership kit to Callahan.  Thereafter, on or about December 19, 2000, MWI billed Callahan's credit card an unsolicited and unexpected $84.00 billed for a Connections membership.  On or about September 14, 2001, her credit card was billed an additional $99.95 for its renewal.

(b)      While Callahan has no present recollection, she must have noticed the September 14, 2001 renewal fee. After inquiring about the September 14, 2001 charge, and without even realizing that this was the second charge, Callahan was informed by MWI that the charge was for an MWI membership.  On or about November 3, 2001, MWI provided a refund of $99.95 for the September 14, 2001 renewal fee.  However, the initial enrollment fee was not refunded.  To retain the initial $84 Defendants had already swindled from her, MWI concealed from Callahan that she had been enrolled in (and been billed for) an MWI membership program for the prior year.  Callahan was not aware that MWI existed until she called to challenge the September 14, 2001 renewal fee.

**Plaintiff Jason Geldmacher**

18.     Plaintiff Jason Geldmacher ("Geldmacher") has been, at all times relevant to this action, a resident of Arlington, State of Virginia.  Geldmacher has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call.  On or about August 15, 2001, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Geldmacher, informing him that he was receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that he "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Geldmacher's confidential debit card information to MWI using the wires.  On or around August 17, 2001, Defendants mailed the bogus membership kit to Geldmacher.  Thereafter, on September 19, 2001, MWI billed Geldmacher's debit card $99.95 for a "Value Max" membership.[10]  Geldmacher was never asked for his consent to be billed for any MWI membership program.  Moreover, Geldmacher never utilized or received any benefit from any MWI membership program.

**Plaintiffs Michael and Debby Limon**

19.     Plaintiffs Michael and Debby Limon (the "Limons") have been, at all times relevant to the action, residents of the City of Casa Grande, Pinal County, State of Arizona.  The Limons have purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Proactiv and Tae-Bo exercise videotapes by way of example).  However, MWI's internal database will identify the bait products that were purchased

---

[10]     While Geldmacher cannot recall what bait products he purchased, counsel have verified that there is no Jason Geldmacher listed as a class member whose claims were settled under the *West* Settlement.

that resulted in their enrollment.  In connection with these purchases, MWI billed the Limons unsolicited, unauthorized and unexpected charges (totaling approximately $680.00) for MWI membership programs.[11]  The Limons were never asked for their consent to be billed for any MWI membership program.  Moreover, the Limons never utilized or received any benefit from any MWI membership program.

(a)      On or about February 17, 1999, at the end of the call to purchase a bait product – plaintiffs cannot remember which one (possibly Proactiv), however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to the Limons informing them they were receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that they "WON'T BE BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred the Limons' confidential credit card information to MWI using the wires.  On or around February 19, 1999, Defendants mailed the bogus membership kit to the Limons. Thereafter, on or about March 17, 1999, MWI billed the Limons' credit card $72.00 for an "Essentials" membership.  On or about January 17, 2000, MWI billed the Limons' credit card an unsolicited and unexpected renewal fee of $84.00.  On or about January 15, 2001, MWI billed the Limons' credit card an unsolicited and unexpected renewal fee of $99.95.  On or about January 15, 2002, MWI billed the Limons' credit card an unsolicited and unexpected renewal fee of $109.95.

(b)      On or about December 15, 2002, at the end of the call to purchase a bait product – plaintiffs cannot remember which one (possibly Proactiv), however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive

---

[11]      While the Limons cannot recall what bait products they purchased, counsel have verified that there is no Michael or Debby Limon listed as a class member whose claims were settled under the *West* Settlement.  In addition, Proactiv is not believed to be a joint venture or wholesale client of West and thus is not included in the *West* Settlement.

telemarketing pitch to the Limons informing them they were receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that they "WON'T BE BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶58 below. The telemarketer thereafter transferred the Limons' confidential credit card information to MWI using the wires. On or around December 17, 2002, Defendants mailed the bogus membership kit to the Limons. Thereafter, on or about January 15, 2003, MWI billed the Limons' credit card an unsolicited and unexpected $149.95 for an "ESP" membership. On January 14, 2004, MWI billed the Limons' credit card an unsolicited and unexpected renewal fee of $169.95.

**Plaintiff Elizabeth Loeper**

20.     Plaintiff Elizabeth Loeper ("Loeper") has been, at all times relevant to the action, a resident of the City of Tucson, Pima County, State of Arizona. Loeper has purchased products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example). MWI's internal database will identify the bait product purchased that resulted in her enrollment. In connection with this purchase, MWI billed Loeper's credit card with unsolicited, unauthorized and unexpected charges (totaling approximately $183.95) for an MWI membership program.[12] Loeper was never asked for her consent to be billed for the MWI membership program. Moreover, Loeper never utilized or received any benefit from any MWI membership program.

(a)     On or about March 5, 2000, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Loeper

---

[12]     While Loeper cannot recall what bait products she purchased in addition to Tae-Bo exercise videotapes, counsel have verified that there is no Elizabeth Loeper listed as a class member whose claims were settled under the *West* Settlement.

informing her she was receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Loeper's confidential credit card information to MWI using the wires.  On or around March 7, 2000, Defendants mailed the bogus membership kit to Loeper.  Thereafter, on April 5, 2000, MWI billed Loeper's credit card an unsolicited and unexpected $84.00 for a Travel membership.  On February 7, 2001, MWI billed Loeper's credit card an unsolicited and unexpected renewal fee of $99.95 (billed as "Travel").

(b)     After inquiring about the February 7, 2001 charge, and without realizing that this was the second charge, Loeper was informed by MWI that the charge was for an MWI membership.  On or about March 29, 2001, MWI provided a refund of $99.95 for the February 7, 2001 renewal fee.  However, the initial enrollment fee was not refunded.  To retain the initial $84.00 Defendants had already swindled from her, MWI concealed from Loeper that she had also been enrolled in (and been billed for) an MWI membership program for the prior year.  Loeper was not aware that MWI existed until she called to challenge the February 7, 2001 renewal fee.

**Plaintiff Arline Rosenzweig**

21.     Plaintiff Arline Rosenzweig ("Rosenzweig") has been, at all times relevant to the action, a resident of Boynton Beach, Palm Beach County, State of Florida.  Rosenzweig has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example).  MWI's internal database will identify the bait products purchased that resulted in her enrollment.  In connection with these purchases, MWI billed Rosenzweig unsolicited, unauthorized and unexpected charges (totaling approximately $600.00) for several MWI membership programs.[13] Rosenzweig was never asked for

---

[13]     While Rosenzweig cannot recall what bait products she purchased in addition to Tae-Bo exercise videotapes, Rosenzweig was enrolled in a second "Essentials" membership which counsel

her consent to be billed for any MWI membership program.  Moreover, Rosenzweig never utilized or received any benefit from any MWI membership program.

(a)    On or about February 6, 2000, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Rosenzweig informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."   The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.   The telemarketer thereafter transferred Rosenzweig's confidential credit card information to MWI using the wires.  On or around February 8, 2000, Defendants mailed the bogus membership kit to Rosenzweig.  Thereafter, on March 6, 2000, MWI billed Rosenzweig's credit card an unsolicited and unexpected $84.00 for an Essentials membership.   On January 5, 2001, MWI billed Rosenzweig's credit card an unsolicited and unexpected renewal fee of $99.95.   On January 7, 2002, MWI billed Rosenzweig's credit card an unsolicited and unexpected renewal fee of $109.95.

(b)    On or about December 15, 2002, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Rosenzweig informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.   The telemarketer thereafter transferred Rosenzweig's confidential credit card information to MWI using the wires.  On or around December 17, 2002, Defendants mailed the bogus membership kit to Rosenzweig.  Thereafter, on January 15,

---

believe is not a joint venture or wholesale membership and thus is not included in the *West* Settlement.

2003, MWI billed Rosenzweig's credit card an unsolicited and unexpected fee of $149.95 for a second "Essentials" membership.  On January 14, 2004, MWI billed Rosenzweig's credit card an unsolicited and unexpected renewal fee of $165.95.

**Plaintiff Frederick French**

22.     Plaintiff Frederick French ("French") has been, at all times relevant to the action, a resident of Cape Coral, State of Florida.  French has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example).  MWI's internal database will identify the bait products purchased that resulted in his enrollment.  In connection with these purchases, MWI billed French unsolicited, unauthorized and unexpected charges (totaling approximately $560.00) for several MWI membership programs.[14]  French was never asked for his consent to be billed for any MWI membership program.  Moreover, French never utilized or received any benefit from any MWI membership program.

(a)     On or about January 2, 2000, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to French informing him he would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that he "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred French's confidential credit card information to MWI using the wires.  On or around January 4, 2000, Defendants mailed the bogus membership kit to French.  Thereafter, on February 2, 2000, MWI

---

[14]     While French cannot recall what bait products he purchased in addition to Tae-Bo exercise videotapes, French was enrolled in an "ESP" membership which counsel believe is not a joint venture or wholesale membership and thus is not included in the *West* Settlement.

billed French's credit card unsolicited and unexpected $84.00 for a Home & Garden membership. On December 5, 2000, MWI billed French's credit card an unsolicited and unexpected renewal fee of $99.95.  On December 3, 2001, MWI billed French's credit card an unsolicited and unexpected renewal fee of $109.95.  On December 3, 2002, MWI billed French's credit card an unsolicited and unexpected renewal fee of $119.95.

        (b)     On or about November 3, 2003, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to French informing him he would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that he "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred French's confidential credit card information to MWI using the wires.  On or around November 5, 2003, Defendants mailed the bogus membership kit to French.  Thereafter, on December 3, 2003, MWI billed French's credit card an unsolicited and unexpected fee of $149.95 for an "ESP" membership.

**Plaintiff Tari Faulk**

23.     Plaintiff Tari Faulk ("Faulk") has been, at all times relevant to the action, a resident of Clermont, State of Florida.  Faulk has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example).  MWI's internal database will identify the bait product purchased that resulted in her enrollment.  In connection with these purchases, MWI billed Faulk unsolicited, unauthorized and unexpected charges (totaling approximately $515.85) for several MWI

membership programs.[15]   Faulk was never asked for her consent to be billed for the MWI membership program.  Moreover, Faulk never utilized or received any benefit from any MWI membership program.

(a)   On or about February 13, 1999, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Faulk informing her she was receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."   The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Faulk's confidential credit card information to MWI using the wires.  On or around February 15, 1999, Defendants mailed the bogus membership kit to Faulk.  Thereafter, on March 13, 1999, MWI billed Faulk's credit card an unsolicited and unexpected $72.00 for an Essential's membership.  On January 14, 2000, MWI billed Faulk's credit card an unsolicited and unexpected renewal fee of $84.00.  On January 15, 2001, MWI billed Faulk's credit card an unsolicited and unexpected renewal fee of $99.95.  On January 14, 2002, MWI billed Faulk's credit card an unsolicited and unexpected renewal fee of $109.95.

(b)   On or about December 15, 2002, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Faulk informing her she was receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."   The language of the deceptive

---

[15]   While Faulk cannot recall what bait products she purchased in addition to Tae-Bo exercise videotapes, Faulk was enrolled in an "ESP" membership which counsel believe is not a joint venture or wholesale membership and thus is not included in the *West* Settlement.

telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Faulk's confidential credit card information to MWI using the wires.  On or around December 17, 2002, Defendants mailed the bogus membership kit to Faulk.  Thereafter, on January 15, 2003, MWI billed Faulk's credit card an unsolicited and unexpected fee of $149.95 believed to be "MWI Essentials."

(c)       After inquiring about the January 15, 2003 charge, and without realizing that this was the fifth charge, Faulk was informed by MWI that the charge was for an MWI membership. On or about February 14, 2003, MWI provided a refund of $149.95 for the January 15, 2003 fee. However, the initial enrollment fee and the other four renewal fees were not refunded.  To retain the initial $365.90 Defendants had already swindled from her, MWI concealed from Faulk that she had also been enrolled in and been billed for an MWI membership program for the prior four years. Faulk was not aware that MWI existed until she called to challenge the January 15, 2003 fee.

**Plaintiff Jammie McKay**

24.       Plaintiff Jammie McKay ("McKay") has been, at all times relevant to the action, a resident of the District of Columbia.  McKay has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example).  MWI's internal database will identify the bait product purchased that resulted in his enrollment.  On or about February 14, 2000, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to McKay informing him he would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that he "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred McKay's confidential credit card information to MWI using the wires.  On or around February 16, 2000, Defendants mailed the bogus membership kit to McKay.  Thereafter, on

March 14, 2000, MWI billed McKay's credit card an unsolicited and unexpected $84.00 for a Travel Arrangement's membership.  On January 15, 2001, MWI billed McKay's credit card an unsolicited and unexpected renewal fee of $99.95 (billed as "MWI Travel").  McKay was never asked for his consent to be billed for any MWI membership program.  Moreover, McKay never utilized or received any benefit from any MWI membership program.[16]

**Plaintiff Claire Teasley**

25.     Plaintiff Claire Teasley ("Teasley") has been, at all times relevant to the action, a resident of the District of Columbia.  Teasley has purchased products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example).  MWI's internal database will identify the bait product purchased that resulted in her enrollment.  On or about April 9, 2000, at the end of the call to purchase the bait product, the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Teasley informing her she was receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Teasley's confidential credit card information to MWI using the wires.  On or around April 11, 2000, Defendants mailed the bogus membership kit to Teasley.  Thereafter, on May 9, 2000, MWI billed Teasley's credit card an unsolicited and unexpected $84.00 for a Travel Arrangement's membership.  On March 12, 2001, MWI billed Teasley's credit card an unsolicited and unexpected renewal fee of $99.95 (billed as "MWI Travel").  Teasley was never asked for her consent to be billed for the MWI

---

[16]     While McKay cannot recall what bait products he purchased in addition to Tae-Bo exercise videotapes, counsel have verified that Jammie McKay is not listed as a class member whose claims were settled under the *West* Settlement.

membership program.  Moreover, Teasley never utilized or received any benefit from any MWI membership program.[17]

**Plaintiff Patricia Gucker**

26.     Plaintiff Patricia Gucker ("Gucker") has been, at all times relevant to the action, a resident of the City of Nampa, Canyon County, State of Idaho.  Gucker has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example).  MWI's internal database will identify the bait products purchased that resulted in her enrollment.  In connection with these purchases, MWI billed Gucker unsolicited, unauthorized and unexpected charges (totaling approximately $680.00) for several MWI membership programs.[18] Gucker was never asked for her consent to be billed for any MWI membership program.  Moreover, Gucker never utilized or received any benefit from any MWI membership program.

(a)     On or about February 14, 1999, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Gucker informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Gucker's confidential credit card information to MWI using the wires.  On or around February 16, 1999,

---

[17]     While Teasley cannot recall what bait products she purchased in addition to Tae-Bo exercise videotapes, counsel have verified that Claire Teasley is not listed as a class member whose claims were settled under the *West* Settlement.

[18]     While Gucker cannot recall what bait products she purchased in addition to Tae-Bo exercise videotapes, counsel have verified that Patricia Gucker is not listed as a class member whose claims were settled under the *West* Settlement.

Defendants mailed the bogus membership kit to Gucker.  Thereafter, on March 14, 1999, MWI billed Gucker's credit card an unsolicited and unexpected $72.00 charge for an Essential's membership.  On January 14, 2000, MWI billed Gucker's credit card an unsolicited and unexpected renewal fee of $84.00.  On January 15, 2001, MWI billed Gucker's credit card an unsolicited and unexpected renewal fee of $99.95.  On January 14, 2002, MWI billed Gucker's credit card an unsolicited and unexpected renewal fee of $109.95.

(b)     On December 15, 2002, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Gucker informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Gucker's confidential credit card information to MWI using the wires.  On or around December 17, 2002, Defendants mailed the bogus membership kit to Gucker.  Thereafter, on January 15, 2003, MWI billed Gucker's credit card an unsolicited and unexpected fee of $149.95 for an "ESP" membership.  On January 14, 2004, MWI billed Gucker's credit card an unsolicited and unexpected renewal fee of $169.95.

**Plaintiff Joan Thornton**

27.     Plaintiff Joan Thornton ("Thornton") has been, at all times relevant to the action, a resident of the State of New York.  Thornton has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example).  MWI's internal database will identify the bait products purchased that resulted in her enrollment.  In connection with these purchases, MWI billed Thornton unsolicited, unauthorized and unexpected charges (totaling approximately $680.00) for several MWI

membership programs.[19]   Thornton was never asked for her consent to be billed for the MWI membership programs.  Moreover, Thornton never utilized or received any benefit from any MWI membership program.

(a)      On or about February 8, 1999, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Thornton informing her she was receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Thornton's confidential credit card information to MWI using the wires.  On or around February 10, 1999, Defendants mailed the bogus membership kit to Thornton.  Thereafter, on March 8, 1999, MWI billed Thornton's credit card an unsolicited and unexpected $72.00 for an MWI Essentials membership program.  On January 7, 2000, MWI billed Thornton's credit card an unsolicited and unexpected renewal fee of $84.00.  On January 8, 2001, MWI billed Thornton's credit card an unsolicited and unexpected renewal fee of $99.95.  On January 7, 2002, MWI billed Thornton's credit card an unsolicited and unexpected renewal fee of $109.95.

(b)      On or about December 15, 2002, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Thornton informing her she was receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive

---

[19]      While Thornton cannot recall what bait products she purchased in addition to Tae-Bo exercise videotapes, Thornton was enrolled in an "ESP" membership which counsel believe is not a joint venture or wholesale membership and thus is not included in the *West* Settlement.

telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Thornton's confidential credit card information to MWI using the wires.  On or around December 17, 2002, Defendants mailed the bogus membership kit to Thornton.  Thereafter, on January 15, 2003, MWI billed Thornton's credit card an unsolicited and unexpected fee of $149.95 for an "ESP" membership.  On January 14, 2004, MWI billed Thornton's credit card an unsolicited and unexpected renewal fee of $169.95.

**Plaintiff Argarette Kirch**

28.    Plaintiff Argarette Kirch ("Kirch") has been, at all times relevant to the action, a resident of the State of New York.  Kirch has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example).  MWI's internal database will identify the bait products purchased that resulted in her enrollment.  In connection with these purchases, MWI billed Kirch unsolicited, unauthorized and unexpected charges (totaling approximately $680.00) for an MWI membership program.[20]  Kirch was never asked for her consent to be billed for any MWI membership program.  Moreover, Kirch never utilized or received any benefit from any MWI membership program.

(a)    On or about February 9, 1999, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Kirch informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Kirch's

---

[20]    While Kirch cannot recall what bait products she purchased in addition to Tae-Bo exercise videotapes, Kirch was enrolled in an "ESP" membership which counsel believe is not a joint venture or wholesale membership and thus is not included in the *West* Settlement.

confidential credit card information to MWI using the wires.  On or around February 11, 1999, Defendants mailed the bogus membership kit to Kirch.  Thereafter, on March 9, 1999, MWI billed Kirch's credit card an unsolicited and unexpected $72.00 for an MWI Essentials membership program.  On January 10, 2000, MWI billed Kirch's credit card an unsolicited and unexpected renewal fee of $84.00.  On January 8, 2001, MWI billed Kirch's credit card an unsolicited and unexpected renewal fee of $99.95.  On January 7, 2002, MWI billed Kirch's credit card an unsolicited and unexpected renewal fee of $109.95.

(b)     On or about December 15, 2002, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Kirch informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Kirch's confidential credit card information to MWI using the wires.  On or around December 17, 2002, Defendants mailed the bogus membership kit to Kirch.  Thereafter, on January 15, 2003, MWI billed Kirch's credit card an unsolicited and unexpected new member fee of $149.95 for an "ESP" membership.  On January 14, 2004, MWI billed Kirch's credit card for an unsolicited and unexpected renewal fee of $169.95.

**Plaintiff Debra Muoio**

29.     Plaintiff Debra Muoio ("Muoio") has been, at all times relevant to the action, a resident of the State of New York.  Muoio has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example).  MWI's internal database will identify the bait products purchased that resulted in her enrollment.  In connection with these purchases, MWI billed Muoio unsolicited,

unauthorized and unexpected charges (totaling approximately $500.00) for several MWI membership programs.[21]   Muoio was never asked for her consent to be billed for the MWI membership programs.  Moreover, Muoio never utilized or received any benefit from any MWI membership program.

(a)      On or about February 16, 2000, at the end of the call to purchase the bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Muoio informing her she was receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."   The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  Muoio recalls telling the telemarketer "NO" in response to the telemarketing pitch.  Regardless, the telemarketer thereafter transferred Muoio's confidential credit card information to MWI using the wires.  On or around February 18, 2000, Defendants mailed the bogus membership kit to Muoio.  Thereafter, on March 16, 2000, MWI billed Muoio's credit card an unsolicited and unexpected $84.00 for a Travel Arrangement's membership program.  On January 15, 2001, MWI billed Muoio's credit card an unsolicited and unexpected renewal fee of $99.95.  On January 15, 2002, MWI billed Muoio's credit card an unsolicited and unexpected renewal fee of $109.95.

(b)      On or about December 15, 2002 at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Muoio informing her she would be receiving a risk-free 30-day trial membership, emphasizing the

---

[21]      While Muoio cannot recall what bait products she purchased in addition to Tae-Bo exercise videotapes, counsel have verified that Debra Muoio is not listed as a class member whose claims were settled under the *West* Settlement.

thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive

telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Muoio's

confidential credit card information to MWI using the wires.  On or around December 17, 2002,

Defendants mailed the bogus membership kit to Muoio.  Thereafter, on January 15, 2003, MWI

billed Muoio's credit card an unsolicited and unexpected fee of $149.95 for an "ESP" membership.

**Plaintiffs Matthew and Rosalba Maistoru**

30.     Plaintiffs Matthew Maistoru and Rosalba Maistoru (the "Maistorus") have been, at all

times relevant to the action, residents of the State of New York.  The Maistorus have purchased

various products after watching television commercials advertising these products and displaying a

1-800 number to call (NADS and Tae-Bo exercise videotapes by way of example).  However,

MWI's internal database will identify the bait products that were purchased that resulted in their

enrollment.  In connection with these purchases, MWI billed the Maistorus unsolicited, unauthorized

and unexpected charges (totaling approximately $500.00) for several MWI membership programs.[22]

The Maistorus were never asked for their consent to be billed for any MWI membership program.

Moreover, the Maistorus never utilized or received any benefit from any MWI membership program.

(a)     On or about February 7, 1999, at the end of the call to purchase a bait product

– plaintiffs cannot remember which one (possibly NADS), however this information is contained in

MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch

to the Maistorus informing them they would be receiving a risk-free 30-day trial membership,

emphasizing the thank you gift was "FREE" and that they "WON'T BE BILLED."  The language of

the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter

---

[22]     While the Maistorus cannot recall what bait products they purchased in addition to NADS
and Tae-Bo exercise videotapes, counsel have verified that Matthew and Rosalba Maistorus are not
listed as a class member whose claims were settled under the *West* Settlement.

transferred the Maistorus' confidential credit card information to MWI using the wires.  On or around February 9, 1999, Defendants mailed the bogus membership kit to the Maistorus.  Thereafter, on March 7, 1999, the Maistorus' credit card was assessed an unsolicited and unexpected $72.00 charge by Defendants for an MWI Essentials membership program.  On January 6, 2000, MWI billed the Maistorus' credit card an unsolicited and unexpected renewal fee of $84.00.  On January 5, 2001, MWI billed the Maistorus' credit card an unsolicited and unexpected renewal fee of $99.95. On January 7, 2002, MWI billed the Maistorus' credit card an unsolicited and unexpected renewal fee of $109.95.

(b)     On or about December 15, 2002, at the end of the call to purchase a bait product – plaintiffs cannot remember which one (possibly NADS), however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to the Maistorus informing them they would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that they "WON'T BE BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred the Maistorus' confidential credit card information to MWI using the wires. On or around December 17, 2002, Defendants mailed the bogus membership kit to the Maistorus. Thereafter, on January 15, 2003, MWI billed the Maistorus' credit card an unsolicited and unexpected fee of $149.95 for an "ESP" membership.

**Plaintiff Rise M. Sheehan**

31.     Plaintiff Rise M. Sheehan ("Sheehan") has been, at all times relevant to the action, a resident of the City of Wenham, Essex County, State of Massachusetts.  Sheehan has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example).  However, MWI's internal database will identify the bait products purchased that resulted in her enrollment.  In connection with

these purchases, MWI billed Sheehan unsolicited, unauthorized and unexpected charges (totaling approximately $680.00) for several MWI membership programs.[23] Sheehan was never asked for her consent to be billed for any MWI membership program. Moreover, Sheehan never utilized or received any benefit from any MWI membership program.

(a)     On or about February 12, 2000, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Sheehan informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶58 below. The telemarketer thereafter transferred Sheehan's confidential credit card information to MWI using the wires. On or around February 14, 2000, Defendants mailed the bogus membership kit to Sheehan. Thereafter, on March 12, 2000, MWI billed Sheehan's credit card an unsolicited and unexpected $84.00 for an Essential's membership. On January 11, 2001, MWI billed Sheehan's credit card an unsolicited and unexpected renewal fee of $99.95. On January 11, 2002, MWI billed Sheehan's credit card an unsolicited and unexpected renewal fee of $109.95.

(b)     On or about December 15, 2002, at the end of the call to purchase a bait product  – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Sheehan informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED." The language of the deceptive

---

[23]     While Sheehan cannot recall what bait products she purchased in addition to Tae-Bo exercise videotapes, Sheehan was enrolled in an "ESP" membership which counsel believe is not a joint venture or wholesale membership and thus is not included in the *West* Settlement.

telemarketing pitch is quoted in full in ¶58 below. The telemarketer thereafter transferred Sheehan's confidential credit card information to MWI using the wires. On or around December 17, 2002, Defendants mailed the bogus membership kit to Sheehan. Thereafter, on January 15, 2003, MWI billed Sheehan's credit card an unsolicited and unexpected fee of $149.95 for an "ESP" membership. On January 14, 2004, MWI billed Sheehan's credit card an unsolicited and unexpected renewal fee of $169.95 (believed to be billed as "MWI Essentials").

**Plaintiff Bonnie Douthitt**

32.     Plaintiff Bonnie Douthitt ("Douthitt") has been, at all times relevant to the action, a resident of the City of Charlotte, Mecklenburg County, State of North Carolina. Douthitt has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example). MWI's internal database will identify the bait products purchased that resulted in her enrollment. In connection with these purchases, MWI billed Douthitt unsolicited, unauthorized and unexpected charges (totaling approximately $680.00) for several MWI membership programs.[24] Douthitt was never asked for her consent to be billed for any MWI membership program. Moreover, Douthitt never utilized or received any benefit from any MWI membership program.

(a)     On or about February 27, 1999, at the end of the call to purchase the bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Douthitt informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED." The language of the deceptive

---

[24]     While Douthitt cannot recall what bait products she purchased in addition to Tae-Bo exercise videotapes, counsel have verified that Bonnie Douthitt is not listed as a class member whose claims were settled under the *West* Settlement.

telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Douthitt's confidential credit card information to MWI using the wires.  On or around March 1, 1999, Defendants mailed the bogus membership kit to Douthitt.  Thereafter, on March 27, 1999, MWI billed Douthitt's credit card an unsolicited and unexpected $72.00 for an Essential's membership. On January 28, 2000, MWI billed Douthitt's credit card an unsolicited and unexpected renewal fee of $84.00.  On January 29, 2001, MWI billed Douthitt's credit card an unsolicited and unexpected renewal fee of $99.95.  On January 28, 2002, MWI billed Douthitt's credit card an unsolicited and unexpected renewal fee of $109.95.

(b)     On or about December 27, 2002, at the end of the call to purchase the bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Douthitt informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Douthitt's confidential credit card information to MWI using the wires.  On or around December 29, 2002, Defendants mailed the bogus membership kit to Douthitt.  Thereafter, on January 27, 2003, MWI billed Douthitt's credit card an unsolicited and unexpected fee of $149.95 for an "ESP" membership. On January 26, 2004, MWI billed Douthitt's credit card an unsolicited and unexpected renewal fee of $169.95 for an "ESP" membership.

**Plaintiff Amber Tulbert**

33.     Plaintiff Amber Tulbert ("Tulbert") has been, at all times relevant to the action, a resident of the City Maggine Valley, Haywood County, State of North Carolina.  Tulbert has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example).  MWI's internal

database will identify the bait products purchased that resulted in her enrollment.  In connection with these purchases, MWI billed Tulbert unsolicited, unauthorized and unexpected charges (totaling approximately $500.00) for several MWI membership programs.[25]  Tulbert was never asked for her consent to be billed for any MWI membership program.  Moreover, Tulbert never utilized or received any benefit from any MWI membership program.

(a)     On or about February 7, 1999, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Tulbert informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Tulbert's confidential credit card information to MWI using the wires.  On or around February 9, 1999, Defendants mailed the bogus membership kit to Tulbert.  Thereafter, on March 7, 1999, MWI billed Tulbert's credit card an unsolicited and unexpected $72.00 for an Essential's membership.  On January 6, 2000, MWI billed Tulbert's credit card an unsolicited and unexpected renewal fee of $84.00.  On January 5, 2001, MWI billed Tulbert's credit card an unsolicited and unexpected renewal fee of $99.95.  On January 7, 2002, MWI billed Tulbert's credit card an unsolicited and unexpected renewal fee of $109.95.

(b)     On or about December 15, 2002, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to

---

[25]     While Tulbert cannot recall what bait products she purchased in addition to Tae-Bo exercise videotapes, counsel have verified that Amber Tulbert is not listed as a class member whose claims were settled under the *West* Settlement.

Tulbert informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Tulbert's confidential credit card information to MWI using the wires.  On or around December 17, 2002, Defendants mailed the bogus membership kit to Tulbert.  Thereafter, on January 15, 2003, MWI billed Tulbert's credit card an unsolicited and unexpected membership fee of $149.95 for an "ESP" membership.

**Plaintiff Mary Beth Zorn**

34.     Plaintiff Mary Beth Zorn ("Zorn") has been, at all times relevant to the action, a resident of the City of St. Paul, Ramsey County, State of Minnesota.  Zorn has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example).  MWI's internal databases will identify the bait products under which she was enrolled.  In connection with these purchases, MWI billed Zorn unsolicited, unauthorized and unexpected charges (totaling approximately $140.00) for several MWI membership programs.[26]  Zorn was never asked for her consent to be billed for any MWI membership program.  Moreover, Zorn never utilized or received any benefit from any MWI membership program.

(a)     On or about December 23, 1998, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Zorn informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank

---

[26]     While Zorn cannot recall what bait products she purchased in addition to Tae-Bo exercise videotapes, counsel have verified that Mary Beth Zorn is not listed as a class member whose claims were settled under the *West* Settlement.

you gift was "FREE" and that she "WON'T BE BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶58 below. The telemarketer thereafter transferred Zorn's confidential credit card information to MWI using the wires. On or around December 27, 1998, Defendants mailed the bogus membership kit to Zorn. Thereafter, on January 23, 1999, MWI billed Zorn's credit card an unsolicited and unexpected $72.00 for an Essential's membership.

(b)     On or about October 2, 1999, at the end of the call to purchase a bait product – plaintiff cannot remember which one however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Zorn informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶58 below. The telemarketer thereafter transferred Zorn's confidential credit card information to MWI using the wires. On or around October 4, 1999, Defendants mailed the bogus membership kit to Zorn. Thereafter, on November 2, 1999, MWI billed Zorn's credit card an unsolicited and unexpected $72.00 for a Travel Arrangement's membership.

**Plaintiff Cynthia Burrell**

35.     Plaintiff Cynthia Burrell ("Burrell") has been, at all times relevant to the action, a resident of the City of Worthington, Nobles County, State of Minnesota. Burrell has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example). MWI's internal database will identify the bait product purchased that resulted in her enrollment. On or about January 3, 2000, at the end of the call to purchase a bait product the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Burrell informing her she was receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶58 below. The telemarketer

thereafter transferred Burrell's confidential credit card information to MWI using the wires.  On or around January 5, 2000, Defendants mailed the bogus membership kit to Burrell.  Thereafter, on February 3, 2000, MWI billed Burrell's credit card an unsolicited and unexpected $84.00 for a Travel Arrangement's membership.  On February 7, 2001, MWI billed Burrell's credit card an unsolicited and unexpected renewal fee of $99.95.  Burrell was never asked for her consent to be billed for the MWI membership program.  Moreover, Burrell never utilized or received any benefit from any MWI membership program.[27]

**Plaintiff Abby Malloy**

36.     Plaintiff Abby Malloy ("Malloy") has been, at all times relevant to the action, a resident of the City of Oak Lawn, Cook County, State of Illinois.  Malloy has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example).  MWI's internal database will identify the bait products purchased that resulted in her enrollment.  In connection with these purchases, MWI billed Malloy unsolicited, unauthorized and unexpected charges (totaling approximately $515.85) for several MWI membership programs.[28]  Malloy was never asked for her consent to be billed for any MWI membership program.  Moreover, Malloy never utilized or received any benefit from any MWI membership program.

(a)     On or about February 27, 1999, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's

---

[27]     While Burrell cannot recall what bait products she purchased in addition to Tae-Bo exercise videotapes, counsel have verified that Cynthia Burrell is not listed as a class member whose claims were settled under the *West* Settlement.

[28]     While Malloy cannot recall what bait products she purchased in addition to Tae-Bo exercise videotapes, Malloy was enrolled in an "ESP" membership which counsel believe is not a joint venture or wholesale membership and thus is not included in the *West* Settlement.

database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Malloy informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶58 below. The telemarketer thereafter transferred Malloy's confidential credit card information to MWI using the wires. On or around March 1, 1999, Defendants mailed the bogus membership kit to Malloy. Thereafter, on March 27, 1999, MWI billed Malloy's credit card an unsolicited and unexpected $72.00 for an Essentials membership. On January 28, 2000, MWI billed Malloy's credit card an unsolicited and unexpected renewal fee of $84.00. On January 29, 2001, MWI billed Malloy's credit card an unsolicited and unexpected renewal fee of $99.95. On January 28, 2002, MWI billed Malloy's credit card an unsolicited and unexpected renewal fee of $109.95.

(b)     On or about December 27, 2002, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Malloy informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶58 below. The telemarketer thereafter transferred Malloy's confidential credit card information to MWI using the wires. On or around December 29, 2002, Defendants mailed the bogus membership kit to Malloy. Thereafter, on January 27, 2003, MWI billed Malloy's credit card an unsolicited and unexpected membership fee of $149.95 for an "ESP" membership.

(c)     After inquiring about the January 27, 2003 charge, and without realizing that this was the fifth charge, Malloy was informed by MWI that the charge was for an MWI membership. On or about February 26, 2003, MWI provided a refund of $150.00 for the January 27,

2003 charge.  However, the initial enrollment fee and the renewal fees for the "Essentials" membership were not refunded.  To retain the $365.85 Defendants had already swindled from her, MWI concealed from Malloy that he had also been enrolled in (and been billed for) an MWI membership program for the prior four years.  Malloy was not aware that MWI existed until she called to challenge the January 27, 2003 renewal fee.

**Plaintiff Christine Felichio**

37.     Plaintiff Christine Felichio ("Felichio") has been, at all times relevant to the action, a resident of the City of Schaumburg, Cook County, State of Illinois.  Felichio has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example).  MWI's internal database will identify the bait products purchased that resulted in her enrollment.  In connection with these purchases, MWI billed Felichio unsolicited, unauthorized and unexpected charges (totaling approximately $515.85) for several MWI membership programs.[29]  Felichio was never asked for her consent to be billed for the MWI membership program.  Moreover, Felichio never utilized or received any benefit from any MWI membership program.

(a)     On or about February 15, 1999, at the end of the call to purchase the bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Felichio informing her she was receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Felichio's

---

[29]     While Felichio cannot recall what bait products she purchased in addition to Tae-Bo exercise videotapes, counsel have verified that Christine Felichio is not listed as a class member whose claims were settled under the *West* Settlement.

confidential credit card information to MWI using the wires.  On or around February 17, 1999, Defendants mailed the bogus membership kit to Felichio.  Thereafter, on March 15, 1999, MWI billed Felichio's credit card an unsolicited and unexpected $72.00 an Essential's membership.  On January 15, 2000, MWI billed Felichio's credit card an unsolicited and unexpected renewal fee of $84.00.  On January 15, 2001, MWI billed Felichio's credit card an unsolicited and unexpected renewal fee of $99.95.  On January 14, 2002, MWI billed Felichio's credit card an unsolicited and unexpected renewal fee of $109.95.

(b)     On or about December 15, 2002, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Felichio informing her she was receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Felichio's confidential credit card information to MWI using the wires.  On or around December 17, 2002, Defendants mailed the bogus membership kit to Felichio.  Thereafter, on January 15, 2003, MWI billed Felichio's credit card an unsolicited and unexpected membership fee of $149.95 for an "ESP" membership.

(c)     After inquiring about the January 15, 2003 charge, and without realizing that this was the fifth charge, Felichio was informed by MWI that the charge was for an MWI membership.  On or about May 20, 2003, MWI provided a refund of $149.95 for the January 15, 2003 renewal fee.  However, the initial enrollment fee and the renewal fees for the "Essentials" membership were not refunded.  To retain the initial $365.90 Defendants had already swindled from her, MWI concealed from Felichio that she had also been enrolled in (and been billed for) an MWI

membership program for the prior four years.  Felichio was not aware that MWI existed until she called to challenge the January 15, 2003 renewal fee.

**Plaintiff James Ackermann**

38.     Plaintiff James Ackermann ("Ackermann") has been, at all times relevant to the action, a resident of the City of Chamblee, DeKalb County, State of Georgia.  Ackermann has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example).  MWI's internal database will identify the bait products purchased that resulted in his enrollment.  In connection with these purchases, MWI billed Ackermann unsolicited, unauthorized and unexpected charges (totaling approximately $680.00) for several MWI membership programs.[30]  Ackermann was never asked for his consent to be billed for any MWI membership program.  Moreover, Ackermann never utilized or received any benefit from any MWI membership program.

(a)     On or about February 14, 1999, at the end of the call to purchase the bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Ackermann informing him he would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that he "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Ackermann's confidential credit card information to MWI using the wires.  On or around February 16, 1999, Defendants mailed the bogus membership kit to Ackermann.  Thereafter, on March 14, 1999, MWI billed Ackermann's credit card an unsolicited and unexpected $72.00 for an Essentials

---

[30]     While Ackermann cannot recall what bait products he purchased in addition to Tae-Bo exercise videotapes, Ackermann was enrolled in an "ESP" membership which counsel believe is not a joint venture or wholesale membership and thus is not included in the *West* Settlement.

membership.   On January 13, 2000, MWI billed Ackermann's credit card an unsolicited and unexpected renewal fee of $84.00.  On January 12, 2001, MWI billed Ackermann's credit card an unsolicited and unexpected renewal fee of $99.95.  On January 14, 2002, MWI billed Ackermann's credit card an unsolicited and unexpected renewal fee of $109.95.

(b)      On or about December 15, 2002, at the end of the call to purchase the bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Ackermann informing him he was receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that he "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.   The telemarketer thereafter transferred Ackermann's confidential credit card information to MWI using the wires.  On or around December 17, 2002, Defendants mailed the bogus membership kit to Ackermann.  Thereafter, on January 15, 2003, MWI billed Ackermann's credit card an unsolicited and unexpected fee of $149.95 for an "ESP" membership. On January 14, 2004, MWI billed Ackermann's credit card an unsolicited and unexpected renewal fee of $169.95.

**Plaintiff Lori Half**

39.      Plaintiff Lori Half ("Half") has been, at all times relevant to the action, a resident of the City of Peachtree, Fayette County, State of Georgia.  Half has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example).  MWI's internal database will identify the bait products purchased that resulted in her enrollment.  In connection with these purchases, MWI billed Half unsolicited, unauthorized and unexpected charges (totaling approximately $685.80) for several

MWI membership programs.[31]  Half was never asked for her consent to be billed for the MWI membership program.  Moreover, Half never utilized or received any benefit from any MWI membership program.

(a)     On or about March 1, 1999, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Half informing her she was receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Half's confidential credit card information to MWI using the wires.  On or around March 3, 1999, Defendants mailed the bogus membership kit to Half.  Thereafter, on April 1, 1999, MWI billed Half's credit card an unsolicited and unexpected $72.00 for an Essential's membership.  On February 2, 2000, MWI billed Half's credit card an unsolicited and unexpected renewal fee of $84.00.  On February 2, 2001, MWI billed Half's credit card an unsolicited and unexpected renewal fee of $99.95.  On February 4, 2002, MWI billed Half's credit card an unsolicited and unexpected renewal fee of $109.95.

(b)     On or about January 3, 2003, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Half informing her she was receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Half's confidential credit card

---

[31]     While Half cannot recall what bait products she purchased in addition to Tae-Bo exercise videotapes, counsel have verified that Lori Half is not listed as a class member whose claims were settled under the *West* Settlement.

information to MWI using the wires.  On or around January 5, 2003, Defendants mailed the bogus membership kit to Half.  Thereafter, on February 3, 2003, MWI billed Half's credit card an unsolicited and unexpected new membership fee of $149.95 for an "ESP" membership.  On February 10, 2004, MWI billed Half's credit card an unsolicited and unexpected renewal fee of $169.95.

**Plaintiff Thomas Cuthbertson**

40.     Plaintiff Thomas Cuthbertson ("Cuthbertson") has been, at all times relevant to the action, a resident of the State of Nevada.  Cuthbertson has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example).  MWI's internal database will identify the bait product purchased that resulted in his enrollment.  On or about February 14, 2000, at the end of the call to purchase a bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Cuthbertson informing him he would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that he "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Cuthbertson's confidential credit card information to MWI using the wires.  On or around February 16, 2000, Defendants mailed the bogus membership kit to Cuthbertson. Thereafter, on March 14, 2000, MWI billed Cuthbertson's credit card an unsolicited and unexpected $84.00 for a Travel Arrangement's membership.  On January 15, 2001, MWI billed Cuthbertson's credit card an unsolicited and unexpected renewal fee of $99.95.  Cuthbertson was never asked for

his consent to be billed for any MWI membership program.  Moreover, Cuthbertson never utilized or

received any benefit from any MWI membership program.[32]

**Plaintiff Brian Messmer**

41.     Plaintiff Brian Messmer ("Messmer") has been, at all times relevant to the action, a

resident of the State of Nevada.  Messmer has purchased various products after watching television

commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise

videotapes by way of example).  MWI's internal database will identify the bait product purchased

that resulted in his enrollment.  On or about April 9, 2000, at the end of the call to purchase the bait

product – plaintiff cannot remember which one, however this information is contained in MWI's

database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to

Messmer informing him he was receiving a risk-free 30-day trial membership in Travel,

emphasizing the thank you gift was "FREE" and that he "WON'T BE BILLED."  The language of

the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter

transferred Messmer's confidential credit card information to MWI using the wires.  On or around

April 11, 2000, Defendants mailed the bogus membership kit to Messmer.  Thereafter, on May 9,

2000, Messmer's credit card was assessed an unsolicited and unexpected $84.00 charge by

Defendants for a Travel Arrangement's membership.  On March 12, 2001, MWI billed Messmer's

credit card an unsolicited and unexpected renewal fee of $99.95.  Messmer was never asked for his

---

[32]     While Cuthbertson cannot recall what bait products he purchased in addition to Tae-Bo
exercise videotapes, counsel have verified that Thomas Cuthbertson is not listed as a class member
whose claims were settled under the *West* Settlement.

consent to be billed for the MWI membership program.  Moreover, Messmer never utilized or received any benefit from any MWI membership program.[33]

**Plaintiff Kathleen Tarantino**

42.     Plaintiff Kathleen Tarantino ("Tarantino") has been, at all times relevant to the action, a resident of the City of Dallas, Dallas County, State of Texas.  Tarantino has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example).  MWI's internal database will identify the bait products purchased that resulted in her enrollment.  In connection with these purchases, MWI billed Tarantino unsolicited, unauthorized and unexpected charges (totaling approximately $515.85) for several MWI membership programs.[34]  Tarantino was never asked for her consent to be billed for any MWI membership program.  Moreover, Tarantino never utilized or received any benefit from any MWI membership program.

(a)     On or about February 25, 1999, at the end of the call to purchase the bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Tarantino informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Tarantino's confidential credit card information to MWI using the wires.  On or around February 27,

---

[33]     While Messmer cannot recall what bait products he purchased in addition to Tae-Bo exercise videotapes, counsel have verified that Brian Messmer is not listed as a class member whose claims were settled under the *West* Settlement.

[34]     While Tarantino cannot recall what bait products she  purchased in addition to Tae-Bo exercise videotapes, Tarantino was enrolled in an "ESP" membership which counsel believe is not a joint venture or wholesale membership and thus is not included in the *West* Settlement.

1999, Defendants mailed the bogus membership kit to Tarantino.  Thereafter, on March 25, 1999, MWI billed Tarantino's credit card an unsolicited and unexpected $72.00 for an Essential's membership.  On January 24, 2000, MWI billed Tarantino's credit card an unsolicited and unexpected renewal fee of $84.00.  On January 23, 2001, MWI billed Tarantino's credit card an unsolicited and unexpected renewal fee of $99.95.  On January 23, 2002, MWI billed Tarantino's credit card an unsolicited and unexpected renewal fee of $109.95.

(b)     On or about December 23, 2002, at the end of the call to purchase the bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Tarantino informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Tarantino's confidential credit card information to MWI using the wires.  On or around December 27, 2002, Defendants mailed the bogus membership kit to Tarantino.  Thereafter, on or about January 23, 2003, MWI billed Tarantino's credit card an unsolicited and unexpected membership fee of $149.95 for an "ESP" membership.

(c)     After inquiring about the January 23, 2003 charge, and without realizing that this was the fifth charge, Tarantino was informed by MWI that the charge was for an MWI membership.  On or about April 16, 2003, MWI provided a partial refund of $149.95 for the January 23, 2003 renewal fee.  However, the initial enrollment fee and the other three renewal fees were not refunded.  Tarantino was not aware that MWI existed until she called to challenge the January 23, 2003 renewal fee.  To retain the initial $365.90 Defendants had already swindled from her, MWI concealed from Tarantino that she had also been enrolled in (and been billed for) an MWI membership program for the prior four years.

**Plaintiff Rene Matula**

43.     Plaintiff Rene Matula ("Matula") has been, at all times relevant to the action, a resident of the City of Mansfield, Tarrant County, State of Texas.  Matula has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example).  MWI's internal database will identify the bait products purchased that resulted in her enrollment.  In connection with these purchases, MWI billed Matula unsolicited, unauthorized and unexpected charges (totaling approximately $515.85) for an MWI membership program.[35]  Matula was never asked for her consent to be billed for any MWI membership program.  Moreover, Matula never utilized or received any benefit from any MWI membership program.

(a)     On or about February 25, 1999, at the end of the call to purchase the bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Matula informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Matula's confidential credit card information to MWI using the wires.  On or around February 27, 1999, Defendants mailed the bogus membership kit to Matula.  Thereafter, on March 25, 1999, MWI billed Matula's credit card an unsolicited and unexpected $72.00 for an Essential's membership.  On January 24, 2000, MWI billed Matula's credit card an unsolicited and unexpected renewal fee of $84.00.  On January 23, 2001, MWI billed Matula's credit card an unsolicited and unexpected

---

[35]     While Matula cannot recall what bait products she purchased in addition to Tae-Bo exercise videotapes, counsel have verified that Rene Matula is not listed as a class member whose claims were settled under the *West* Settlement.

renewal fee of $99.95.  On January 23, 2002, MWI billed Matula's credit card an unsolicited and unexpected renewal fee of $109.95.

(b)     On or about December 23, 2002, at the end of the call to purchase the bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Matula informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Matula's confidential credit card information to MWI using the wires.  On or around December 27, 2002, Defendants mailed the bogus membership kit to Matula.  Thereafter, on or about January 23, 2003, MWI billed Matula's credit card an unsolicited and unexpected membership fee of $149.95 for an "ESP" membership.

**Plaintiff Wayman Ashburne**

44.     Plaintiff Wayman Ashburne ("Ashburne") has been, at all times relevant to the action, a resident of the City of La Plata, Charles County, the State of Maryland.  Ashburne has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example).  MWI's internal database will identify the bait products purchased that resulted in his enrollment.  In connection with these purchases, MWI billed Ashburne unsolicited, unauthorized and unexpected charges (totaling approximately $516.00) for several MWI membership programs.[36]  Ashburne was never asked for

---

[36]     While Ashburne cannot recall what bait products he purchased in addition to Tae-Bo exercise videotapes, counsel have verified that Wayman Ashburne is not listed as a class member whose claims were settled under the *West* Settlement.

his consent to be billed for any MWI membership program.  Moreover, Ashburne never utilized or received any benefit from any MWI membership program.

(a)      On or about February 13, 1999, at the end of the call to purchase the bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Ashburne informing him he would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that he "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.   The telemarketer thereafter transferred Ashburne's confidential credit card information to MWI using the wires.  On or around February 15, 1999, Defendants mailed the bogus membership kit to Ashburne.  Thereafter, on March 13, 1999, MWI billed Ashburne's credit card an unsolicited and unexpected $72.00 for an Essentials membership.   On January 14, 2000, MWI billed Ashburne's credit card an unsolicited and unexpected renewal fee of $84.00.  On January 15, 2001, MWI billed Ashburne's credit card an unsolicited and unexpected renewal fee of $99.95.  On January 14, 2002, MWI billed Ashburne's credit card an unsolicited and unexpected renewal fee of $109.95.

(b)      On or about December 15, 2002, at the end of the call to purchase the bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Ashburne informing him he would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that he "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.   The telemarketer thereafter transferred Ashburne's confidential credit card information to MWI using the wires.  On or around December 17, 2002, Defendants mailed the bogus membership kit to Ashburne.  Thereafter, on January 15,

2003, MWI billed Ashburne's credit card an unsolicited and unexpected membership fee of $149.95 for an "ESP" membership.

(c)    After inquiring about the January 15, 2003 charge, and without realizing that this was the fifth charge, Ashburne was informed by MWI that the charge was for an MWI membership. On or about February 28, 2003, MWI provided a refund of $149.95 for the January 15, 2003 charge. However, the initial enrollment fee and the other three renewal fees were not refunded. To retain the initial $365.90 Defendants had already swindled from him, MWI concealed from Ashburne that he had also been enrolled in (and been billed for) an MWI membership program for the prior four years. Ashburne was not aware that MWI existed until he called to challenge the January 15, 2003 charge.

**Plaintiff Wendy Piehler**

45.    Plaintiff Wendy Piehler ("Piehler") has been, at all times relevant to the action, a resident of the City of Racine, Racine County, State of Wisconsin. Piehler has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example). MWI's internal database will identify the bait products purchased that resulted in her enrollment. In connection with these purchases, MWI billed Piehler unsolicited, unauthorized and unexpected charges (totaling approximately $680.00) for several MWI membership programs.[37] Piehler was never asked for her consent to be billed for any MWI membership program. Moreover, Piehler never utilized or received any benefit from any MWI membership program.

---

[37]    While Piehler cannot recall what bait products she purchased in addition to Tae-Bo exercise videotapes, counsel have verified that Wendy Piehler is not listed as a class member whose claims were settled under the *West* Settlement.

(a)      On or about February 23, 1999, at the end of the call to purchase the bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Piehler informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Piehler's confidential credit card information to MWI using the wires.  On or around February 25, 1999, Defendants mailed the bogus membership kit to Piehler.  Thereafter, on March 23, 1999, MWI billed Piehler's credit card an unsolicited and unexpected $72.00 for an Essential's membership.  On January 24, 2000, MWI billed Piehler's credit card an unsolicited and unexpected renewal fee of $84.00.  On January 22, 2001, MWI billed Piehler's credit card an unsolicited and unexpected renewal fee of $99.95. Defendants mailed the bogus membership kit to Piehler on or about January 24, 2001.  On January 21, 2002, MWI billed Piehler's credit card an unsolicited and unexpected renewal fee of $109.95.

(b)      On or about December 21, 2002, at the end of the call to purchase the bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Piehler informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Piehler's confidential credit card information to MWI using the wires.  On or around December 23, 2002, Defendants mailed the bogus membership kit to Piehler.  Thereafter, on January 21, 2003, MWI billed Piehler's credit card an unsolicited and unexpected fee of $149.95 for an "ESP" membership.

On January 20, 2004, MWI billed Piehler's credit card an unsolicited and unexpected renewal fee of $169.95.

**Plaintiff Karen S. Befort**

46.     Plaintiff Karen S. Befort ("Befort") has been, at all times relevant to the action, a resident of the City of Bartlesville, Washington County, State of Oklahoma.  Befort has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example).  MWI's internal database will identify the bait products purchased that resulted in her enrollment.  In connection with these purchases, MWI billed Befort unsolicited, unauthorized and unexpected charges (totaling approximately $680.00) for several MWI membership programs.[38]  Befort was never asked for her consent to be billed for any MWI membership program.  Moreover, Befort never utilized or received any benefit from any MWI membership program.

(a)     On or about February 22, 1999, at the end of the call to purchase the bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Befort informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Befort's confidential credit card information to MWI using the wires.  On or around February 24, 1999, Defendants mailed the bogus membership kit to Befort.  Thereafter, on March 22, 1999, MWI billed Befort's credit card an unsolicited and unexpected $72.00 for an Essential's membership.  On

---

[38]     While Befort cannot recall what bait products she purchased in addition to Tae-Bo exercise videotapes, counsel have verified that Karen S. Befort is not listed as a class member whose claims were settled under the *West* Settlement.

January 21, 2000, MWI billed Befort's credit card an unsolicited and unexpected renewal fee of $84.00.  On January 22, 2001, MWI billed Befort's credit card an unsolicited and unexpected renewal fee of $99.95.  On January 21, 2002, MWI billed Befort's credit card an unsolicited and unexpected renewal fee of $109.95.

   (b) On or about December 20, 2002, at the end of the call to purchase the bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Befort informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Befort's confidential credit card information to MWI using the wires.  On or around December 22, 2002, Defendants mailed the bogus membership kit to Befort.  Thereafter, on January 20, 2003, MWI billed Befort's credit card an unsolicited and unexpected fee of $149.95 for an "ESP" membership.  On January 19, 2004, MWI billed Befort's credit card an unsolicited and unexpected renewal fee of $169.95.

**Plaintiff Deborah Gorman**

   47. Plaintiff Deborah Gorman ("Gorman") has been, at all times relevant to the action, a resident of the State of Missouri.  Gorman has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example).  MWI's internal database will identify the bait products purchased that resulted in her enrollment.  In connection with these purchases, MWI billed Gorman unsolicited, unauthorized and unexpected charges (totaling approximately $515.00) for an MWI membership

program.[39]  Gorman was never asked for her consent to be billed for the MWI membership program. Moreover, Gorman never utilized or received any benefit from any MWI membership program.

(a)      On or about February 20, 1999, at the end of the call to purchase the bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Gorman informing her she was receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."   The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Gorman's confidential credit card information to MWI using the wires.   On or around February 22, 1999, Defendants mailed the bogus membership kit to Gorman.  Thereafter, on March 20, 1999, MWI billed Gorman's credit card an unsolicited and unexpected $72.00 for an MWI Essentials membership program.  On January 20, 2000, MWI billed Gorman's credit card an unsolicited and unexpected renewal fee of $84.00.  On January 19, 2001, MWI billed Gorman's credit card an unsolicited and unexpected renewal fee of $99.95.  On January 21, 2002, MWI billed Gorman's credit card an unsolicited and unexpected renewal fee of $109.95.

(b)      On or about December 20, 2002, at the end of the call to purchase the bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Gorman informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."   The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Gorman's

---

[39]      While Gorman cannot recall what bait products she purchased in addition to Tae-Bo exercise videotapes, Gorman was enrolled in an "ESP" membership which counsel believe is not a joint venture or wholesale membership and thus is not included in the *West* Settlement.

confidential credit card information to MWI using the wires.  On or around December 22, 2002, Defendants mailed the bogus membership kit to Gorman.  Thereafter, on January 20, 2003, MWI billed Gorman's credit card an unsolicited and unexpected fee of $149.95 for an "ESP" membership.

**Plaintiff Laura Walker**

48.     Plaintiff Laura Walker ("Walker") has been, at all times relevant to the action, a resident of the State of Missouri.  Walker has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example).  MWI's internal database will identify the bait products purchased that resulted in her enrollment.  In connection with these purchases, MWI billed Walker unsolicited, unauthorized and unexpected charges (totaling approximately $685.00) for several MWI membership programs.[40]  Walker was never asked for her consent to be billed for any MWI membership program.  Moreover, Walker never utilized or received any benefit from any MWI membership program.

(a)     On or about February 7, 1999, at the end of the call to purchase the bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Walker informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Walker's confidential credit card information to MWI using the wires.  On or around February 9, 1999, Defendants mailed the bogus membership kit to Walker.  Thereafter, on March 7, 1999, MWI billed

---

[40]     While Walker cannot recall what bait products she purchased in addition to Tae-Bo exercise videotapes, counsel have verified that Laura Walker is not listed as a class member whose claims were settled under the *West* Settlement.

Walker's credit card an unsolicited and unexpected $72.00 for an MWI Essentials membership program.  On January 6, 2000, MWI billed Walker's credit card an unsolicited and unexpected renewal fee of $84.00.  On January 5, 2001, MWI billed Walker's credit card an unsolicited and unexpected renewal fee of $99.95. On January 7, 2002, MWI billed Walker's credit card an unsolicited and unexpected renewal fee of $109.95.

    (b)  On or about December 15, 2002, at the end of the call to purchase the bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Walker informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Walker's confidential credit card information to MWI using the wires.  On or around December 17, 2002, Defendants mailed the bogus membership kit to Walker.  Thereafter, on January 15, 2003, MWI billed Walker's credit card an unsolicited and unexpected fee of $149.95 for an "ESP" membership. On January 14, 2004, MWI billed Walker's credit card for an unsolicited and unexpected renewal fee of $169.95.

**Plaintiff Ann Mosley**

    49.  Plaintiff Ann Mosley ("Mosley") has been, at all times relevant to the action, a resident of the State of Missouri.  Mosley has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Proactiv, OxiClean or Atkins Diet by way of example).  MWI's internal database will identify the bait products purchased that resulted in her enrollment.  In connection with these purchases, MWI billed Mosley unsolicited, unauthorized and unexpected charges (totaling approximately $515.00) for several MWI

membership programs.[41]   Mosley was never asked for her consent to be billed for the MWI membership program.  Moreover, Mosley never utilized or received any benefit from any MWI membership program.

(a)     On or about February 20, 1999, at the end of the call to purchase the bait product – plaintiff cannot remember which one (possibly Proactiv, OxiClean or Atkins Diet), however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Mosley informing her she was receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Mosley's confidential credit card information to MWI using the wires.  On or around February 22, 1999, Defendants mailed the bogus membership kit to Mosley.  Thereafter, on March 20, 1999, MWI billed Mosley's credit card an unsolicited and unexpected $72.00 for an MWI Essentials membership program.  On January 20, 2000, MWI billed Mosley's credit card an unsolicited and unexpected renewal fee of $84.00.  On January 19, 2001, MWI billed Mosley's credit card an unsolicited and unexpected renewal fee of $99.95.  On January 21, 2002, MWI billed Mosley's credit card an unsolicited and unexpected renewal fee of $109.95.

(b)     On or about December 20, 2002, at the end of the call to purchase the bait product – plaintiff cannot remember which one (possibly Proactiv, OxiClean or Atkins Diet), however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Mosley informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that she "WON'T BE

---

[41]     While Mosley cannot recall what bait products she purchased in addition to Proactiv, OxiClean and Atkins Diet, Mosley was enrolled in an "ESP" membership which counsel believe is not a joint venture or wholesale membership and thus is not included in the *West* Settlement.

BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶58 below. The telemarketer thereafter transferred Mosley's confidential credit card information to MWI using the wires. On or around December 22, 2002, Defendants mailed the bogus membership kit to Mosley. Thereafter, on January 20, 2003, MWI billed Mosley's credit card an unsolicited and unexpected fee of $149.95 for an "ESP" membership.

**Plaintiff Marcus D. Holden**

50.     Plaintiff Marcus D. Holden ("Holden") has been, at all times relevant to the action, a resident of the City of Forrest City, St. Francis County, State of Arkansas. Holden has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call (Tae-Bo exercise videotapes by way of example). MWI's internal database will identify the bait products purchased that resulted in his enrollment. In connection with these purchases, MWI billed Holden unsolicited, unauthorized and unexpected charges (totaling approximately $685.00) for several MWI membership programs.[42] Holden was never asked for his consent to be billed for any MWI membership program. Moreover, Holden never utilized or received any benefit from any MWI membership program.

(a)     On or about February 6, 1999, at the end of the call to purchase the bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Holden informing him he would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that he "WON'T BE BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶58 below. The telemarketer thereafter transferred Holden's

---

[42]     While Holden cannot recall what bait products she purchased in addition to Tae-Bo exercise videotapes, Holden was enrolled in an "ESP" membership which counsel believe is not a joint venture or wholesale membership and thus is not included in the *West* Settlement.

confidential credit card information to MWI using the wires.  On or around February 8, 1999, Defendants mailed the bogus membership kit to Holden.  Thereafter, on March 6, 1999, MWI billed Holden's credit card an unsolicited and unexpected $72.00 for an Essentials membership.  On January 6, 2000, MWI billed Holden's credit card an unsolicited and unexpected renewal fee of $84.00.  On January 5, 2001, MWI billed Holden's credit card an unsolicited and unexpected renewal fee of $99.95.  On January 7, 2002, MWI billed Holden's credit card an unsolicited and unexpected renewal fee of $109.95.

(b)     On or about December 14, 2002, at the end of the call to purchase the bait product – plaintiff cannot remember which one, however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Holden informing him he would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was "FREE" and that he "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶58 below.  The telemarketer thereafter transferred Holden's confidential credit card information to MWI using the wires.  On or around December 16, 2002, Defendants mailed the bogus membership kit to Holden.  Thereafter, on January 14, 2003, MWI billed Holden's credit card an unsolicited and unexpected fee of $149.95 for an "ESP" membership.  On January 14, 2004, MWI billed Holden's credit card an unsolicited and unexpected renewal fee of $169.95.

**236,107 Unnamed Class Members**

51.     In addition, plaintiffs include in their allegations the names, the dates of the fraudulent charges and the bogus membership enrollment for 236,107 of the unnamed California class members.  The names of the unnamed class members included in Exhibit A, which is filed under seal, represent only a fraction of the unnamed class members included in the proposed class. The identity of the remainder of the unnamed class members are contained within MWI's electronic

database(s), and will be revealed through discovery.  Each of these unnamed class members, as well as each of the unnamed class members who have yet to be identified through discovery, received the deceptive telemarketing pitch at the end of their calls, the language of which is quoted at ¶58 below.

52.     Defendant Vertrue Inc. ("Vertrue"), previously known as MWI, has been, at all times relevant to the action, a Delaware corporation whose primary place of business is 20 Glover Avenue, Norwalk, Connecticut.  Defendant MWI does business in Ohio, and throughout the nation, as MWI Essentials, MWI Leisure Advantage, MWI Home & Garden, MWI Connections, Health Trends, Travel Arrangements, Transmedia, Cardmember Protection Service, Countrywide Dental, 24 Protect, Smartsource, Value Max Shopping Service, Money Master Tai Value Max, Tai Vital Basics and various other names under which it markets and charges consumers, by and through nationwide telemarketing campaigns, as well as by and through the interstate instrumentality of mailings throughout Ohio and the nation.  Defendant MWI entered into express and tacit agreements with the Telemarketers.  Defendant MWI drafted the deceptive script used and sought comments from and approval by the Telemarketers.  Defendant MWI operates and is involved in the unlawful scheme of charging the credit card and/or debit card accounts of consumers for unordered merchandise.

53.     Defendant Adaptive Marketing LLC ("Adaptive Marketing") is a Delaware limited liability company with its principal place of business, with Vertrue, in Norwalk, Connecticut. Defendant Adaptive Marketing does business in Ohio, and throughout the nation, as MWI Essentials, MWI Leisure Advantage, MWI Home & Garden, MWI Connections, Health Trends, Travel Arrangements, Transmedia, Cardmember Protection Service, Countrywide Dental, 24 Protect, Smartsource, Value Max Shopping Service, Money Master Tai Value Max, Tai Vital Basics and various other names under which it markets and charges consumers, by and through nationwide telemarketing campaigns, as well as by and through the interstate instrumentality of mailings throughout Ohio and the nation.  Defendant Adaptive Marketing is a wholly-owned subsidiary and

"operating company" of Vertrue. At some point in time which is unknown to plaintiffs, but which will be revealed through discovery, defendant MWI began using defendant Adaptive Marketing to market the bogus memberships at issue, and fraudulently billed the class members' debit and credit cards. Adaptive Marketing shares personnel with Vertrue and markets, and bills for, Vertrue's membership programs. There exists, and at all relevant times existed, a unity of interest and ownership between Vertrue and Adaptive Marketing, such that any individuality and separateness between each of them ceased and each is the alter ego of the other in that each entity is completely controlled, dominated, managed and operated without regard for corporate individuality.

54. In committing the wrongful acts alleged herein, Defendants have pursued a common course of conduct, acted in concert with, aided and abetted and conspired, in furtherance of their common plan, scheme or design to make unauthorized charges to customers' credit and/or debit cards for an unsolicited, unwanted and unordered membership and thereafter to conceal and cover up their wrongdoing – all for their own personal profit. Defendants actually knew, or should have known, of the fraudulent conduct being committed and actively participated in covering up its true nature. Thus, in addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and knowingly assisted each other in the breach of their respective duties, contracts and obligations as herein alleged, and acted as the agent of each other in participating in this wrongdoing.

55. At all times herein mentioned in the claims for relief alleged herein, each and every defendant was an agent and/or employee of each and every other defendant. In doing the acts alleged in the claims for relief alleged herein, each and every defendant was acting within the course and scope of this agency or employment, and were acting with the consent, permission and authorization of each of the remaining Defendants. All of the actions of each defendant as alleged in

the claims for relief stated herein were ratified and approved by every other defendant or their officers or managing agents.

**DEFENDANTS' WRONGFUL CONDUCT**

**The Telemarketing Pitch**

56.     Defendants obtain the necessary information to bill consumers for MWI memberships by piggybacking onto popular consumer products.  MWI looks for products advertised heavily on television or in print which ask consumers to call a 1-800 number to order that product.  Some examples of the products which MWI uses to upsell its programs are: NADS, vitamins, knives, Q-Ray bracelets, Edgemaster paint rollers, Simoniz car washers, flowers, dance videos, AB Sliders, ultrasonic toothbrushes and OxiClean.

57.     The consumers see the advertising for the product (such as a NADS, a Simoniz car washer or an OxiClean infomercial) and call the 1-800 number.  The consumer has not seen or heard anything about any MWI product and has no desire or intent to purchase an MWI product.  The consumer is most likely to wind up speaking with an employee of the Telemarketers.  The consumer goes through the process of ordering the product the consumer wanted and the Telemarketing Entities who handle the incoming calls "capture" the consumer's credit or debit card information.  This portion of the call may take anywhere from approximately 5 to 15 minutes.

58.     Before the telemarketer lets the consumer off the line, MWI has the telemarketing entity read the following deceptive script to the consumer:

> Mr(s) _____, for purchasing **[NAME OF BAIT PRODUCT]** today, we're sending you a risk-FREE 30-day membership to **[MWI PROGRAM]**, a service designed to SAVE YOU 20% from leading stores such as **[STORES]**, PLUS additional savings on eyewear, beauty products, haircuts and more!  After 30 days, the service is extended to a full year for just $6 a month, billed annually in advance to the credit card you're using today.  If you want to cancel, just call the toll-free

number that appears in your kit in the first 30 days and YOU WON'T BE BILLED.
So look for that kit in the mail, OKAY?[43]

59.     The words in ALL CAPITAL LETTERS are the words the telemarketer emphasizes when reading the script. In other words, MWI emphasizes that the trial membership is "FREE," and that class members "WON'T BE BILLED."   At the end of the call, MWI merely tells class members: "So look for that kit in the mail, OKAY?"   MWI does not ask the consumers if they want to receive the purported trial membership, let alone any agreement to be enrolled in the membership. And, MWI does not ask the consumer for permission or consent to charge their credit and debit cards.

60.     At most, the consumer is led to believe that a free trial membership will be mailed to the consumer to evaluate, and if the consumer likes the product he or she can call to purchase a membership. *No express consent to mail the membership is obtained from the consumer, let alone any agreement to be enrolled in the membership. Nor is any express consent requested to bill the consumers' credit or debit cards*.   This is Defendants' "upsell" and Defendants' excuse for charging consumers for a membership program they neither wanted nor ordered.

61.     Notwithstanding the failure to obtain consent to enroll consumers in MWI's membership programs and charge their cards, the Telemarketing Entities transfer the class members' confidential credit and/or debit card information, which they obtained when the consumers called to purchase the unrelated bait products, to MWI.   MWI then mails a membership kit and charges the consumers' credit and/or debit cards.   Neither Defendants, the Telemarketing Entities nor the Bait Product Suppliers seek or obtain the consumers' express consent to charge the MWI membership to the consumers' credit and/or debit card accounts.

---

[43]     While there can be minor variations to the script – *e.g.*, the list of stores can change, the MWI program can change, the script may say "to thank you for your purchase," or as a "special thanks," and such – the substance of the telemarketing pitch is identical across all scripts.

62.     The fraud at issue is the assessment of an unsolicited and unlawful fee billed to consumers which the consumers did not seek out and did not want.  The consumers are deceived by Defendants' purposely misleading script, then mailed a membership kit and enrolled and billed for a membership they did not want or order.  Defendants' automatic self-renewing membership is an outright theft of money under the guise of a membership.

63.     During the call, the telemarketing operators who answered plaintiffs' calls, obtained their credit and debit card numbers and transferred that confidential financial information to Defendants neither provide their names to plaintiffs or the class members, nor provide the name of the telemarketing entity who employed them.  While this information was never made available to plaintiffs and the unnamed class members, as Defendants entered into contracts with the Telemarketing Entities, this information is readily available to Defendants and will be revealed during discovery.

**The Mechanics of the Scheme**

64.     To generate calls, Defendants rely on the popularity of the non-MWI products offered by the bait entities.

65.     After a consumer has viewed an infomercial or read an advertisement for a bait product they want to purchase, the class members call a "1-800" telephone number to order the product.  The purchasers of these products are given the option of purchasing by credit card or debit card.  To complete the purchase, the class members are required to provide their names, credit or debit card numbers and the expiration date to the Telemarketers who answer the calls and process the sales.  Thus, at the end of the purchase transactions, the Telemarketing Entities possess all of the information necessary for MWI to assess the unsolicited membership fees against unsuspecting consumers.

66.     After the financial information for the sale of the advertised bait product is obtained by the Telemarketers, MWI has them read the "upsell" script.  The message of the upsell script is that the consumer will be mailed a 30-day risk-free trial membership.  The class members are not asked whether they want to enroll, they are not invoiced and they are not asked to give or to confirm their credit or debit card information to pay for the membership.  Instead, Defendants wait approximately 30 days and then bill the class members' credit and/or debit cards using the information Defendants received from consumers when they purchased the product they actually wanted.

67.     The class members are never asked to provide their confidential credit or debit card information in connection with the unrelated MWI upsell.  Class members are never asked to give permission to permit their confidential financial information to be transferred to defendant MWI. The class members are never even asked if they want to receive the purported membership materials – rather they are simply informed that for purchasing the advertised product, risk-free they are being sent a 30-day trial membership.  The purported membership kit which allows the consumer to access the so-called benefits of the program are mailed 24 to 48 hours after the call.

68.     Approximately one month after the call, defendant MWI uses the confidential financial information it received from the consumers' purchases of the unrelated product to charge the class members' credit and/or debit cards. As happened with plaintiffs Waslin, the Smiths, Thornton, Kirch, Muoio, the Maistorus, Felichio, Half, Matula, Piehler, Befort, Gorman, Walker, Mosley, Holden and prior class representative Sanford, some consumers are "enrolled" more than once. This situation could only arise if the consumers did not know they had already been enrolled, or were going to be enrolled, in the purported membership as no one would twice pay $60-$170 to MWI to join the same membership.  It, of course, makes no difference to MWI how many times a

consumer is enrolled, as each "enrollment" is simply another $60-$170 a year for MWI, other than if a member is "enrolled" multiple times, they are more likely to notice the offending charge.

69.     The class members do not know they have been enrolled in MWI's membership programs and therefore never use any of the programs' so-called benefits (*see* ¶¶86-92 below). Defendants count on this deception and subsequent non-use of the benefits to hold the costs of the programs to a nominal amount thus making the annual fees pure profit for Defendants.

70.     Unless the class member notices the charge to their debit and/or credit card and calls to complain, the class member will continue to be billed $60-$170 each year.  As with the initial charges to the class members' credit and/or debit cards, no invoice or bill is ever sent to the class members to inform them that their credit and/or debit cards have been, or will be, billed by defendant MWI.  What is even more insidious is that the purported "annual" membership is billed every 11 months and, similarly, no invoice is ever sent to the class members for renewal charges.

71.     The fraud is perpetuated because the customers' prior expressed acceptance or consent to enroll in the membership is not obtained.  Defendants do not clearly and unambiguously communicate the terms of the purported membership programs.  The membership that is mailed is neither risk-free, nor a free 30-day trial as was represented by Defendants.  Defendants charge the class members for a membership they did not order.  The consumers billed for the membership who never use the so-called benefits are paying $60-$170 per year for nothing.

72.     Defendants know that consumers do not understand that they will be billed a membership fee unless they call to cancel based on Defendants' testing, data and past experiences. Defendants mail the membership kit fully understanding that the consumer will not understand they are being billed for the materials.  Further, Defendants have designed the generic membership materials so as to appear to be "junk mail" so the materials will be discarded and thus never read. Defendants purposely design their scripts to maximize consumer confusion and allow Defendants to

"enroll" the maximum number of unsuspecting persons. Defendants then mail the membership kit to the deceived and/or confused consumers who Defendants "enroll" in the MWI memberships. Defendants are able to maximize their profits at the expense of the consumers deceived by Defendants' scheme.

73.     The *only* notice that a class member receives that he or she has been billed for a membership is his or her credit or debit card statement reflecting a charge – which may or may not identify MWI as the entity who levied the charge – which the class member may not notice depending on how closely the class member reads his or her credit and/or debit card statement. If the class member notices and challenges the charge, the charge may be reversed or a pro rata refund may be sent. In this way, Defendants conceal their deception from the other class members and from the public. Those class members who do not notice the charge are billed every 11 months until they notice that they have been billed and complain.

74.     These acts take place as a result of the concerted action, agreement and direction by Defendants.

**The Lack of Audiotaped Confirmations**

75.     Until required as part of the Nebraska Attorney General "Best Practices" requirements (June 1, 2001), Defendants failed to confirm consumers' acceptance of the upsell offer by MWI for many, if not most, of the "enrolled" consumers.

76.     Accordingly, no audiotaping of the upsells occurred for most of the class members deceived by Defendants.

**The Deceptive Telemarketing Script**

77.     Defendants worked together to produce a script to be read to each consumer. MWI creates the deceptive scripts to be read when marketing the MWI programs and the Telemarketing Entities comment on and approve the deceptive scripts.

78.     Defendants purposely avoid clearly and unambiguously notifying consumers that their credit and/or debit cards will be billed between $60-$170 for the "membership" mailed to them. No focus groups or other consumer research is undertaken by Defendants.  Even after Defendants received numerous consumer complaints, ranging from a lack of any recollection of ever even hearing of MWI or any of its purported memberships to accusations of fraud and theft, Defendants avoided ascertaining whether their scripts clearly and unambiguously: (1) requested consent from the consumer to charge for the membership; (2) notified the consumers of the terms of the purported membership; or (3) informed the consumers that their credit and/or debit cards would be billed.

79.     Defendants are well aware of the fact that consumers are deceived by their scripts as seven state attorneys general alleged that MWI was deceiving consumers.  MWI settled the matters with five of the attorneys general, and agreed to pay civil penalties in excess of $2 million to one of those attorneys general.  Defendants know that consumers are misled into believing that they are not making a purchase decision regarding the MWI memberships.  Defendants' script is intended to, and does, convey to consumers that the membership mailed to them is a free trial membership, which if they like the membership they can call to order.

80.     The scripts are written and designed to be read in a manner intended to confuse, mislead and deceive consumers.

81.     Defendants' conduct is deceptive, unlawful and fraudulent and it cannot be justified in any manner.  Indeed, seven different attorneys general have determined that these same MWI scripts are deceptive and do not clearly and unambiguously communicate to consumers that they will be billed for an annual self-renewing membership unless they affirmatively act to cancel the membership.  Nor do the scripts inform the class members that they will be required to return the purported membership card should they desire to cancel.

**The Purported "Membership Kit"**

82.     Twenty-four to 48 hours after receiving the class members' confidential financial information by piggybacking onto the advertised product, defendant MWI mails out membership materials and customer service information to the persons enrolled.  Then, MWI simply charges the consumers $60-$170 each year on the consumer's credit or debit card.

83.     Defendants have designed the generic purported membership materials so as to appear to be "junk mail" in the hopes that the materials will be discarded and thus never read.  If the packet mailed by MWI for the risk-free trial membership is thrown out by the recipient, then the consumer will not have the number to access the so-called benefits.  The kits are mailed out bulk rate indicating the lack of value of the material.  The kits contain a cheap paper membership card typical of cards received in mail solicitations.  This card is, however, the actual membership card for the enrolled member.  By making the kit typical junk mail, Defendants further conceal the fact that the class members have been billed an annual, self-renewing membership fee.

84.     Other than the one line on their credit and/or debit card statements, the class members are not notified that they have been "enrolled" in an MWI membership program or that their credit and/or debit cards have been billed.  Defendants do not send new "members" any invoice or record of the charge.  Moreover, after the membership kits are mailed and consumers are billed and throughout the duration of the "membership," class members never hear from any of the Defendants about any membership benefits.  After the initial mailing of the membership kit, consumers do not receive any newsletters, coupons, surveys or any other notifications.  The only thing they receive is a charge of $60-$170 on their credit and/or debit cards.

85.     The term "membership" used by Defendants is merely an excuse to take money from consumers who submit their credit and/or debit card information for their purchase of other products.

Defendants take consumers' money by mailing them an unordered membership and then charging them for it.

**Lack of Usage of the Membership Benefits**

86.     The manner in which a consumer can access the purported membership is further evidence of Defendants' scheme to defraud.  Other than the purported membership kit, Defendants do not send "members" anything.  No newsletter or other correspondence is sent to the class members.  No confirmation letters or satisfaction surveys are sent.  The class members receive nothing after they are billed, or before the next time they are "renewed."

87.     For consumers to obtain the purported membership benefits, they must contact defendant MWI either by telephone or via the Internet, and obtain certificates through MWI.  If the retail establishment works with MWI, then the consumer can order a certificate that can be used at that retail establishment.  Unless the consumer knows to call MWI, they receive nothing.[44]

88.     In the *West Action*, MWI produced a database containing the transactions of 567,430 California consumers, many of whom are members of the class.  Some of these consumers were enrolled under West's joint venture and wholesale arrangements with MWI, which were  settled in the *West Action* and for which no recovery is sought in this action.  The database establishes that 552,605 (or 97.5%) of the consumers included in this database never used any membership benefits. The database establishes that out of 567,430 consumers included in the data, ***only one person*** purchased any of the following membership benefits:

---

[44]     Some coupons of nominal value are included in the purported membership kits.  However, the "reward program" is the "member benefit" and the reward program requires the "member" to contact MWI to use it.

| $25 Exxon Gas Card | $25 WalMart Gift Card |
| $25 Gas Card Choice A | $25 Babies R Us Gift Card |
| $25 Warner Bros. Certificate | $25 SunCoast Gift Card |
| $25 Hollywood Video Gift Cards | Hickory Farms Offer |
| Lady Footlocker Merchandise Certificate | Sharper Image Coupon |

89.     The database establishes that out of 567,430 consumers *only two people* bought one or more of the following:

| ARCO Gas Cards | $25 Structure Certificates |
| $10 Olive Garden Gift Cards | $25 Bloomingdales Certificates |
| Zales Certificates | |

90.     The database establishes that out of 567,430 consumers *only three people* bought one or more:

| $10 Toys R Us Certificates | $25 Borders Gift Cards |
| $25 Barnes and Nobel Gift Certificates | |

91.     The database establishes that out of the 567,430 consumers, four people bought one or more $25 Toys R Us Gift Cards or a $10 Applebees Certificates; five bought a GNC Coupon; eight bought a $10 Blockbuster Gift Card or a $25 Linens-N-Things Gift Card; ten bought a $25 Sam Goody Gift Card, a $25 K-Mart certificate or a $10 Red Lobster/Olive Garden Certificate; 11 bought a $10 Outback Steak House Certificate or a $25 Lowes Gift Card; 12 bought a $25 KB Toys Gift Card; 16 bought a Pier 1 Gift Card; 17 bought a $25 Footlocker Certificate; 26 bought a $25 Home Depot Gift Certificate; 28 bought a $25 Sears Certificate; 35 bought a Nordstrom Gift Certificate; 36 bought a $25 TJ MAXX Certificate; and just 152 people bought a $25 Target gift card.  Equally significant, the most purchased benefits were purchased by less than one percent of the 567,430 consumers – just 0.4% (2,250 people) received one or more $40 Hair Cut Rebates and just 0.7% (4,063 people) received four $5 Dining Rebates.

92.     The lack of use of the membership benefits demonstrates that Defendants knew, or should have known, that the people they billed $60-$170 were utterly unaware that they had been billed for and enrolled in the MWI memberships.  Consumers were treating the membership kit as

the law allows; they were ignoring it and assuming they had no obligation to the sender of the unordered merchandise.  Defendants billed them and took their money in violation of law.

**Consumer Complaints**

93.     Immediately after the first customers were billed for an MWI membership, Defendants began receiving an enormous number of customer complaints.  These complaints ranged from the consumers having no recollection of ever being told about an MWI program to irate consumers alleging theft and fraud by Defendants.  A simple Internet search for "MemberWorks," pulls up thousands of consumer complaints, including websites such as www.ripoffreport.com, www.consumeraffairs.com and www.uspeakout.com.  Despite receiving such complaints and despite knowing of the existence of a number of Internet sites dedicated to complaining about MWI and its unlawful practices, Defendants took no steps to make sure that their marketing practices were not deceptive.

94.     In addition to complaints directly by consumers, MWI received numerous inquiries by the Better Business Bureau (the "BBB") regarding their practices as they related to customers. Defendant MWI received an unsatisfactory rating by the BBB due to a pattern of complaints concerning unauthorized charges to consumers' credit cards.  The BBB's website reported on June 30, 2006 that it had processed a total of 2,277 complaints about MWI in the previous 36 months, including 765 in the previous year.  The conduct giving rise to these complaints continues. Almost one year later, on June 2, 2007, the BBB's website reported that it had processed a total of 2,180 complaints about MWI in the previous 36 months, including 667 in the previous year.

95.     Defendants received so many complaints from consumers that they scripted responses to "frequently asked questions" or "FAQs" for their customer service representatives.  The following "frequently asked questions" were received by Defendants who prepared scripted responses to them:

(a)     "I received my credit card bill and saw this Essentials or Home & Garden Rewards program listed here for $84 – what is this";

(b)     "I don't remember hearing about Essentials or Home & Garden Rewards";

(c)     "I said 'no' to this program";

(d)     "I didn't authorize this program"; and

(e)     "Who authorized this billing/purchase?"

96.     The conduct of each of the Defendants contributed to the scheme designed to deceive and defraud class members, resulting in the unlawful assessment of an unsolicited annual recurring membership fee.

**Governmental Actions**

97.     Every governmental and judicial entity to review Defendants' telemarketing practices has concluded they are deceptive and misleading.

98.     Seven attorneys general (from Minnesota, New York, Nebraska, California, Florida, Ohio and Iowa) have separately concluded that the telemarketing scheme Defendants employed was deceptive.  In the words of the Minnesota Attorney General:

"They just say at the end of the script so we're going to send you the package in the mail ok and they never say Is it OK to charge your credit card? . . .  [The Telemarketers] tell you that the deal is about you getting something for nothing . . . . You're going to get a free gift, you're going to get a risk-free membership and that's not what the real deal is.  The real deal is you're going to get billed unless you act to cancel that."[45]

99.     According to the New York Attorney General:

Consumers may be confused and mistakenly believe that (1) their credit card or bank card accounts will not be debited unless they directly provide their billing information to MW; (2) they do not have to take any affirmative action to avoid being billed a membership fee; (3) they do not have to take any affirmative action to

---

[45]     *Why Some U.S. Flag Buyers Are Seeing Red*, ABC News.com, Nov. 28, 2001.

avoid being billed a renewal fee upon expiration of the initial membership term; and (4) they are not making a purchasing decision at the time of the telemarketing call.

100.    The New York Attorney General also billed that:

Because the trial offer is termed "risk free," Consumers may be confused or fail to understand that they will be billed a membership fee unless they cancel their membership before the end of the trial offer.  By reason of the foregoing, the Attorney General believes that MW has engaged in business conduct that has the tendency and capacity to be deceptive and misleading in violation of New York's consumer protection laws.

101.    As a result of the Minnesota and New York Attorneys General investigations, MWI was forced to stop reading its scripts to Minnesota and New York consumers until the scripts were revised to: (1) inform consumers that they would be billed after 30 days if they did not call to cancel; and (2) ask the consumers' permission to charge their credit and/or debit cards.  While in 2001 MWI ultimately revised the scripts in Minnesota and New York, it did not include similar disclosures on any of its scripts read in any other state.

102.    Following on the Minnesota and New York investigations, the Nebraska Attorney General implemented an investigation into the deceptive telemarketing practices and came to the same conclusions as the Minnesota and New York Attorneys General investigations.  As a result, MWI was required to modify its scripting nationwide to inform consumers that they would be billed after 30 days if they did not call to cancel and to ask their permission to charge their credit and/or debit cards.  The new scripting requirements were referred to as "Best Practices" requirements or "Best Practices" scripting.  Prior to the June 1, 2001 deadline for implementing the Best Practices scripting, MWI tested the disclosures on several "bait" products.  The results were dramatic as affirmative responses to the telemarketing script dropped to nearly zero.  In response to the test results, MWI secured an extension of the implementation date, and returned to using the old deceptive scripting to maximize their "sales."

103.    In 2001, MWI also entered a settlement with the California Attorney General relating to the sale of MWI memberships to consumers who called to purchase unrelated products from

Sears.  Under the settlement, MWI agreed to pay an unprecedented $2 million fine.  MWI also agreed to use the Best Practices scripts in California, and to send renewal notices to California residents that they would be billed unless they called to cancel.

104.    On information and belief, in order to circumvent the scripting requirements required by the Nebraska, Minnesota, New York, Florida and California Attorneys General, MWI hatched a scheme to allow it to continue its deceptive telemarketing practices.  Without discussing the matter with any of the attorneys general, MWI and certain of the Telemarketers took the position that the Best Practices requirements did not apply to enrollments originated by the Telemarketers.  This meant that while Best Practices scripting would have to be used where MWI simply paid a fee to the Telemarketers to read the scripts and where consumers were enrolled under the joint venture arrangements with the Telemarketers, the old deceptive scripting would continue to be read by Telemarketers having wholesale arrangements with MWI.  Certain of these Telemarketers would then turn around and "sell" the enrolled consumers back to MWI who would bill the credit and/or debit cards of consumers for the bogus memberships.

105.    On October 21, 2003, the Florida Attorney General filed a complaint concerning Defendants' deceptive telemarketing practices. Noting that MWI reported annual revenue of $400 million, the Florida Attorney General's Office indicated its investigation estimated that 50% of all sales were reported as "unauthorized."  In 2004, MWI also entered into a settlement agreement with the Florida Attorney General relating to the sale of its products in conjunction with unrelated infomercial products.  MWI agreed to pay a $950,000 fine.  The agreement also required MWI to clearly disclose all terms and conditions of its programs, and to obtain consumers' express consent to charge their credit cards for MWI programs.

106.    The Iowa Attorney General filed suit on May 11, 2006.  As part of its investigation, the Iowa Attorney General sent questionnaires to 400 Iowa residents enrolled in MWI membership

programs.  Among the questionnaire respondents, 67% indicated that they did not know they were members and/or that they did not authorize MWI to charge them.  The Iowa Attorney General reports that: "Most of the rest of the consumers who responded indicated that they had never used their membership, or thought that they had already cancelled.  None of those responding said that they were satisfied members."

107.   In 2002, the Federal Trade Commission (the "FTC") published its Notice of Proposed Rulemaking (the "Notice") pertaining to telemarketing sales rules stating "in many pre-acquired account telemarketing solicitations, products and services (often buyers' clubs) are marketed through the use of free trial offers, which are presented to consumers as 'low involvement marketing decisions.'"  *See* 67 Fed. Reg. 4492, 4501 (Jan. 30, 2002).  The Notice went on to state, "[c]onsumers are asked merely to consent to the mailing of materials about the offer.  Consumers frequently do not realize that the seller or telemarketer already has their billing information in hand and, instead, mistakenly believe they must take some action before they will be billed – *i.e.*, that they are under no obligation unless they take some additional affirmative step to consent to the purchase." *Id*.

108.   In 2003, the FTC enacted rules to combat "abusive telemarketing . . . practices" by telemarketers using a "free-to-pay conversion feature" when the telemarketers have "pre-acquired account information."  *See* 16 C.F.R. §310.4.  Significantly, in adopting these rules, the FTC included defendant MWI among a list of "bad actors" billed with engaging in this type of abusive telemarketing practices.  68 Fed. Reg. 4580, 4621 n.472 (Jan. 29, 2003).  The rule sets forth three objective requirements which, at a minimum, must be satisfied to meet the FTC's informed consent requirement.  MWI would have had to "obtain ***from the customer***, at a minimum, the last four (4) digits of the account number to be billed." 16 C.F.R. §310.4(a)(6)(i)(A) (emphasis added).  It would have had to "obtain ***from the customer*** his or her express agreement ***to be billed*** for the goods or

services **and to be billed using the account number** [identified by the customer]."  16 C.F.R.

§310.4(a)(6)(i)(B) (emphasis added).  And MWI would have had to "make and maintain an audio

recording of the entire telemarketing transaction."  68 Fed. Reg. 4580, 4621 n.471 (Jan. 29, 2003).

In order to circumvent these requirements, MWI began charging $1 for the 30-day trial so that at the

end of 30 days, there would not be a "pay to pay" conversion, as with what happened to Waslin.

109.    In connection with the rule-making proceedings, MWI submitted a purported

consumer survey on the understandability of the telemarketing scripts.  The FTC concluded that

MWI's survey was biased in its favor and that even in the face of this bias, the study demonstrated

that "at least 46 percent of the respondents did not even 'mostly' understand the way in which they

would be billed after listening carefully to a sales offer involving pre-acquired account information

and a 'free-to-pay conversion' feature."  68 Fed. Reg. 4580, 4621 n.468 (Jan. 29, 2003).

110.    In the Original *Sanford* Federal Action, after weighing the evidence and expert

testimony submitted, the federal arbitrator concluded:

> When I look at the overall picture here from an objective reasonable person
> viewpoint I consider: the experience that MWI has had in thousands of these cases,
> the circumstances of this type of call (an unsolicited, unexpected offer read by MWI
> with high sounding words such as "RISK-FREE" membership – "YOU WON'T BE
> BILLED" – "So, look for this kit in the mail, OKAY?"), *I conclude that even if the
> script was read to [the consumer], [they were] misled, [they] didn't agree to this
> "deal," there was no meeting of the minds*, and MWI not only could suspect, but
> knew that many of the callers did not understand that they were making a "deal" to
> purchase a membership and assuming a burden to act.

Arbitration Award at 6-7 (emphasis added).

111.    In reaching this conclusion, the arbitrator stated: "I conclude that the script has fuzzy

language, would have been read in less than 30 seconds (my estimate) as a fast sell over the phone

for a product that had nothing to do with the purpose of [the consumer's] call.  The script, if it was

read to [the consumer], was *foisted upon [them] in a quick, slick and misleading sales pitch that

few people would understand*."  *Id*. at 7 (emphasis added).  Ultimately, he found: "***This script is a***

*recipe for misunderstanding and confusion when heard by a consumer hearing it under the*

*circumstances*." *Id*. at 8 (emphasis added).

112.    In the *Ritt Action*, the Ohio Court of Appeals found that the upsell scripts were

deceptive and misleading:

> The fact is, with or without authorization, consumers who stayed on the telephone line long enough to receive the entire scripted pitch would not have known the ramifications of what they were agreeing to once the upsell had been pitched to them and they said "yes" to receiving a membership kit.[46]

## TOLLING OF THE STATUTE OF LIMITATIONS

113.    The running of any applicable statutes of limitation has been tolled for several

reasons.

**Tolling by Virtue of 28 U.S.C. §1367**

114.    The EFTA and state-law claims asserted herein were originally filed in the Original

*Sanford* Federal Action in the United States District Court for the Southern District of California.

Sanford and the Smiths were the plaintiffs and class representatives in that action.  The Original

*Sanford* Federal Action has been continuously pending since it was filed on March 28, 2002.

115.    On September 29, 2008, the court dismissed the federal claims without prejudice and

declined to exercise supplemental jurisdiction over the Smiths' and the class members' state-law

claims.  In that order, the court denied plaintiffs' request for leave to amend.

116.    On October 14, 2008, plaintiffs filed an *ex parte* application for reconsideration,

asking the federal court for leave to amend the complaint.  Plaintiffs' application was granted on

November 3, 2008, with the Court directing plaintiffs to file a motion for leave.

---

[46]    *Ritt v. Billy Blanks Enters.*, No. 80983, 2003 Ohio App. LEXIS 3297, at *7, *20-*21 (Ohio Ct. App. July 10, 2003).

117.    On November 17, 2008, plaintiffs filed the motion for leave to amend, seeking to include federal Racketeer Influenced and Corrupt Organizations Act ("RICO") counts, and to re-allege the EFTA and state-law claims which had been dismissed without prejudice.

118.    On December 16, 2008, Defendants filed an *ex parte* motion to dismiss or, in the alternative, to strike, among other things, the re-pled state-law claims from the proposed amended complaint.  Defendants argued that the court had earlier required plaintiffs to re-file these claims in state court.  Defendants stated that "the Court previously dismissed numerous state law claims without prejudice, and thus the state law claims can be pursued in the appropriate state court(s)." Defendants' Motion at 8.

119.    On December 23, 2008, the federal court struck the state-law claims from the proposed amended complaint, holding: "Furthermore, dismissing the action would not preclude Plaintiffs from pursuing relief in other venues.  The Court has not precluded the Plaintiffs from pursuing its state law claims in state court."  December 23, 2008 Order at 4.

120.    Pursuant to 28 U.S.C. §1367(d), where, as here, a district court declines to exercise supplemental jurisdiction over state-law claims, the statute of limitations for all claims that have been dismissed without prejudice "shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."

121.    As for the transferred actions that were re-filed in state court only to be subsequently removed back to federal court, the applicable statutes of limitation for the re-pled claims asserted have been tolled from March 28, 2002 (the date the Original *Sanford* Federal Action) through January 22, 2008 (the date the EFTA claims and the state-law claims were stricken from the proposed third amended complaint in the Original *Sanford* Federal Action).

122.    Defendants have at all times known the core facts concerning the claims for which plaintiffs and the class members seek to hold them accountable.  Defendants have also known that at

no time have plaintiffs ever intended to drop the claims asserted against them.  Accordingly, there is

no prejudice to Defendants in permitting plaintiffs and the class members to proceed with this action

and prosecute their rights against Defendants.

**Equitable Tolling by Reason of Estoppel**

123.    Plaintiffs re-allege and herein incorporate by reference the allegations stated in ¶¶1-

122 above.

124.    In their December 16, 2008 *ex parte* motion, Defendants argued that plaintiffs and the

unnamed class members would not be prejudiced by the striking of the claims from the Original

*Sanford* Federal Action, that have since been re-pled in these transferred actions, because "the Court

previously dismissed numerous state law claims without prejudice, and thus the state law claims can

be pursued in the appropriate state court(s)."  Defendants' Motion at 8.

125.    Based in part upon Defendants representations, the district court granted Defendants'

request.  In doing so, the district court specifically held:  "Furthermore, dismissing the action would

not preclude Plaintiffs from pursuing relief in other venues.   The Court has not precluded the

Plaintiffs from pursuing its state law claims in state court."  December 23, 2008 Order at 4.

126.    As defendants represented to the district court that dismissal of these claims from the

Original *Sanford* Federal Action did not preclude plaintiffs from prosecuting these claims were they

to be subsequently re-pled, Defendants are estopped from asserting the statute of limitations preclude

the prosecution of these claims.

127.    Defendants have at all times known the core facts concerning the claims for which

plaintiffs and the class members seek to hold them accountable.  Defendants have also known that at

no time have plaintiffs ever intended to drop the claims asserted against them.  Accordingly, there is

no prejudice to Defendants in permitting plaintiffs and the class members to proceed with this action

and prosecute their rights against Defendants.

**Tolling by Reason of Prior Class Action Pending**

128.   Plaintiffs re-allege and herein incorporate by reference the allegations stated in ¶¶1-127 above.

129.   The claims asserted herein were originally asserted in the Original *Sanford* Federal Action.  The Original *Sanford* Federal Action is and was brought as a nationwide class action.  The EFTA and state- law claims were finally severed from the federal action on December 23, 2008.

130.   The dismissal of the claims asserted under 39 U.S.C. §3009, as well as the district court's denial of plaintiffs' motion for leave to amend, remain pending on appeal before the Ninth Circuit.

131.   Under established case law, the filing of the Original *Sanford* Federal Action against MWI tolls all statutes of limitation until a final judgment of dismissal, which is no longer subject to additional appeals, has been entered.

132.   In its September 29, 2008 Order granting Defendants' motion to dismiss the federal claims, and refusing to exercise supplemental jurisdiction over Sanford's and the class members' state-law claims, the court in the Original *Sanford* Federal Action, relying on *Wright v. Schock*, 742 F.2d 541, 545 (9th Cir. 1984) (citing *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 352-53 (1983)), held the pendency of the federal action "tolled the statute of limitations for individual claims, mitigating prejudice to members of the putative class."  September 29, 2008 Order at 8.

133.   Defendants have at all times known the core facts concerning the claims for which plaintiffs and the class members seek to hold them accountable.  Defendants have also known that at no time have plaintiffs ever intended to drop the claims asserted against them.  Accordingly, there is no prejudice to Defendants in permitting plaintiffs and the class members to proceed with this action and prosecute their rights against Defendants.

**Tolling by Virtue of Defendants' Fraudulent Concealment**

134.    Plaintiffs re-allege and herein incorporate by reference the allegations stated in ¶¶1-133 above.

135.    Through various techniques and devices of secrecy, deception and misrepresentation, Defendants affirmatively and intentionally concealed the existence of their unlawful and unfair telemarketing practices from plaintiffs, class members and the public.  The fraudulent concealment, deception and misrepresentation existed before plaintiffs were enrolled and billed and continued throughout the class period.  Defendants carried out their violations of law in secret and consistently deceived, misrepresented and concealed the truth regarding the unauthorized enrollment into the various membership programs and the unauthorized charging of plaintiffs' and class members' credit and/or debit cards.  Such acts included purposely designing their scripts to maximize consumers' confusion, thus allowing Defendants to enroll the maximum number of unsuspecting consumers.

136.    Defendants' scheme is based upon their knowledge that a large segment of the consumer population does not check their credit card statements and/or would miss the charge even if they did review their credit card statement.

137.    So as to assuage any suspicion that a consumer may have, Defendants emphasize that the trial membership they are sending is "FREE" and that the class members "WON'T BE BILLED."

138.    To conceal the fact of billing consumers' credit and/or debit cards, Defendants intentionally did not send plaintiffs or class members any invoice or any other notification that they were going to charge their cards.  Similarly, to conceal the true facts concerning the billing of the consumers' credit and/or debit cards, after they billed the consumers' credit and/or debit cards, Defendants did not send any invoice, or notification of the fact that they had in fact billed the class members' cards.

139.     Another method that Defendants used to conceal their wrongful practices from plaintiffs and the class was to reverse the charges for any consumer that was able to track down the source of the illicit charge and called to complain.  After reading scripts in an attempt to keep the consumer enrolled, Defendants and/or their agents would reverse the charges for complaining consumers so that the complaints did not get escalated to the point that their practices became common knowledge and reached the ears of the consumers they illicitly enrolled in, and billed for, the bogus programs.  Further evidence of this concealment is demonstrated by the existence of a Frequently Asked Questions script providing their telephone operators and/or operators of their agents, with scripted answers to consumer questions/statement such as "I did not authorize this charge," "how did you get my credit card number" and "what is this program," among others.

140.     To further conceal their wrongful conduct from those consumers who did review their credit card statements, Defendants intentionally billed between $60-$170 – amounts that were unlikely to rouse suspicion from the consumer and provoke any further inquiry.  Indeed, had Defendants billed the consumers' credit and/or debit cards for several hundred dollars, consumers would be more likely to notice the illicit charges and seek to have them reversed.  Similarly, the identification of the charges was designed to conceal the illicit nature of the subject charges, as the charges were identified by such words as "Essentials," "Value Max" and "Home and Garden," among others.  A consumer who reviewed his or her statement seeing a charge for $75 to "Essentials," for example would likely perceive such name to be a clothing store, curio store, drug store or other retail establishment from which his or her spouse would have made a purchase, and thus not pursue any further inquiry to determine if the charge was legitimate or fraudulent.

141.     Through such acts of fraudulent concealment, even assuming that a class member noticed the charge on their credit or debit card statement, the existence of a charge for Essential,

Value Max, Home & Garden or others would not provide any indication to the class member that their card was fraudulently billed.

142.    Defendants' scheme worked perfectly on plaintiffs and the class members. Succumbing to Defendants' practices of fraudulent concealment described above, plaintiffs Waslin, Callahan, Malloy, Tarantino and Ashburne did not notice the fraudulent charges when they were originally enrolled, and billed by Defendants.

(a)    Waslin contacted MWI inquiring about suspicious charges to his debit card. Waslin was or may have been refunded the most recent charges, but was never informed of all or any previous charges.

(b)    Callahan contacted MWI inquiring about suspicious charges to her credit card. Callahan was or may have been refunded the most recent charges, but was never informed of all or any previous charges.

(c)    Malloy contacted MWI inquiring about suspicious charges to her credit card. Malloy was or may have been refunded the most recent charges, but was never informed of all or any previous charges.

(d)    Tarantino contacted MWI inquiring about suspicious charges to her credit card.  Tarantino was or may have been refunded the most recent charges, but was never informed of all or any previous charges.

(e)    Ashburne contacted MWI inquiring about suspicious charges to his credit card.  Ashburne was or may have been refunded the most recent charges, but was never informed of all or any previous charges.

(f)    Faulk contacted MWI inquiring about suspicious charges to her credit card. Faulk was or may have been refunded the most recent charges, but was never informed of all or any previous charges.

(g)    Loeper contacted MWI inquiring about suspicious charges to her credit card. Loeper was or may have been refunded the most recent charges, but was never informed of all or any previous charges.

143.    By virtue of their pervasive deception and misrepresentation and concealment of facts, Defendants successfully concealed from plaintiffs and class members the truth about the memberships thereby tolling the running of any applicable statutes of limitation.  Plaintiffs and class members were unaware of, and through the exercise of due diligence could not have discovered, the existence of such violations until after they had been billed for the membership.

144.    In the alternative, based on the facts alleged herein, Defendants are estopped from relying on any statutes of limitation because of their fraudulent concealment, deception and misrepresentation of facts regarding the enrollment into the membership programs and unauthorized charges.  They were under a duty to disclose this information because it is non-public information over which Defendants had exclusive control, because Defendants knew this information was not available to plaintiffs and class members and because this information was crucial to the consuming public in making purchasing decisions.

## CLASS ACTION ALLEGATIONS

145.    Plaintiffs bring this action on behalf of themselves and all other persons similarly situated.  The class which plaintiffs represent is composed of all persons in the United States (or such states as the Court may certify) who, after calling a telephone number to inquire about or purchase another product: (1) were sent a membership kit in the mail; and (2) billed for an annual MWI membership program (the "Class").[47]  Excluded from the Class are all persons enrolled in an

---

[47]    The Class which plaintiffs represent is comprised of all person in the United States who after called a telephone number to inquire about or purchase another product between January 1, 1998 and March 31, 2003.

MWI program under the March 16, 1998 "Joint Marketing Agreement between West Telemarketing Corporation and MemberWorks Incorporated," and/or the January 1, 1999 "Agreement" between West Telemarketing Corporation and MemberWorks Incorporated, and/or the July 1, 1999 "Joint and Wholesale Marketing Agreement" between West Telemarketing Corporation, West Teleservices Corporation and MemberWorks Incorporated and/or the December 1, 2001 "Wholesale and Retail Marketing Agreement" between MemberWorks Incorporated and West Direct, Inc., and any amendments or addendums to these agreements.[48] Not included within the Class are Defendants and their officers, directors, employees, agents and/or affiliates.

146.    The Class is composed of hundreds of thousands of persons geographically dispersed throughout the country, the joinder of whom in one action is impracticable, and the disposition of their claims in a class action will provide substantial benefits to both the parties and the Court.

147.    The Class is ascertainable and maintains a sufficient community of interest since the rights of each member of the Class were violated in a similar fashion based upon Defendants' use of a uniform script that was read to the class members.

148.    The victimized consumers can be identified in the databases maintained by MWI. More specifically, MWI maintains databases that contain the following information: (1) the name of each class member "enrolled" in an MWI program via an inbound call; (2) the address of each such class member; (3) the dates each class member was enrolled; (4) the date and amount each class member was billed; and (5) the date and amount each class member was refunded.  Thus the class members can be located and notified with specificity of the pendency of this action using techniques and a form of notice customarily used in class action litigation.

---

[48]    The identities of the consumers encompassed by this exclusion are identified on Exhibit A to the Declaration of Markham Sherwood Re Mailing of Notice and Claim Form, Report on Opt-Outs and Objections Received, filed in the *West Action* in support of plaintiffs' final approval of settlement.

149.    Plaintiffs' claims are typical of the members of the Class as a whole because of the similarity, uniformity and common purpose of the unlawful conduct of Defendants.  Each class member was read the subject "upsell" script.  Each class member was mailed a membership kit for an MWI membership program.  Each class member has sustained damage as a result of Defendants' wrongful conduct in violation of state statutes, state common law, as well as general principles of equity and fair play.

150.    Plaintiffs will fairly and adequately protect the members of the Class as plaintiffs have retained competent counsel who are experienced in federal and state class action claims such as those asserted in this case.

151.    A class action is superior to all other methods for the just, fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, the damages suffered by individual class members are not sufficient to justify the enormous cost associated with the prosecution of this type of litigation.  The expense and burden posed by such individual litigation makes it impossible for the class members to individually redress the wrong done to them, nor would such an individual case be adequate to ensure that such practices cease to harm others.  Further, there will be no difficulty in the management of this action as a class action.

152.    Common questions of law and fact exist as to all members of the Class and these common issues predominate over any questions which go particularly to any individual member of the Class.  Among such common questions of law and fact are the following:

(a)    did Defendants mail memberships to the class members without obtaining prior express consent or acceptance;

(b)    were the subject "upsell" scripts deceptive;

(c)    did Defendants clearly and unambiguously communicate that the class members would be billed unless they called Defendants to cancel the "risk-free" trial membership;

(d)     were the membership materials deceptive;

(e)     did Defendants act willfully or recklessly;

(f)     did Defendants' acts, as alleged herein, violate federal statutes, the common law, state consumer protection statutes and/or general principles of equity and fair play;

(g)     what amount of damages has the Class sustained as a result of Defendants' wrongful conduct, and the proper measure of such damages; and

(h)     what restitution is due class members.

## COUNT I

**For Violations of the Electronic Fund Transfer Act, 15 U.S.C. §1693 *et seq.***
**(On Behalf of Plaintiffs Waslin and Geldmacher and the Members of the Class Whose Debit Cards Were Billed)**

153.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-152 above.

154.    MWI billed Waslin's debit card on August 22, 2002, September 18, 2002, September 25, 2002 and October 15, 2002.  At no time did MWI secure oral authorization, let alone written authorization, to levy such debit card charges.

155.    MWI billed Geldmacher's debit card on September 19, 2001.  At no time did MWI secure oral authorization, let alone written authorization, to levy such debit card charges.

156.    Accordingly, Waslin and Geldmacher have standing to assert this Count on behalf of themselves and to act as class representatives and represent the interests of the unnamed class members whose debit cards were similarly billed by MWI without having first obtained written authorization to levy such charges.

157.    The purpose of the EFTA is "to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund transfer systems."  15 U.S.C. §1693(b). The primary objective of the EFTA "is the provision of individual consumer rights."  *Id.*

158.    The EFTA provides that "[a] preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." 15 U.S.C. §1693e(a). "In the case of preauthorized transfers from a consumer's account to the same person which may vary in amount, the . . . designated payee shall, prior to each transfer, provide reasonable advance notice to the consumer, in accordance with the regulations of the Board, of the amount to be transferred and the scheduled date of the transfer." 15 U.S.C. §1693e(b).

159.    Defendants engaged in "unauthorized electronic fund transfers," as that term is defined in 15 U.S.C. §1693a(11), by debiting consumer's bank accounts without the consumer's actual authorization.  As alleged herein, Defendants failed to comply with their duties under the EFTA because they initiated electronic fund transfers from the class members' accounts without obtaining authorization in writing.

## COUNT II

**For Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1962(c) and 1964(c) – Credit Card Fraud Enterprise (Participation in an Enterprise) (On Behalf of All Plaintiffs and All Members of the Class)**

160.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-159 above.[49]

161.    This claim for relief arises under 18 U.S.C. §§1962(c) and 1964(c) of the RICO, which provide:

18 U.S.C. §1962(c): "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign

---

[49]    Plaintiffs recognize that the district court's March 6, 2009 Order denying Sanford's and the Smiths' motion for leave to amend to include this claim in the Original *Sanford* Federal Action may impact this Count.  However, this Count is alleged in this Complaint in order to protect their rights, and the rights of the absent class members.

commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

18 U.S.C. §1964(c): "Any person injured in his business or property by reason of a violation of section 1962 of this chapter [18 U.S.C. §1962] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ."

162.    **Person**: At all relevant times, defendant MWI was a "person" within the meaning of 18 U.S.C. §1961(3).

163.    **Enterprise**: At all relevant times, MWI (described in ¶1), the Telemarketing Entities (described in ¶¶1, 164(b)) and the Bait Product Suppliers (described in ¶¶1, 164(c)) constitute the "Credit Card Fraud Enterprise" – an enterprise within the meaning of 18 U.S.C. §1961(a), and together constitute an "enterprise in fact" within the meaning of 18 U.S.C. §1961(4).  MWI, the Telemarketing Entities and the Bait Product Suppliers intentionally agreed to levy, and did levy, illicit credit and debit card charges on plaintiffs and the class members for a bogus membership product after the plaintiffs called to purchase unrelated products offered for sale by the Bait Product Suppliers.  The Credit Card Fraud Enterprise intentionally was constructed through meetings and agreements between MWI, the Telemarketing Entities and the Bait Product Suppliers.  The participants included representatives of MWI, representatives of the Telemarketing Entities and representatives of the Bait Product Suppliers.  MWI has intentionally participated in the enterprise, and helped to direct the enterprise's actions and manage its affairs.  MWI intentionally conducted or participated, directly and/or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).  MWI's pattern of racketeering activity dates from at least January 1, 1998 and continues to the present, and threatens to continue in the future.

164.    The roles of the participants of the Credit Card Fraud Enterprise are as follows:

(a)    **MWI**: Defendant MWI was and is the king-pin of the enterprise.  MWI intentionally created the scheme.  MWI intentionally conducted or participated, directly or indirectly,

in the conduct of the enterprise's affairs, and helped to direct the enterprise's actions and manage its affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).  In exchange for a portion of the proceeds, MWI intentionally induced the Telemarketing Entities to agree to identify their clients (the Bait Product Suppliers), who would have an available pool of consumers upon whom the participants in the enterprise could subject to the credit and debit card fraud alleged.  MWI intentionally developed the deceptive telemarketing scripts and the bogus "membership kits."  MWI intentionally caused the deceptive telemarketing pitch to be read to plaintiffs and the class members. MWI intentionally received the credit and debit card information, transmitted via the wires from the Telemarketing Entities, and used that confidential financial information to levy fraudulent charges on plaintiffs' and the class members' credit and debit cards.  MWI intentionally billed the class members' credit and debit cards using the wires, and delivered the bogus membership kits via the U.S. mail.  MWI intentionally used that confidential information to levy illicit "renewal" charges on the cards of plaintiffs and the class members every 11 months, until such time as the class member noticed the charge and called to complain.  MWI intentionally distributed the illegally obtained proceeds to the Telemarketing Entities and the Bait Product Suppliers via the mail and wires.

(b)     ***The Telemarketing Entities***: The Telemarketing Entities intentionally colluded with MWI and their clients who were selling products to consumers via infomercials (the Bait Product Suppliers), to gain access to the consumers who purchased these bait products.  The Telemarketing Entities intentionally read and caused to be read the deceptive telemarketing scripts to plaintiffs and the class members.  The Telemarketing Entities also intentionally collected the class members' confidential credit and debit card information in connection with the sale of the "bait" product and transferred that confidential information via interstate wire to MWI who used that information to illicitly bill the class members' credit and debit cards (also by interstate wire).  At this time, without the benefit of discovery, plaintiffs understand that Convergys Corporation and that

West Telemarketing[50] are two of the Telemarketing Entities. The identities of the other Telemarketing Entities who are participants in the enterprise are known by MWI, and will be revealed through discovery.

(c) ***The Bait Product Suppliers***: In return for a fee paid to them for each customer fraudulently enrolled in a bogus MWI membership program, the Bait Product Suppliers intentionally directed the Telemarketing Entities transmit to MWI, the confidential credit and debit card information obtained from the class members who called to purchase the bait product. At this time, without the benefit of discovery, plaintiffs are aware of the identities of the following entities who plaintiffs understand are Bait Product Suppliers and/or bait products who are participants in the enterprise:

| | |
|---|---|
| Ambitious Ideas Inc. | Cspot Run |
| Bionic Buddies | Donovan Group |
| Renosky Lure Corp. | Entertainment America |
| CEMPSI & Telecom | Fleet Bank |
| Contour Pillow | Fredrickson Television |
| Copa | Fresh Start Marketing |
| GRSN | Product Partners |
| Harris Publishing | HZL |
| Infomarketing Group | Infotopia |
| Media Group | Merchant Services |
| Modern Media | Morris International |
| NSI | Speedway Motorsports |
| Sylmark | Talk America |
| Tasmark | Tru-Star Global |
| TV Media | Value Center |
| Valuevision | Wave Communications |
| Williams Direct | WNR-Direct Response |

The identities of the other Bait Product Suppliers who are also participants in the enterprise are known by MWI, and will be revealed through discovery.

---

[50] Consumers enrolled under MWI's fee for service business arrangement with West are members of the Class. Pursuant to the Final Order Approving Settlement, dated December 23, 2008, this action does not include claims on behalf of consumers enrolled by West under its joint venture and wholesale business relationships with MWI.

165.     The Credit Card Fraud Enterprise functioned as a continuing unit to intentionally mislead plaintiffs and the class members through the deceptive telemarketing practices alleged in order to illegally and fraudulently extract payment of money from the class members for bogus MWI membership products they did not order or authorize, and to levy illicit renewal charges on the class members through the date of this Complaint.  The enterprise has an ascertainable structure and purpose separate from MWI's predicate acts.

166.     The Credit Card Fraud Enterprise was an ongoing and continuous organization whose members have been in frequent communication regarding furthering the fraudulent scheme, the methods and means of maximizing the fraudulent charges, coordinating strategy and suppressing the truth about the fraudulent telemarketing scheme.

167.     *Pattern of Racketeering Activity*: MWI has been associated with and participated in the affairs of the Credit Card Fraud Enterprise.  MWI intentionally helped to direct each enterprise's actions and manage their affairs.  MWI intentionally conducted or participated, directly or indirectly, in the conduct of the Credit Card Fraud Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c), involving multiple and intentional acts of mail fraud and wire fraud in violation of 18 U.S.C. §§1341 and 1343.  Defendants' pattern of racketeering activity dates from at least January 1, 1998 to the present.

(a)     With respect to wire fraud:

(i)     Defendants intentionally made the deceptive telemarketing pitch to the Smiths on or about February 10, 1999 and levied a fraudulent charge of $72.00 to their credit card on March 5, 1999.  Defendants also made the same intentional deceptive telemarketing pitch to the Smiths in connection with their purchase to a different bait product on or about November 20, 1999 and levied a second fraudulent charge of $95.88 on December 27, 1999.  Defendants also made the same intentional deceptive telemarketing pitch to the Smiths in connection with their purchase to a

different bait product on or about October 30, 2000 and levied a third fraudulent charge of $84.00 on December 6, 2000. Defendants also made the same intentional deceptive telemarketing pitch to the Smiths in connection with their purchase to a different bait product on or about November 20, 2000 and levied a fourth fraudulent charge of $59.40 on December 27, 2000. Defendants also made the same intentional deceptive telemarketing pitch to the Smiths in connection with their purchase to a different bait product on or about November 20, 2000 and levied a fifth fraudulent charge of $95.88 on December 27, 2000.

(ii)     Defendants intentionally made the deceptive telemarketing pitch to Waslin on or about August 12, 2002 and levied a fraudulent charge of $96.00 to his debit card on September 18, 2002. Defendants also made the same intentional deceptive telemarketing pitch to Waslin in connection with his purchase of a different bait product on or about July 15, 2002 and levied a second fraudulent charge of $1.00 to his debit card on August 22, 2002 and a third fraudulent charge of $149.95 to his debit card on September 25, 2002. Defendants also made the same deceptive telemarketing pitch to Waslin in connection with his purchase of a different bait product on or about September 10, 2002 and levied a fourth fraudulent charge of $96.00 to his debit card on October 15, 2002.

(iii)     Defendants intentionally made the deceptive telemarketing pitch to Callahan on or about November 12, 2000 and levied a fraudulent charge of $84.00 to her credit card on or about December 19, 2000 and levied a second fraudulent charge of $99.95 to her credit card on or around September 14, 2001.

(iv)     Defendants intentionally made the deceptive telemarketing pitch to Geldmacher on or about August 15, 2001 and levied a fraudulent charge of $99.95 to his credit card on September 19, 2001.

(v)      Defendants intentionally made the deceptive telemarketing pitch to the Limons on or about February 17, 1999, and levied a fraudulent charge of $72.00 to their credit card on March 17, 1999, and levied a second fraudulent charge to their credit card of $84.00 on January 17, 2000, and levied a third fraudulent charge of $99.95 to their credit card on January 15, 2001, and levied a fourth fraudulent charge of $109.95 to their credit card on January 15, 2002, and levied a fifth fraudulent charge of $149.95 to their credit card on January 15, 2003, and levied a sixth fraudulent charge of $169.95 to their credit card on January 14, 2002.

(vi)      Defendants intentionally made the deceptive telemarketing pitch to Loeper on or about March 5, 2000, and levied a fraudulent charge of $84.00 to her credit card on April 5, 2000, and levied a second fraudulent charge of $99.95 on her credit card on February 7, 2001.

(vii)      Defendants intentionally made the deceptive telemarketing pitch to Rosenzweig on or about February 6, 2000, and levied a fraudulent charge of $84.00 to her credit card on March 6, 2000, and levied a second fraudulent charge of $99.95 on her credit card on January 5, 20001, and levied a third fraudulent charge of $109.95 on her credit card on January 7, 2002, and levied a fourth fraudulent charge of $149.95 on her credit card on January 15, 2003, and levied a fifth fraudulent charge of $169.95 on her credit card on January 14, 2004.

(viii)      Defendants intentionally made the deceptive telemarketing pitch to French on or about January 2, 2000, and levied a fraudulent charge of $84.00 to his credit card on February 2, 2000, and levied a second fraudulent charge of $99.95 on his credit card on December 5, 2000, and levied a third fraudulent charge of $109.95 on his credit card on December 3, 2001, and levied a fourth fraudulent charge of $119.95 to his credit card on December 3, 2002, and levied a fifth fraudulent charge of $149.95 to his credit card on December 3, 2003.

(ix)       Defendants intentionally made the deceptive telemarketing pitch to Faulk on or about February 13, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 13, 1999, and levied a second fraudulent charge of $84.00 on her credit card on January 14, 2000, and levied a third fraudulent charge of $99.95 on her credit card on January 15, 2001, and levied a fourth fraudulent charge of $109.95 on her credit card on January 14, 2002, and levied a fifth fraudulent charge of $149.95 on her credit card on January 15, 2003.

(x)       Defendants intentionally made the deceptive telemarketing pitch to McKay on or about February 14, 2000, and levied a fraudulent charge of $84.00 to her credit card on March 14, 2000. Defendants also made the same intentional deceptive telemarketing pitch to McKay in connection with her purchase of a different bait product on or about February 14, 2000, and levied a fraudulent charge of $99.95 on her credit card on January 15, 2001.

(xi)       Defendants intentionally made the deceptive telemarketing pitch to Teasley on or about April 9, 2000 and levied a fraudulent charge of $84.00 to her credit card on May 9, 2000, and levied a second fraudulent charge of $99.95 on her credit card on March 12, 2001.

(xii)       Defendants intentionally made the deceptive telemarketing pitch to Gucker on or about February 14, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 14, 1999, and levied a second fraudulent charge of $84.00 on her credit card on January 14, 2000, and levied a third fraudulent charge of $99.95 on her credit card on January 15, 2001, and levied a fourth fraudulent charge of $109.95 on her credit card on January 14, 2002, and levied a fifth fraudulent charge of $149.95 on her credit card on January 15, 2003, and levied a sixth fraudulent charge of $169.95 on her credit card on January 14, 2004.

(xiii)       Defendants intentionally made the deceptive telemarketing pitch to Thornton on or about February 8, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 8, 1999, and levied a second fraudulent charge of $84.00 on her credit on January 7, 2000,

and levied a third fraudulent charge of $99.95 on her credit card on January 8, 2001, and levied a

fourth fraudulent charge of $109.95 on her credit card on January 7, 2002, and levied a fifth

fraudulent charge of $149.95 on her credit card on January 15, 2003, and levied a sixth fraudulent

charge of $169.95 on her credit card on January 14, 2004.

(xiv)     Defendants intentionally made the deceptive telemarketing pitch to

Kirch on or about February 9, 1999, and levied a fraudulent charge of $72.00 to her credit card on

March 9, 1999, and levied a second fraudulent charge of $84.00 on her credit card on January 10,

2000, and levied a third fraudulent charge of $99.95 on her credit card on January 8, 2001, and

levied a fourth fraudulent charge of $109.95 on her credit card on January 7, 2002, and levied a fifth

fraudulent charge of $149.95 on her credit card on January 15, 2003, and levied a sixth fraudulent

charge of $169.95 on her credit card on January 14, 2004.

(xv)     Defendants intentionally made the deceptive telemarketing pitch to

Muoio on or about February 16, 2000, and levied a fraudulent charge of $84.00 to her credit card on

March 16, 2000, and levied a second fraudulent charge of $99.95 on her credit card on January 15,

2001, and levied a third fraudulent charge of $109.95 on her credit card on January 15, 2002, and

levied a fourth fraudulent charge of $149.95 on her credit card on January 15, 2003.

(xvi)     Defendants intentionally made the deceptive telemarketing pitch to the

Maistorus on or about February 7, 1999, and levied a fraudulent charge of $72.00 to their credit card

on March 7, 1999, and levied a second fraudulent charge of $84.00 to their credit card on January 6,

2000, and levied a third fraudulent charge of $99.95 on their credit card on January 5, 2001, and

levied a fourth fraudulent charge of $109.95 on their credit card on January 7, 2002, and levied a

fifth fraudulent charge of $149.95 to their credit card on January 15, 2003.

(xvii)     Defendants intentionally made the deceptive telemarketing pitch to

Sheehan on or about February 12, 2000, and levied a fraudulent charge of $84.00 to her credit card

on March 12, 2000, and levied a second fraudulent charge of $99.95 to her credit card on January 11, 2001, and levied a third fraudulent charge of $109.95 to her credit card on January 11, 2002, and levied a fourth fraudulent charge of $149.95 to her credit card on January 15, 2003, and levied a fifth fraudulent charge of $169.95 to her credit card on January 14, 2004.

(xviii)     Defendants intentionally made the deceptive telemarketing pitch to Douthitt on or about February 27, 1999,  and levied a fraudulent charge of $72.00 to her credit card on March 27, 1999, and levied a second fraudulent charge of $84.00 on her credit card on January 28, 2000, and levied a third fraudulent charge of $99.95 on her credit card on January 29, 2001, and levied a fourth fraudulent charge of $109.95 on her credit card on January 28, 2002, and levied a fifth fraudulent charge of $149.95 on her credit card on January 27, 2003, and levied a sixth fraudulent charge of $169.95 on January 26, 2004.

(xix)     Defendants intentionally made the deceptive telemarketing pitch to Tulbert on or about Feburary 7, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 7, 1999, and levied a second fraudulent charge of $84.00 on her credit card on January 6, 2000, and levied a third fraudulent charge of $99.95 on her credit card on January 5, 2001, and levied a fourth fraudulent charge of $109.95 on her credit card on January 7, 2002, and levied a fifth fraudulent charge of $149.95 on her credit card on January 15, 2003.

(xx)     Defendants intentionally made the deceptive telemarketing pitch to Zorn on or about December 23, 1998, and levied a fraudulent charge of $72.00 to her credit card on January 23, 1999.  Defendants also made the same intentional deceptive telemarketing pitch to Zorn in connection with her purchase of a different bait product on or about October 2, 1999, and levied a second fraudulent charge of $72.00 on her credit card on November 2, 1999.

(xxi)     Defendants intentionally made the deceptive telemarketing pitch to Burrell on or about January 3, 2000, and levied a fraudulent charge of $84.00 to her credit card on

February 3, 2000, and levied a second fraudulent charge of $99.95 to her credit card on February 7, 2001.

(xxii)     Defendants intentionally made the deceptive telemarketing pitch to Malloy on or about February 27, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 27, 1999, and levied a second fraudulent charge of $84.00 to her credit card on January 28, 2000, and levied a third fraudulent charge of $99.95 to her credit card on January 29, 2001, and levied a fourth fraudulent charge of $109.95 to her credit card on January 28, 2002, and levied a fifth fraudulent charge of $149.95 on her credit card on January 27, 2003.

(xxiii)    Defendants intentionally made the deceptive telemarketing pitch to Felichio on or about February 15, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 15, 1999, and levied a second fraudulent charge of $84.00 to her credit card on January 15, 2000, and levied a third fraudulent charge of $99.95 to her credit card on January 15, 2001, and levied a fourth fraudulent charge of $109.95 to her credit card on January 14, 2002, and levied a fifth fraudulent charge of $149.95 to her credit card on January 15, 2003.

(xxiv)    Defendants intentionally made the deceptive telemarketing pitch to Ackermann on or about February 14, 1999, and levied a fraudulent charge of $72.00 to his credit card on March 14, 1999, and levied a second fraudulent charge of $84.00 to his credit card on January 13, 2000, and levied a third fraudulent charge of $99.95 to his credit card on January 12, 2001, and levied a fourth fraudulent charge of $109.95 to his credit card on January 14, 2002, and levied a fifth fraudulent charge of $149.95 to his credit card on January 15, 2003, and levied a sixth fraudulent charge of $169.95 to his credit card on January 14, 2004.

(xxv)     Defendants intentionally made the deceptive telemarketing pitch to Half on or about March 1, 1999, and levied a fraudulent charge of $72.00 to her credit card on April 1, 1999, and levied a second fraudulent charge of $84.00 to her credit card on February 2, 2000, and

levied a third fraudulent charge of $99.95 to her credit card on February 2, 2001, and levied a fourth fraudulent charge of $109.95 to her credit card on February 4, 2002, and levied a fifth fraudulent charge of $149.95 to her credit card on February 3, 2003, and levied a sixth fraudulent charge of $169.95 to her credit card on February 10, 2004.

(xxvi)  Defendants intentionally made the deceptive telemarketing pitch to Cuthbertson on or about February 14, 2000, and levied a fraudulent charge of $84.00 to his credit card on March 14, 2000, and levied a second fraudulent charge of $99.95 to his credit card on January 15, 2001.

(xxvii)  Defendants intentionally made the deceptive telemarketing pitch to Messmer on or about April 9, 2000, and levied a fraudulent charge of $84.00 to his credit card on May 9, 2000, and levied a second fraudulent charge of $99.95 to his credit card on March 12, 2001.

(xxviii)  Defendants intentionally made the deceptive telemarketing pitch to Tarantino on or about February 25, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 25, 1999, and levied a second fraudulent charge of $84.00 to her credit card on January 24, 2000, and levied a third fraudulent charge of $99.95 to her credit card on January 23, 2001, and levied a fourth fraudulent charge of $109.95 to her credit card on January 23, 2002, and levied a fifth fraudulent charge of $149.95 to her credit card on January 23, 2003.

(xxix)  Defendants intentionally made the deceptive telemarketing pitch to Matula on or about February 25, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 25, 1999, and levied a second fraudulent charge of $84.00 to her credit card on January 24, 2000, and levied a third fraudulent charge of $99.95 to her credit card on January 23, 2001, and levied a fourth fraudulent charge of $109.95 to her credit card on January 23, 2002, and levied a fifth fraudulent charge of $149.95 to her credit card on January 23, 2003.

(xxx)        Defendants intentionally made the deceptive telemarketing pitch to Ashburne on or about February 13, 1999, and levied a fraudulent charge of $72.00 to his credit card on March 13, 1999, and levied a second fraudulent charge of $84.00 to his credit card on January 14, 2000, and levied a third fraudulent charge of $99.95 to his credit card on January 15, 2001, and levied a fourth fraudulent charge of $109.95 to his credit card on January 14, 2002, and levied a fifth fraudulent charge of $149.95 to his credit card on January 15, 2003.

(xxxi)        Defendants intentionally made the deceptive telemarketing pitch to Piehler on or about February 23, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 23, 1999, and levied a second fraudulent charge of $84.00 to her credit card on January 24, 2000, and levied a third fraudulent charge of $99.95 to her credit card on January 22, 2001, and levied a fourth fraudulent charge of $109.95 to her credit card on January 21, 2002, and levied a fifth fraudulent charge of $149.95 to her credit card on January 21, 2003, and levied a sixth fraudulent charge of $169.95 to her credit card on January 20, 2004.

(xxxii)        Defendants intentionally made the deceptive telemarketing pitch to Befort on or about February 22, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 22, 1999, and levied a second charge of $84.00 to her credit card on January 21, 2000, and levied a third charge of $99.95 to her credit card on January 22, 2001, and levied a fourth charge of $109.95 to her credit card on January 21, 2002, and levied a fifth charge of $149.95 to her credit card on January 20, 2003, and levied a sixth charge of $169.95 to her credit card on January 19, 2004.

(xxxiii)        Defendants intentionally made the deceptive telemarketing pitch to Gorman on or about February 20, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 20, 1999, and levied a second fraudulent charge of $84.00 to her credit card on January 20, 2000, and levied a third fraudulent charge of $99.95 to her credit card on January 19, 2001, and

levied a fourth fraudulent charge of $109.95 to her credit card on January 21, 2002, and levied a fifth fraudulent charge of $149.95 to her credit card on January 20, 2003.

(xxxiv)       Defendants intentionally made the deceptive telemarketing pitch to Walker on or about February 7, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 7, 1999, and levied a second fraudulent charge of $84.00 to her credit card on January 6, 2000, and levied a third fraudulent charge of $99.95 to her credit card on January 5, 2001, and levied a fourth fraudulent charge of $109.95 to her credit card on January 7, 2002, and levied a fifth fraudulent charge of $149.95 to her credit card on January 15, 2003, and levied a sixth fraudulent charge of $169.95 to her credit card on January 14, 2004.

(xxxv)       Defendants intentionally made the deceptive telemarketing pitch to Mosley on or about February 20, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 20, 1999, and levied a second fraudulent charge of $84.00 to her credit card on January 20, 2000, and levied a third fraudulent charge of $99.95 to her credit card on January 19, 2001, and levied a fourth fraudulent charge of $109.95 to her credit card on January 21, 2002, and levied a fifth fraudulent charge of $149.95 to her credit card on January 20, 2003.

(xxxvi)       Defendants intentionally made the deceptive telemarketing pitch to Holden on or about February 6, 1999, and levied a fraudulent charge of $72.00 to his credit card on March 6, 1999, and levied a second fraudulent charge of $84.00 to his credit card on January 6, 2000, and levied a third fraudulent charge of $99.95 to his credit card on January 5, 2001, and levied a fourth fraudulent charge of $109.95 to his credit card on January 7, 2002, and levied a fifth fraudulent charge of $149.95 to his credit card on January 14, 2003, and levied a sixth fraudulent charge of $169.95 to his credit card on January 14, 2004.

(b)       With respect to mail fraud:

(i)　　　　Defendants intentionally mailed the bogus membership kit to the Smiths on or about February 12, 1999 and levied a fraudulent charge of $72.00 to their credit card on March 5, 1999.  Defendants also mailed the bogus membership kit to the Smiths in connection with their purchase of a different bait product on or about November 22, 1999 and levied a second fraudulent charge of $95.88 on December 27, 1999.  Defendants also mailed the bogus membership kit to the Smiths in connection with their purchase of a different bait product on or about November 1, 2000 and a third fraudulent charge of $84.00 to their credit card on December 6, 2000. Defendants also mailed the bogus membership kit to the Smiths in connection with their purchase of a different bait product on or about November 22, 2000 and a fourth fraudulent charge of $59.40 to their credit card  on December 27, 2000. Defendants also mailed the bogus membership kit to the Smiths in connection with their purchase of a different bait product on or about November 22, 2000 and billed the Smiths a fifth fraudulent charge of $95.88 to their credit card on December 27, 2000.

(ii)　　　　Defendants intentionally mailed the bogus membership kit to Waslin on or about August 14, 2002 and levied a fraudulent charge of $96.00 to his debit card on September 18, 2002.  Defendants also mailed the bogus membership kit to Waslin in connection with his purchase of a different bait product on or about July 17, 2002 and levied a second fraudulent charge of $1.00 to his debit card on August 22, 2002 and a third fraudulent charge of $149.95 to his debit card on September 25, 2002.  Defendants also mailed the bogus membership kit to Waslin in connection with his purchase of a different bait product on or about September 12, 2002 and levied a fourth fraudulent charge of $96.00 to his debit card on October 15, 2002.

(iii)　　　　Defendants intentionally mailed the bogus membership kit to Callahan on or about November 14, 2000 and levied a fraudulent charge of $84.00 to her credit card on or about December 19, 2000.

(iv)        Defendants intentionally mailed the bogus membership kit to Geldmacher on or about August 17, 2001, and levied a fraudulent charge of $99.95 to his credit card on September 19, 2001.

(v)        Defendants intentionally mailed the bogus membership kit to the Limons on or about February 19, 1999, and levied a fraudulent charge of $72.00 to their credit card on March 17, 1999.  Defendants intentionally mailed another bogus membership kit to the Limons for a second membership on or about December 17, 2002, and levied another fraudulent charge of $149.95 to their credit card, for this new membership on January 15, 2003.

(vi)        Defendants intentionally mailed the bogus membership kit to Loeper on or about March 7, 2000, and levied a fraudulent charge of $84.00 to her credit card on April 5, 2000.

(vii)        Defendants intentionally mailed the bogus membership kit to Rosenzweig on or about February 8, 2000, and levied a fraudulent charge of $84.00 to her credit card on March 6, 2000.  Defendants intentionally mailed another bogus membership kit to Rosenzweig for a second membership on or about December 17, 2002, and levied another fraudulent charge of $149.95 to her credit card, for this new membership on January 15, 2003.

(viii)        Defendants intentionally mailed the bogus membership kit to French on or about January 4, 2000, and levied a fraudulent charge of $84.00 to his credit card on February 2, 2000.  Defendants intentionally mailed another bogus membership kit to French for a second membership on or about November 5, 2003, and levied another fraudulent charge of $149.95 to his credit card, for this new membership on December 3, 2003.

(ix)        Defendants intentionally mailed the bogus membership kit to Faulk on or about February 15, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 13, 1999.  Defendants intentionally mailed another bogus membership kit to Faulk for a second

membership on or about December 17, 2002, and levied another fraudulent charge of $149.95 to her credit card, for this new membership on January 15, 2003.

        (x)        Defendants intentionally mailed the bogus membership kit to McKay on or about February 16, 2000, and levied a fraudulent charge of $84.00 to his credit card on March 14, 2000.

        (xi)        Defendants intentionally mailed the bogus membership kit to Teasley on or about April 11, 2000, and levied a fraudulent charge of $84.00 to her credit card on May 9, 2000.

        (xii)        Defendants intentionally mailed the bogus membership kit to Gucker on or about February 16, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 14, 1999.  Defendants intentionally mailed another bogus membership kit to Gucker for a second membership on or about December 17, 2002, and levied another fraudulent charge of $149.95 to her credit card, for this new membership on January 15, 2003.

        (xiii)        Defendants intentionally mailed the bogus membership kit to Thornton on or about February 10, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 8, 1999.  Defendants intentionally mailed another bogus membership kit to Thornton for a second membership on or about December 17, 2002, and levied another fraudulent charge of $149.95 to her credit card, for this new membership on January 15, 2003.

        (xiv)        Defendants intentionally mailed the bogus membership kit to Kirch on or about February 11, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 9, 1999.  Defendants intentionally mailed another bogus membership kit to Kirch for a second membership on or about December 17, 2002, and levied another fraudulent charge of $149.95 to her credit card, for this new membership on January 15, 2003.

(xv)        Defendants intentionally mailed the bogus membership kit to Muoio on or about February 18, 2000, and levied a fraudulent charge of $84.00 to her credit card on March 16, 2000.  Defendants intentionally mailed another bogus membership kit to Muoio for a second membership on or about December 17, 2002, and levied another fraudulent charge of $149.95 to her credit card, for this new membership on January 15, 2003.

(xvi)        Defendants intentionally mailed the bogus membership kit to the Maistorus on or about February 9, 1999, and levied a fraudulent charge of $72.00 to their credit card on March 7, 1999. Defendants intentionally mailed another bogus membership kit to the Maistorus for a second membership on or about December 17, 2002, and levied another fraudulent charge of $149.95 to their credit card, for this new membership on January 15, 2003.

(xvii)        Defendants intentionally mailed the bogus membership kit to Sheehan on or about February 14, 2000, and levied a fraudulent charge of $84.00 to her credit card on March 12, 2000.  Defendants intentionally mailed another bogus membership kit to Sheehan for a second membership on or about December 17, 2002, and levied another fraudulent charge of $149.95 to her credit card, for this new membership on January 15, 2003.

(xviii)        Defendants intentionally mailed the bogus membership kit to Douthitt on or about March 1, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 27, 1999.  Defendants intentionally mailed another bogus membership kit to Douthitt for a second membership on or about December 29, 2002, and levied another fraudulent charge of $149.95 to her credit card, for this new membership on January 27, 2003.

(xix)        Defendants intentionally mailed the bogus membership kit to Tulbert on or about February 9, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 7, 1999.  Defendants intentionally mailed another bogus membership kit to Tulbert for a second

membership on or about December 17, 2002, and levied another fraudulent charge to her credit card, for this new membership on January 15, 2003.

(xx)      Defendants intentionally mailed the bogus membership kit to Zorn on or about December 27, 1998, and levied a fraudulent charge of $72.00 to her credit card on January 23, 1999. Defendants also mailed another bogus membership kit to Zorn in connection with her purchase of another bait product on or about October 4, 1999, and levied a second fraudulent charge of $72.00 to her credit card on November 2, 1999.

(xxi)      Defendants intentionally mailed the bogus membership kit to Burrell on or about January 5, 2000, and levied a fraudulent charge of $84.00 to her credit card on February 3, 2000.

(xxii)      Defendants intentionally mailed the bogus membership kit to Malloy on or about March 1, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 27, 1999.  Defendants intentionally mailed another bogus membership kit to Malloy for a second membership on or about December 29, 2002, and levied another fraudulent charge of $149.95 to her credit card, for this new membership on January 27, 2003.

(xxiii)      Defendants intentionally mailed the bogus membership kit to Felichio on or about February 17, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 15, 1999.  Defendants intentionally mailed another bogus membership kit to Felichio for a second membership on or about December 17, 2002, and levied another fraudulent charge of $149.95 to her credit card, for this new membership on January 15, 2003.

(xxiv)      Defendants intentionally mailed the bogus membership kit to Ackermann on or about February 16, 1999, and levied a fraudulent charge of $72.00 to his credit card on March 14, 1999.  Defendants intentionally mailed another bogus membership kit to

Ackermann for a second membership on or about December 17, 2002, and levied another fraudulent charge of $149.95 to his credit card, for this new membership on January 15, 2003.

(xxv)      Defendants intentionally mailed the bogus membership kit to Half on or about March 3, 1999, and levied a fraudulent charge of $72.00 to her credit card on April 1, 1999. Defendants intentionally mailed another bogus membership kit to Half for a second membership on or about January 5, 2003, and levied another fraudulent charge of $149.95 to her credit card, for this new membership on February 3, 2003

(xxvi)      Defendants intentionally mailed the bogus membership kit to Cuthbertson on or about February 16, 2000, and levied a fraudulent charge of $84.00 to his credit card on March 14, 2000.

(xxvii)      Defendants intentionally mailed the bogus membership kit to Messmer on or about April 11, 2000, and levied a fraudulent charge of $84.00 to his credit card on May 9, 2000.

(xxviii)      Defendants intentionally mailed the bogus membership kit to Tarantino on or about February 27, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 25, 1999.  Defendants intentionally mailed another bogus membership kit to Tarantino for a second membership on or about December 27, 2002, and levied another fraudulent charge for $149.95 to her credit card, for this new membership on January 23, 2003.

(xxix)      Defendants intentionally mailed the bogus membership kit to Matula on or about February 27, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 25, 1999.  Defendants intentionally mailed another bogus membership kit to Matula for a second membership on or about December 27, 2002, and levied another fraudulent charge for $149.95 to her credit card, for this new membership on January 23, 2003.

(xxx)      Defendants intentionally mailed the bogus membership kit to Ashburne on or about February 15, 1999, and levied a fraudulent charge of $72.00 to his credit card on March 13, 1999. Defendants intentionally mailed another bogus membership kit to Ashburne for a second membership on or about December 17, 2002, and levied another fraudulent charge of $149.95 to his credit card, for this new membership on January 15, 2003.

(xxxi)      Defendants intentionally mailed the bogus membership kit to Piehler on or about February 25, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 23, 1999.  Defendants intentionally mailed another bogus membership kit to Piehler for a second membership on or about December 23, 2002, and levied another fraudulent charge of $149.95 to her credit card, for this new membership on January 21, 2003.

(xxxii)      Defendants intentionally mailed the bogus membership kit to Befort on or about February 24, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 22, 1999. Defendants intentionally mailed another bogus membership kit to Befort for a second membership on or about December 22, 2002, and levied another fraudulent charge of $149.95 to her credit card, for this new membership on January 20, 2003.

(xxxiii)      Defendants intentionally mailed the bogus membership kit to Gorman on or about February 22, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 20, 1999.  Defendants intentionally mailed another bogus membership kit to Gorman for a second membership on or about December 22, 2002, and levied another fraudulent charge of $149.95 to her credit card, for this new membership on January 20, 2003.

(xxxiv)      Defendants intentionally mailed the bogus membership kit to Walker on or about February 9, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 7, 1999.  Defendants intentionally mailed another bogus membership kit to Walker for a second

membership on or about December 17, 2002, and levied another fraudulent charge of $149.95 to her credit card, for this new membership on January 15, 2003.

(xxxv)     Defendants intentionally mailed the bogus membership kit to Mosley on or about February 22, 1999, and levied a fraudulent charge of $72.00 to her credit card on March 20, 1999.  Defendants intentionally mailed another bogus membership kit to Mosley for a second membership on or about December 22, 2002, and levied another fraudulent charge of $149.95 to her credit card, for this new membership on January 20, 2003.

(xxxvi)     Defendants intentionally mailed the bogus membership kit to Holden on or about February 8, 1999, and levied a fraudulent charge of $72.00 to his credit card on March 6, 1999.  Defendants intentionally mailed another bogus membership kit to Holden for a second membership on or about December 16, 2003, and levied another fraudulent charge of $149.95 to his credit card, for this new membership on January 14, 2003.

(c)     With respect to the unnamed class members, at this time, without the benefit of discovery from Defendants, plaintiffs are aware of at least 480,810 additional separate acts of fraudulent telemarketing and illicit charging of the class members' credit and debit cards by virtue of Defendants reading of the deceptive telemarketing pitch and mailing the bogus membership kit.  As stated above, plaintiffs are in possession of information identifying the name of the class member, city and state from where the call was made, and the date and amount of the fraudulent telemarketing charge (which is covered by a protective order).  Plaintiffs expect that more than a million additional such fraudulent charges and mailings are known to MWI, and will be revealed through discovery.

(i)     At this time, without the benefit of discovery from Defendants, plaintiffs are aware that the earliest telemarketing pitch was made on March 12, 1998, and that the earliest fraudulent charge occurred on April 29, 1998.  As stated above, plaintiffs are in possession of information identifying the name of the class member, city and state from where the call was

made, and the date and amount of the fraudulent telemarketing charge which is covered by a protective order. At this time, without the benefit of discovery from Defendants, plaintiffs are aware that the most recent telemarketing pitch was made on or about September 10, 2002, and that the most recent fraudulent charge occurred on October 15, 2002. Based upon a database MWI produced in the related California state court action, plaintiffs are aware that the most recent fraudulent charge to a West Subclass member[51] was levied on March 9, 2007 – the month that the database was produced. Accordingly, based upon this information, plaintiffs believe that discovery will reveal a continuation of the pattern and practice of fraudulently charging the credit and debit cards of the class members in this action, through at least March 2007, through the present, and for the foreseeable future.

(ii)     At this time, without the benefit of discovery from Defendants, plaintiffs are aware that MWI has levied at least $32,494,964.22 in intentional and fraudulent charges to the class members' credit and debit cards. As stated above, plaintiffs are in possession of information identifying the name of the class member, city and state from where the call was made, and the date and amount of the fraudulent telemarketing charge which is covered by a protective order. Plaintiffs expect that tens of millions of dollars in additional such charges are known to MWI, and will be revealed through discovery.

(d)     In short, even without discovery from Defendants, plaintiffs are aware: (i) that the earliest act of racketeering (mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343) occurred on March 12, 1998; (ii) that the most recent act of racketeering (mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343) occurred on March 9, 2007; (iii) that acts of racketeering (mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343) occurred on a daily basis from at

---

[51]     As noted above, the claims of the West Subclass members were severed from this action and subsequently settled with West and this action seeks no recovery for these dismissed West Subclass members.

least March 1998 through March 2007; (iv) that acts of racketeering (mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343) have occurred to the present; and (v) that the acts of racketeering (mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343) resulted in the theft of at least $32 million and that discovery will reveal that tens of millions of dollars in additional damage to the Class.

168.    MWI's acts of racketeering include multiple intentional acts of mail and wire fraud in violation of 18 U.S.C. §§1341 (mail fraud) and 1343 (wire fraud).  MWI intentionally engaged in schemes to defraud plaintiffs and members of the Class.  Those schemes involved, *inter alia*, intentionally levying illicit charges to the class members' credit and debit cards for a purportedly free gift and levying illicit renewal charges every 11 months thereafter. The Credit Card Fraud Enterprise's intentional misrepresentations and fraudulent concealment of material facts include misrepresentations and fraudulent concealment of the fact that the free gift the class members would purportedly receive was neither free, nor a gift, and instead the class members would be billed for it, even though MWI never asked permission to charge plaintiffs and the class members for the bogus membership products.

169.    The Credit Card Fraud Enterprise intentionally committed mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343 in executing and/or attempting to execute such schemes through the use of interstate transmissions by wire (reading the deceptive telemarketing scripts to persons who telephoned to purchase the unrelated bait products and electronically processing fraudulent credit card and debit card transactions) and through the use of the United States mail (mailing purported membership kits to consumers).  More particularly, the Credit Card Fraud Enterprise's predicate acts of mail and wire fraud include:

(a)    Using interstate wires, MWI and the Credit Card Fraud Enterprise falsely and intentionally informed plaintiffs and the class members that they were being sent a free 30-day trial membership and that they would not be billed;

(b)    Using interstate wires, MWI and the Credit Card Fraud Enterprise intentionally and illicitly billed the class members' credit and/or debit cards without ever asking or receiving permission to do so;

(c)    Using interstate wires and the U.S. mail, MWI and the Credit Card Fraud Enterprise communicated with each other regarding the method of undertaking their deceptive telemarketing scheme (as well as the implementation and day-to-day operation of the scheme), as well as negotiating the split of the illicit profit they would make;

(d)    Using interstate wires and U.S. mail, MWI and the Credit Card Fraud Enterprise intentionally distributed the illegally obtained gains they had received from plaintiffs and the class members to the members of the enterprise; and

(e)    Using interstate wires and the U.S. mail to distribute the proceeds of unlawful activity and otherwise to promote, manage, establish, carry on or facilitate the promotion, management, establishment or carrying on of unlawful activity in violation of 18 U.S.C. §1952.

170.    The racketeering acts of the Credit Card Fraud Enterprise also include engaging in monetary transactions involving the proceeds of crime in violation of 18 U.S.C. §1957(a), which prohibits "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specific unlawful activity," including mail and wire fraud, and 18 U.S.C. §1956(c)(7)(A), which prohibits conducting or attempting to conduct a financial transaction involving the proceeds of an unlawful activity. MWI and the Credit Card Fraud Enterprise intentionally engaged in monetary transactions in criminally

derived property to distribute amongst themselves millions of dollars of illegally obtained credit and debit card charges.

171.   These predicate acts form a "pattern" of racketeering activity.  They are related in their common objectives of maximizing revenues derived from the sale of MWI membership products, maximizing repeat "renewal" charges for the bogus products, misleading the public and government regulators that have responsibility for protecting consumers and policing telemarketing fraud.  These racketeering acts have had the same or similar purposes, results, participants, victims and methods of commission.  The acts have been, and are capable of being regularly repeated.

172.   **Affect on Interstate Commerce**: The Credit Card Fraud Enterprise has engaged in, and its activities have affected, interstate and foreign commerce.  MWI continues to date to carry out the goals of the enterprise, including concerted activities to disguise the nature of its wrongdoing, to conceal the proceeds thereof and to conceal its participation in the enterprise in order to avoid and/or minimize its exposure to criminal and civil penalties and damages.

173.   **Time Period**: The Credit Card Fraud Enterprise is an ongoing operation whose members have been and remain in frequent communication in order to conduct the enterprise.  As more fully alleged in ¶167(c)(i) above, the enterprise began on or about January 1, 1998, and has obtained illegal "renewal charges" from the class members as late as March 2007.  Discovery will reveal that illicit renewal charges have continued to be levied to the present and will continue to be levied in the future.  Accordingly, the Credit Card Fraud Enterprise engaged in a continuous pattern of racketeering acts within the last four years.

174.   **Injury to Business or Property**: Plaintiffs and the members of the Class have been injured in their business and property by reason of Defendants' and the Credit Card Fraud Enterprise's violations of 18 U.S.C. §§1962(c) and 1964(c), because they have had money and

property illegally and fraudulently taken from them.  In the absence of Defendants' violation of these statutes, plaintiffs' and the class members' funds would not have been stolen from them.

175.    Under the provisions of 18 U.S.C. §1964(c), plaintiffs and the members of the Class have standing and are entitled to bring this action and to recover herein treble damages, the costs of bringing this suit and reasonable attorneys' fees.

### COUNT III

**For Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1962(d) and 1964(c) – Credit Card Fraud Enterprise (Conspiracy to Violate 18 U.S.C. §1962(c)) (On Behalf of All Plaintiffs and All Members of the Class)**

176.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-175 above.[52]

177.    This claim for relief arises under 18 U.S.C. §§1962(d) and 1964(c) of RICO, which provide:

> 18 U.S.C. §1962(d): "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

> 18 U.S.C. §1964(c): "Any person injured in his business or property by reason of a violation of section 1962 of this chapter [18 U.S.C. §1962] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ."

178.    ***Person***: At all relevant times, MWI was a "person" within the meaning of 18 U.S.C. §1961(3).

179.    At all relevant times, MWI, the Telemarketing Entities and the Bait Product Suppliers have constituted the Credit Card Fraud Enterprise described herein.  By intentional use of the mail,

---

[52]    Plaintiffs recognize that the district court's March 6, 2009 Order denying Sanford's and the Smiths' motion for leave to amend to include this claim in the Original *Sanford* Federal Action may impact this Count.  However, this Count is alleged in this Complaint in order to protect their rights, and the rights of the absent class members.

wire and Internet, the enterprise and its activities have had an effect on interstate commerce in that the enterprise is engaged in the business of extracting the illegal charges, the disguised nature of or a "sale" of bogus membership kits and the illegal "renewal" charges for these bogus memberships.

180.    As more fully alleged above, MWI has engaged in a pattern of racketeering activity which dates from January 1, 1998 through the present and threatens to continue in the future. MWI's multiple predicate acts of racketeering are alleged above.  These racketeering acts generated income for Defendants.

181.    In violation of 18 U.S.C. §1962(d), Defendants intentionally combined, conspired and agreed, among themselves and with persons and entities known and unknown to the class members, to conduct and participate, directly or indirectly in the affairs of the Credit Card Fraud Enterprise and acquired an interest and control in this racketeering enterprise and used the proceeds of the racketeering enterprise to acquire an interest in, establish and operate the enterprise.

182.    Plaintiffs and the members of the Class have been injured in their business and property by reason of Defendants' conspiracy in violation of 18 U.S.C. §§1962(d) and 1964(c) because they have had money and property illegally and fraudulently taken from them.  In the absence of Defendants' violation of these statutes, plaintiffs' and the class members' funds would not have been stolen from them.

183.    Under 18 U.S.C. §1964(c), plaintiffs and the members of the Class have standing and are entitled to bring this action and to recover herein treble damages, the costs of bringing this suit and reasonable attorneys' fees.

## COUNT IV

### For Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1962(c) and 1964(c) – Participation in Regulatory Enterprise (Obstruction of Justice) (On Behalf of All Plaintiffs and All Members of the Class)

184.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-183 above.[53]

185.    This claim for relief arises under 18 U.S.C. §§1962(c) and 1964(c) of RICO, which provide:

> 18 U.S.C. §1962(c): "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

> 18 U.S.C. §1964(c): "Any person injured in his business or property by reason of a violation of section 1962 of this chapter [18 U.S.C. §1962] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ."

186.    *Person*: At all relevant times, MWI was a "person" within the meaning of 18 U.S.C. §1961(3).

187.    *The Regulatory Enterprise*: At all relevant times, MWI and the Telemarketing Entities have together constituted an additional "enterprise" within the meaning of 18 U.S.C. §§1961(a) and 1961(4).  As described in ¶¶97-112, the participants intentionally hid each others involvement in the Credit Card Fraud Enterprise from various attorneys general and other law enforcement agencies who were investigating (and/or who had authority to investigate) the deceptive telemarketing practices, as well as to circumvent consent judgments entered in the attorneys general

---

[53]    Plaintiffs recognize that the district court's March 6, 2009 Order denying Sanford's and the Smiths' motion for leave to amend to include this claim in the Original *Sanford* Federal Action may impact this Count.  However, this Count is alleged in this Complaint in order to protect their rights, and the rights of the absent class members.

settlements agreed to by MWI, and regulations imposed by the FTC designed to put an end to the pernicious practice of charging consumers' credit cards without prior authorization. The Regulatory Enterprise intentionally engaged in meetings between MWI and the Telemarketing Entities. The participants included employees and officers of MWI and the Telemarketing Entities. MWI participated in the enterprise and helped to direct the enterprise's actions and manage its affairs. Defendants intentionally conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c). The Regulatory Enterprise's pattern of racketeering activity dates from at least April 1, 2000 and continues to the present, and threatens to continue in the future.

188.    The roles of the participants of the Regulatory Enterprise are as follows:

(a)    ***MWI***: Defendant MWI intentionally conspired with the Telemarketing Entities to keep their telemarketing scheme secret should there be a governmental investigation into the telemarketing scheme. In addition, to intentionally circumvent at least four consent judgments to which MWI was subject and was a signatory (but the Telemarketing Entities were not), aimed at putting an end to Defendants' fraudulent practices in California, Minnesota, New York and Nebraska, MWI and the Telemarketing Entities arranged to alter (on paper only) the ownership of the bogus memberships that were sold, to make it appear that MWI was not enrolling the class members. To this end, MWI caused the Telemarketing Entities to enroll the consumers, and then immediately "sell" the newly enrolled consumers to MWI who would bill the credit and debit cards of consumers for the bogus memberships. By having the Telemarketing Entities enroll the class members, the Regulatory Enterprise thus intentionally circumvented the restrictions on MWI imposed under the consent judgments.

(b)     *The Telemarketing Entities*: The Telemarketing Entities participated in the conduct described above, and intentionally agreed to take initial ownership of the memberships and to immediately sell the new memberships to MWI to levy the illicit charges.

189.    The Regulatory Enterprise is an organization whose constituent elements functioned together, and with others, to disrupt and defeat governmental investigations and to circumvent consent judgments by suppressing the truth concerning the intentional and deceptive telemarketing practices of the Credit Card Fraud Enterprise, and continue to carry out their scheme to illicitly charge the class members for the bogus membership products they did not order or authorize.  The Regulatory Enterprise has an ascertainable structure and purpose beyond the scope of MWI's predicate acts and the conspiracy to commit such acts. The Regulatory Enterprise exists separate and apart from MWI.

190.    The Regulatory Enterprise is an ongoing organization whose members have been in frequent and intentional communication to coordinate strategy, suppress the truth about MWI's activities and otherwise further the fraudulent telemarketing scheme.

191.    *Pattern of Racketeering Activity*: MWI has been intentionally associated with the Regulatory Enterprise.  MWI intentionally helped to direct the enterprise's actions and manage its affairs.  MWI intentionally conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).  MWI's pattern of racketeering activity has operated continuously from at least April 1, 2001, and will continue in the future.  MWI has intentionally and illegally taken more than a million dollars in fraudulent charges to the class members' credit and debit cards.  The Regulatory Enterprise's predicate acts of racketeering include:

(a)     Multiple and intentional acts of mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343.  MWI intentionally engaged in schemes to defraud the governmental entities

responsible for regulating and prosecuting consumer fraud.  Those schemes have involved, *inter alia*, MWI intentionally conspired with the Telemarketing Entities to keep each other's identity and operation secret in the event governmental investigations and/or enforcement actions were undertaken and purposely circumvented consent judgments entered into on April 18, 2000 with the Minnesota Attorney General, on August 23, 2000 with the New York Attorney General, on February 7, 2001 with the Nebraska Attorney General, on April 27, 2001 with the California Attorney General and on July 1, 2004 with the Florida Attorney General in such law enforcement actions.

(i)      MWI and the Regulatory Enterprise intentionally executed or attempted to execute such schemes by using the mail and the wires (including telephone and electronic mail) to reach agreements with the Telemarketing Entities to keep each other's identity secret in the event governmental investigations and/or enforcement actions were undertaken and actively circumventing settlements reached with at least four attorneys general in such enforcement actions.  This conduct constitutes mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343, and obstruction of justice in violation of 18 U.S.C. §1501 *et seq*.

(ii)     MWI and the Regulatory Enterprise intentionally executed or attempted to execute such schemes through the use of transmissions by the mail and wires (telephone discussions and e-mail exchanges) in responding to the governmental investigations, and engaged in telephone discussions and e-mail exchanges amongst each other regarding what to tell and/or not tell these governmental officials.  This conduct constitutes mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343, and obstruction of justice in violation of 18 U.S.C. §1501 *et seq*.

192.      ***Affect on Interstate Commerce***: The Regulatory Enterprise has engaged in, and its activities have affected, interstate and foreign commerce.  The enterprise continues to date through the concerted activities of Defendants actively disguising the nature of their wrongdoing, to conceal

the proceeds thereof and to conceal Defendants' participation in the enterprise in order to avoid and/or minimize their exposure to criminal and civil penalties and damages.

193.    **Time Period**: The Regulatory Enterprise is a continuous organization whose members were in frequent communication.  It began in April 2001 with the Minnesota Attorney General investigation, and the latest attorney general investigation in which MWI has concealed the existence and role of the Telemarketing Entities was the Iowa Attorney General investigation launched in May 2006.  Accordingly, the Regulatory Enterprise has engaged in a continuing pattern of racketeering practices during the last four years

194.    **Injury to Business or Property**: Plaintiffs and the members of the Class have been injured in their business and property by reason of MWI's violations of 18 U.S.C. §§1962(c) and (d) and 1964(c), because they have had money illicitly taken from them.

195.    Under the provisions of 18 U.S.C. §1964(c), plaintiffs and the class members have standing and are entitled to bring this action and to recover herein treble damages, the costs of bringing this suit and reasonable attorneys' fees.

**COUNT V**

**For Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.
§§1962(d) and 1964(c) – Regulatory Enterprise
(Conspiracy to Violate 18 U.S.C. §1962(c))
(On Behalf of All Plaintiffs and All Members of the Class)**

196.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-195 above.[54]

---

[54]    Plaintiffs recognize that the district court's March 6, 2009 Order denying Sanford's and the Smiths' motion for leave to amend to include this claim in the Original *Sanford* Federal Action may impact this Count.  However, this Count is alleged in this Complaint in order to protect their rights, and the rights of the absent class members.

197.     This claim for relief arises under 18 U.S.C. §§1962(d) and 1964(c) of RICO, which

provide:

> 18 U.S.C. §1962(d): "It shall be unlawful for any person to conspire to violate any of
> the provisions of subsection (a), (b), or (c) of this section."
>
> 18 U.S.C. §1964(c): "Any person injured in his business or property by reason of a
> violation of section 1962 of this chapter [18 U.S.C. §1962] may sue therefor in any
> appropriate United States district court and shall recover threefold the damages he
> sustains and the cost of the suit, including a reasonable attorney's fee . . . ."

198.     At all relevant times, MWI was a "person" within the meaning of 18 U.S.C. §1961(3).

199.     At all relevant times, MWI and the Telemarketing Entities constituted the Regulatory

Enterprise described above.  Each enterprise and its activities have an effect on interstate commerce

in that the enterprise is intentionally engaged in the business of maximizing the illicit charges in the

disguised nature of a "sale" of the bogus membership kits, and the illicit "renewal" charges for said

bogus memberships, by shielding each other from attorneys general investigations and

circumventing consent judgments entered against MWI.

200.     The Regulatory Enterprise is an ongoing organization whose constituent elements

function as continuing units. The enterprises have engaged in, or their activities have affected,

interstate or foreign commerce.

201.     The Regulatory Enterprise has ongoing existence separate and apart from MWI's

racketeering acts. The members of these enterprises operate as continuing units with a hierarchical or

consensual decision-making structure.

202.     Beginning in April 2000, MWI intentionally conspired with the Telemarketing

Entities to circumvent consent judgments entered between MWI and the Minnesota, New York,

Florida, California and Nebraska Attorneys General.  As more than two acts took place over a ten

year time span, these acts form a obstruction of justice.  They have been related in their common

objectives of intentionally maximizing sales of MWI membership products, maximizing repeat

"renewal" charges for the bogus products, misleading the public and government regulators which

bear responsibility for protecting consumers and policing telemarketing fraud.  These acts have had the same or similar purposes, results, participants, victims and methods of commission.  The acts have been consistently repeated and are capable of future repetition.

203.    In violation of 18 U.S.C. §1962(d), MWI intentionally combined, conspired and agreed, among themselves and with persons and entities known and unknown to the class members, to conduct, operate and participate, directly or indirectly in the affairs of the Regulatory Enterprise and acquired an interest and control in this racketeering enterprise.

204.    Plaintiffs and the class members have been injured in their business and property by reason of Defendants' conspiracy to violate 18 U.S.C. §1962(c) and (d) in that plaintiffs and the class members' funds would not have been stolen from them.

205.    Under the provisions of 18 U.S.C. §1964(c), plaintiffs and the class members have standing and are entitled to bring this action and to recover herein treble damages, the costs of bringing this suit and reasonable attorneys' fees.

## COUNT VI

### For Conversion
### (On Behalf of All Plaintiffs and All Members of the Class)

206.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-205 above.

207.    Defendants have converted to their own use, property belonging to plaintiffs and the class members through unlawful acts and conduct.  The specific sum of money that was converted by Defendants is readily identifiable from information and records in Defendants' possession or control.

208.    Defendants knowingly or intentionally billed and collected money for unordered merchandise from credit and/or debit card accounts of consumers, including plaintiffs and members of the Class.  Defendants obtained money from consumers through fraud and/or deception.

Defendants thus converted to their own use property, specifically monies, belonging to plaintiffs and the Class.

209.    The specific sum of money of plaintiffs and members of the Class that was converted by Defendants are readily identifiable from information and records in Defendants' possession or control.

210.    As a direct and proximate result of Defendants' unlawful acts and conduct, plaintiffs and the Class were deprived of the use of their money that was unlawfully converted by Defendants, and are thereby entitled to restoration of their monies, interest on these monies from the date said monies were converted by Defendants to the date of judgment, compensatory damages (including overdraft fees paid by consumers due to Defendants' conversion of their money) and punitive damages.

## COUNT VII

### For Unjust Enrichment
### (On Behalf of All Plaintiffs and All Members of the Class)

211.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-210 above.

212.    Defendants have received, and continue to receive, a benefit at the expense of plaintiffs and members of the Class.

213.    Defendants have fraudulently and/or deceptively billed and collected membership fees and/or renewals from consumers, including plaintiffs and members of the Class, for unordered memberships.  Accordingly, Defendants have received benefits which they have unjustly retained at the expense of plaintiffs and members of the Class.

214.    As a direct and proximate result of Defendants' unlawful acts and conduct, plaintiffs and members of the Class were deprived of the use of their money that was unlawfully billed and collected by Defendants, and are therefore entitled to restoration of their monies.

- 126 -

## COUNT VIII

### For Fraud
### (On Behalf of All Plaintiffs and All Members of the Class)

215.     Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-214 above.

216.     The acts, conduct and practices of Defendants, as alleged above, were fraudulent and deceptive.  The use of deceptive scripts assuring consumers that they were being mailed a free 30-day trial membership is and was likely to mislead, and did in fact mislead, plaintiffs and members of the Class.  Through the use of the deceptive scripts, Defendants made false representations that they knew to be false in order to enroll plaintiffs and class members in an MWI membership program and pay associated costs billed to their credit and/or debit cards, resulting in damage to the plaintiffs and class members.

217.     Plaintiffs and members of the Class ordered non-MWI products.  Approximately one month later, they were enrolled in an MWI membership program and were billed an approximate amount of between $60-$170 to their credit or debit cards.  Eleven months after the initial charge, Defendants billed the class members approximately the same amount (usually 15%-25% more) without seeking any approval to do so.  These charges, if undetected, will keep occurring in subsequent years.

218.     Through the use of deceptive scripts that were read to the class members, Defendants concealed material facts from plaintiffs and the members of the Class.  Defendants tell and have told members of the Class that they are being mailed a risk-free 30-day trial membership.  No permission to use the consumers' credit and/or debit cards is sought or obtained.  The scripts deceive members of the Class.  After mailing the unsolicited membership kit to the class members, Defendants charge the members of the Class for an unsolicited and unwanted membership.

219.     Defendants falsely and fraudulently utilize deceptive scripts that conceal from the class members that they will be automatically billed unless the class members affirmatively call Defendants to cancel the membership.  Defendants' scripts contain misrepresentations and are intended to, and do, deceive the class members.

220.     Defendants intentionally designed the scripts and the purported membership material in order to mislead the class members into believing that they would receive a risk-free trial membership that they could try out, and if they liked the membership, the class members could contact Defendants to activate a full membership.  The true facts are just the opposite – Defendants charge the class members unless they call to cancel.

221.     Defendants have intentionally designed the generic membership materials so as to appear to be "junk mail" in the hopes that the materials will be discarded and thus never read.  If the packet mailed by MWI for the risk-free trial membership is thrown out by the recipient, then the consumer will not have the number to access the benefits.  The kits are mailed out bulk rate indicating the lack of value of the material.  In this way, Defendants further conceal the fact that the class members will be billed an annual, self-renewing membership fee.

222.     To further their scheme to conceal the true facts, Defendants never send any invoice or bill to plaintiffs and the class members informing them that their credit and/or debit cards were going to be, or were in fact, billed.

223.     Defendants' renewal of the purported memberships is fraudulently concealed by Defendants in the same manner.  No bill or invoice is sent to the class members informing them that they were going to be, or had in fact been, billed.

224.     Plaintiffs and members of the Class reasonably relied on Defendants and believed that they were making a one-time purchase of non-MWI products.

225.     Defendants' false and misleading statements and suppression of the material facts set forth above and throughout this Complaint defrauded plaintiffs and the Class, and are in direct violation of federal and state statutes, as well as principles of common law, for which plaintiffs and members of the Class are entitled to recover damages, including punitive damages.

## COUNT IX

### Negligent Misrepresentation
### (On Behalf of All Plaintiffs and All Members of the Class)

226.     Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-225 above.

227.     In making representations to Plaintiffs and members of the Class described herein, Defendants failed to fulfill their duty to disclose the material facts set forth above.  Among the direct and proximate causes of said failures to disclose were the negligence and carelessness of Defendants.

228.     Defendants owed plaintiffs and members of the Class the duty to act with reasonable care in retaining, training and supervising their agents and sales agents.  Defendants also failed to take reasonable steps to ensure that their representatives conducted themselves in accordance with the law and to ensure that the representatives disclosed all material facts and did not misrepresent or omit such facts in conducting such sales.

229.     Defendants, as set forth herein, breached their duties to retain, train, supervise and discipline their sales force and to ensure full disclosure by them.

230.     Plaintiffs and the members of the Class were unaware of the falsity of Defendants' affirmative misrepresentations and their failure to disclose that plaintiffs and members of the Class would be billed undisclosed and unauthorized fees for a fictitious membership on their credit card accounts.  Plaintiffs and the members of the Class, as a direct and proximate cause of Defendants' breaches of their various duties, reasonably relied upon such representations to their detriment.  By

reason thereof, plaintiffs and members of the Class have suffered damage, in an amount according to proof at time of trial.

## COUNT X

### Money Had & Received
### (On Behalf of All Plaintiffs and All Members of the Class)

231.   Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-230 above.

232.   As a result of Defendants' conduct as alleged herein, Defendants improperly received monies from plaintiffs and the Class they were not legally entitled to receive.

233.   Plaintiffs and class members have a claim for improperly paid fees for the products at issue.

234.   Equity and good conscience require that Defendants ought to pay over such additional monies, described above to plaintiffs and the Class.

235.   As a direct and proximate result of Defendants' unfair, unlawful, deceptive and fraudulent business practices, plaintiffs and class members have suffered injury and are entitled to reimbursement, restitution and disgorgement in the amount necessary to restore them to the position they would have been in if Defendants had not improperly enrolled, billed, collected and retained the aforementioned unauthorized membership fees.

## COUNT XI

### For Violation of State Consumer Protection Laws
### (On Behalf of All Plaintiffs and All Members of the Class)

236.   Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-235 above.

237.   Each state has enacted consumer protection statutes permitting their citizens who suffer an ascertainable loss of money or property, real or personal, as a result of unfair, unlawful or fraudulent business practices, to recover damages and/or restitution for their injury.

238.     The telemarketing scheme alleged violates the following consumer protection statutes:  the Alabama Deceptive Trade Practices Act (codified at Ala. Code §8-19-5 *et seq.*); the Alaska Unfair Trade Practices and Consumer Protection Act (codified at Alaska Stat. §45.50.471 *et seq.*); the Arizona Consumer Fraud Act (codified at Ariz. Rev. Stat. Ann. §44-1522 *et seq.*); the Arkansas Deceptive Trade Practice Act (codified at Ark. Code Ann. §4-88-107 *et seq.*); the California Unfair Competition Act (codified at Cal. Bus. & Prof. Code §17200 *et seq.*); the Colorado Consumer Protection Act (codified at Colo. Rev. Stat. §6-1-105 *et seq.*); the Connecticut Unfair Trade Practices Act (codified at Conn. Gen. Stat. §42-110 *et seq.*);  the Delaware Consumer Fraud Act (codified at 6 Del. Code Ann. §2513 *et seq.*); the District of Columbia Consumer Protection Procedure Act (codified at D.C. Code Ann. §28-3904 *et seq.*); the Florida Deceptive and Unfair Trade Practices Act (codified at Fla. Stat. §501.201 *et seq.*); the Georgia Fair Business Practices Act (codified at Ga. Code Ann. §10-1-372 *et seq.*); the Hawaii Unfair Deceptive Acts or Practices (codified at Haw. Rev. Stat. §480-2 *et seq.*); the Idaho Consumer Protection Act (codified at Idaho Code §48-603 *et seq.*); the Illinois Consumer Fraud and Deceptive Business Practices Act (codified at 815 ILCS 505/2 *et seq.*); the Indiana Deceptive Consumer Sales Act (codified at Ind. Code Ann. §24-5-0.5-3 *et seq.*); the Iowa Consumer Fraud Act (codified at Iowa Code §714.16.2 *et seq.*); the Kansas Consumer Protection Act (codified at Kan. Stat. Ann. §50-626 *et seq.*); the Kentucky Consumer Protection Act (codified at Ky. Rev. Stat. Ann. §367.170 *et seq.*); the Louisiana Unfair Trade Practices and Consumer Protection Act (codified at La. Rev. Stat. Ann. §51:1405 *et seq.*); the Maine Consumer Legal Remedies Act (codified at 5 Me. Rev. Stat. Ann. §207 *et seq.*); the Maryland Consumer Protection Law (codified at 5 Md. Com. Law Ann. §13-301 *et seq.*); the Massachusetts Consumer Protection Law (codified at Mass. Ann. L. Ch. 93A *et seq.*); the Michigan Consumer Protection Act (codified at Mchs. §445.903 *et seq.*); the Minnesota Uniform Deceptive Trade Practices Act (codified at Minn. Stat. §325D.44 *et seq.*); the Mississippi Consumer Protection Act

(codified at Miss. Code Ann. §75-24-5 *et seq.*); the Missouri Merchandising Practices Act (codified at Mo. Rev. Stat. §407.020.1 *et seq.*); the Montana Consumer Protection Act (codified at Mont. Code Ann. §30-14-103 *et seq.*); the Nebraska Consumer Protection Act (codified at Neb. Rev. Stat. §59-1602 *et seq.*); the Nevada Deceptive Trade Practices Act (codified at Nev. Rev. Stat. §598.0915 *et seq.*); the New Hampshire Regulation of Business Practices for Consumer Protection (codified at N.H. Rev. Stat. Ann. §358-A:2 *et seq.*); the New Jersey Consumer Fraud Act (codified at N.J. Rev. Stat. §56:8-2 *et seq.*); the New Mexico Unfair Practices Act (codified at N.M. Stat. Ann. §57-12-3 *et seq.*); the New York General Business Law §349 (codified at N.Y. Gen. Bus. Law §349 *et seq.*); the North Carolina Unfair and Deceptive Trade Practice Act (codified at N.C. Gen. Stat. §75-1.1 *et seq.*); the North Dakota Consumer Fraud Act (codified at N.D. Cent. Code §51-15-02 *et seq.*); the Ohio Consumer Sales Practices Act (codified at Ohio Rev. Code Ann. §1345.02 *et seq.*); the Oklahoma Consumer Protection Act (codified at 15 Okl. Stat. §753 *et seq.*); the Oregon Unfair Trade Practices Act (codified at Ore. Rev. Stat. §646.608 *et seq.*); the Pennsylvania Unfair Trade Practices and Consumer Protection Act (codified at 73 Pa. Stat. Ann. §201-2 *et seq.*); the Rhode Island Deceptive Trade Practice Law (codified at R. I. Gen. Laws §6-13.1-1 *et seq.*); the South Carolina Unfair Trade Practices Act (codified at S.C. Code Ann. §39-5-20 *et seq.*); the South Dakota Deceptive Trade Practices and Consumer Protection Law (codified at S.D. Codified Laws Ann. §37-24-6 *et seq.*); the Tennessee Consumer Protection Act (codified at Tenn. Code Ann. §47-18-104 *et seq.*); the Texas Deceptive Trade Practices Consumer Protection Act (codified at Tex. Bus. & Com. Code Ann. §17.46 *et seq.*); the Utah Consumer Sale Practices Act (codified at Utah Code Ann. §13-11-4 *et seq.*); the Vermont Consumer Fraud Act (codified at 9 Vt. Stat. Ann. §2453 *et seq.*); the Virginia Consumer Protection Act (codified at Va. Code Ann. §59.1-200 *et seq.*); the Washington Consumer Protection Act (codified at Wash. Rev. Code §19.86.020 *et seq.*); the West Virginia Consumer Credit and Protection Act (codified at W. Va. Code §46A-6-104 *et seq.*); the Wisconsin

Deceptive Trade Practices Act (codified at Wis. Stat. Ann. §100.18 *et seq.*); and the Wyoming Consumer Protection Act (codified at Wyo. Stat. §40-12-105 *et seq.*).

239.    Defendants have acted, as alleged herein, in the conduct of trade or commerce.

240.    At all times relevant, Defendants engaged in deceptive acts, omissions, conduct or misrepresentations as part of trade or commerce throughout the nation.  Defendants were sellers of products to plaintiffs and the class members.  Plaintiffs and class members have each suffered substantial loss because of one or more of Defendants' deceptive acts or omissions

241.    The acts, omissions, misrepresentations, policies, practices and non-disclosures of Defendants as alleged herein were intentional, malicious, immoral, unethical, unscrupulous or oppressive.

242.    The policies, acts and practices of Defendants as described above were intended to deceive, deceived and continue to deceive plaintiffs, the members of the Class and the general public as described herein and have resulted (and will result) in annual fees being imposed on members of the Class and offend public policy.

243.    Defendants, in connection with the advertising, tender and/or delivery of the products at issue, employed unconscionable tactics and inserted unconscionable provisions into the sales of the products at issue herein by unilaterally attempting to impose an automatic, fees for enrollment (and renewal) in fictitious and/or useless and unwanted memberships which is offensive to public policy.

244.    Defendants advertised the products at issue with the intent not to sell them as advertised or represented.

245.    Defendants have made false or misleading representations concerning the nature of the transaction or obligation incurred concerning the products at issue.

246.     Defendants have made false or misleading representations concerning the offering price of, or the person's cost for the products at issue.

247.     Defendants have used plaintiffs' and class members' credit and/or debit cards with the intent to injure and/or defraud plaintiffs and class members by the unauthorized use of plaintiffs' and class members' credit and/or debit cards in regards to the products at issue.

248.     Defendants' unfair or deceptive acts or trade practices, of knowingly and willfully enrolling, charging and collecting an invalid and illegal membership fees (and renewal fees) from plaintiffs and all putative class members, are immoral, unethical, oppressive, despicable, reprehensible, unscrupulous and have and continue to cause substantial financial injury.

249.     Defendants profited at the expense of plaintiffs and the Class by systematically enrolling them in an MWI program and billing their credit and/or debit cards without first securing authorization to do so.

250.     By reason of the foregoing, plaintiffs, the members of the Class and the general public have been (and will continue to be) irreparably harmed.

251.     The injuries suffered by plaintiffs and the Class were not outweighed by any countervailing benefits to plaintiffs and class members.

252.     At all times material to this Complaint, Defendants were acting for financial gain.

253.     Defendants knowingly concealed, suppressed and omitted in their scripts, advertisements and membership kits, material facts about the deceptive products at issue with intent that plaintiffs and the Class would rely upon the concealments, suppressions or omissions.

254.     The charges to plaintiffs and the class members credit and/or debit cards constitutes an ascertainable and quantifiable losses as a result of Defendants' unlawful, unfair and fraudulent business practices.

255.    Plaintiffs and class members are entitled to their actual damages, restitution, injunctive relief, as well as the costs of suit, including reasonable attorneys' fees.

256.    A copy of the Complaint filed by Waslin was mailed to the Connecticut Attorney General Richard Blumenthal, pursuant to Conn. Gen. Stat. §42-110(g)(c).  In conjunction with the filing of this Complaint, pursuant to Conn. Gen. Stat. §42-110(g)(c), a copy will be mailed to the Connecticut Attorney General Richard Blumenthal.

257.    On May 25, 2009, plaintiffs notified Defendants in writing of the particular violations of the Massachusetts Consumer Protection Statute, Mass. Gen. Laws ch. 93A, §§2, 9 and 11 and demanded that Defendants rectify the actions described above and give notice to all affected consumers of their intent to do so. plaintiffs sent this notice by certified mail, return receipt requested, to Defendants' principal place of business and counsel.

258.    On February 23, 2009, Plaintiffs notified Defendants in writing of the particular violations of the Georgia Fair Business Practices Act, Ga. Code Ann. §10-1-399(b) and demanded that Defendants rectify the actions described above and give notice to all affected consumers of their intent to do so.  Plaintiffs sent this notice by certified mail, return receipt requested, to Defendants' principal place of business and counsel.

259.    On April 8, 2009 plaintiffs notified Defendants in writing of the particular violations of the Texas Deceptive Trade Practices Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code Ann. §17.41 *et seq*. and demanded that Defendants rectify the actions described above and give notice to all affected consumers of their intent to do so. Plaintiffs sent this notice by certified mail, return receipt requested, to Defendants' principal place of business and counsel.

260.    Pursuant to §1782 of the California Remedies Act (the "Act"), in conjunction with the filing of this action, plaintiffs have given written notice to Defendants of the particular violations of §1770 of the Act; plaintiffs' intention to file an amended complaint if Defendants failed to offer

appropriate consideration or other remedy for damages under the Act, or if Defendants failed to offer appropriate consideration or other remedy to all affected consumers as described in the written notice, demanded that Defendants rectify the actions described above and gave notice to all affected consumers of their intent to do so. Defendants failed to respond to plaintiffs' demand within 30 days of such written notice.

261.    Defendants continue to posses funds that belong to plaintiffs and the class members, to this date.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs on behalf of themselves and the members of the Class, pray for judgment and relief against Defendants as follows:

A.      For an order certifying the Class and appointing plaintiffs and their counsel to represent the Class;

B.      For compensatory damages sustained by plaintiffs and the members of the Class as a result of Defendants' unlawful acts and conduct, including interest and any overdraft fees caused by Defendants' unlawful taking of consumers' money;

C.      For treble damages pursuant to 18 U.S.C. §1964(c);

D.      For restitution of all monies acquired by Defendants from plaintiffs and the Class as a result of Defendants' wrongful practices described above;

E.      For a declaration that plaintiffs and the class members did not enter into any membership contract with Defendants;

F.      For statutory and common law punitive damages to be awarded to plaintiffs and the members of the Class;

G.      For pre-judgment and post-judgment interest to be awarded to plaintiffs and the members of the Class;

H.     An order preliminarily and/or permanently enjoining Defendants from pursuing the policies, acts and practices complained of herein;

I.     An order of this Court ordering Defendants to immediately cease all acts of unfair competition and enjoin Defendants from continuing to conduct business via the unlawful, unfair or fraudulent business acts or practices as particularized herein;

J.     An order requiring Defendants to identify all class members and pay restitution to plaintiffs and all members of the Class so as to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, fraudulent or unfair business act or practice, in violation of applicable laws, statutes or regulations or constituting unfair competition or untrue or misleading advertising;

K.     An order of the Court requiring Defendants to disgorge all monies wrongfully collected that could not be returned to class members as alleged herein and all monies and profits derived by Defendants as a result of the wrongful, deceptive, unfair and/or unlawful acts, conduct and practices alleged above, and requiring disgorgement and/or imposing a trust upon Defendants' ill-gotten monies and freezing Defendants' assets;

L.     For the costs and expenses incurred in this action, including reasonable attorneys' fees and experts' fees; and

M.     For an order awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  September 28, 2009

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
FRANK J. JANECEK, JR.
JAMES A. CAPUTO
CHRISTOPHER COLLINS
CHRISTIE SURIEL


           s/ FRANK J. JANECEK, JR.
           FRANK J. JANECEK, JR.

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

LANDSKRONER • GRIECO • MADDEN, LLC
JACK LANDSKRONER
1360 West 9th Street, Suite 200
Cleveland, OH  44113
Telephone:  216/522-9000
216/522-9007 (fax)

LAW OFFICES OF ARTIE BARAN, APC
ARTIE BARAN
4545 Murphy Canyon Road, Suite 300
San Diego, CA  92123
Telephone:  858/560-5600
858/836-0318 (fax)

Attorneys for Plaintiffs

S:\CasesSD\Memberworks\MDL\CPT00061919_Consolidated.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 28, 2009, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on September 28, 2009.

s/ FRANK J. JANECEK, JR.
FRANK J. JANECEK, JR.

COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail: frankj@csgrr.com

# Mailing Information for a Case 1:09-vm-75000-PAG

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Marina V. Bogorad**
  marina.bogorad@skadden.com

- **James A. Caputo**
  jimc@csgrr.com

- **Christopher Collins**
  chrisc@csgrr.com

- **Robert J. Herrington**
  robert.herrington@skadden.com

- **Darrel J. Hieber**
  darrel.hieber@skadden.com

- **J. Russell Jackson**
  russell.jackson@skadden.com

- **Frank J. Janecek , Jr**
  frankj@csgrr.com

- **Matthew J. Kucharson**
  mkucharson@calfee.com

- **Jack Landskroner**
  jack@lgmlegal.com,debra@lgmlegal.com

- **Drew T. Legando**
  drew@lgmlegal.com

- **Thomas C. Merriman**
  tom@lgmlegal.com,carolyn@lgmlegal.com

- **Robert N. Rapp**
  rrapp@calfee.com,jdamian@calfee.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

Roger M. Adelman

1100 Connecticut Avenue, NW
Ste. 730
Washington, DC 20036

**Gerald T. Anglin**
Tommasino & Tommasino
Two Center Plaza
8th Floor
Boston, MA 02108

**Francis Joseph Balint**                                        **, Jr**
Bonnett Fairbourn Friedman & Balint PC
2901 N Central Ave
Ste 1000
Phoenix, AZ 85012-3311

**Artie Baran**
Law Offices of Artie Baran APC
4545 Murphy Canyon Rd
Ste 300
San Diego, CA 92123

**Mary Beth Clark**
Legal Aid Service of Broward County
491 N State Road 7
Plantation, FL 33317

**Stuart Andrew Davidson**
Coughlin Stoia Geller Rudman & Robbins LLP
120 East Palmetto Park Road
Suite 500
Boca Raton, FL 33432

**John E. Drury**
Ste. 303
1900 L Street, NW
Washington, DC 20036

**Lori Ann Fanning**
Miller Law LLC
115 South LaSalle Street
Suite 2910
Chicago, IL 60603

**Scott B. Fisher**
Jaspan, Schlesinger & Hoffman, LLP
300 Garden City Plaza
Garden City, NY 11530

**David J. George**
Coughlin Stoia Geller Rudman & Robbins LLP
120 E Palmetto Park Road
Suite 500
Boca Raton, FL 33432

**Eric M. Higgins**
Wofsey, Rosen, Kweskin & Kuriansky
600 Summer St.
Stamford, CT 06901-1490

**Robert M. Rothman**
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road
Suite 200
Melville, NY 11747

**Steven R. Schlesinger**
Jaspan, Schlesinger & Hoffman, LLP
300 Garden City Plaza, 5th Floor
Garden City, NY 11530

**Andrew Joseph Schwaba**
Wallace & Graham
525 N Main Street
Salisbury, NC 28144

**Christie Suriel**
Sprenger & Lang
Ste. 600
310 4th Avenue
Minneapolis, MN 55415

**Mona Lisa Wallace**
Wallace & Graham, PA
525 N. Main St.
Salisbury, NC 28144

**Daniel M. Young**
Wofsey, Rosen, Kweskin & Kuriansky
600 Summer St., 7th Floor
Stamford, CT 06901